















CAG   6/7/06   10:48
3:06-CV-00792   SAN DIEGO CITY OF V. GABRIEL ROEDER SMITH
*22*
*NTCLDG.*

Donald A. English, Esq.  (State Bar No. 115569)
Christy I. Yee, Esq.  (State Bar No. 166238)
ENGLISH & GLOVEN
A Professional Corporation
550 West "C" Street, Suite 1800
San Diego, California 92101
Telephone: (619) 338-6610
Facsimile: (619) 338-6657

Attorneys for Defendant
Gabriel, Roeder, Smith & Company

FILED

06 JUN -5 PH 3: 55

SOUTHERN DISTRICT OF CALIF.

BY: _____

DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CITY OF SAN DIEGO,<br><br>Plaintiff,<br><br>v.<br><br>GABRIEL, ROEDER, SMITH & COMPANY;<br>and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. 06CV0792 WQH (POR)<br><br>**DEFENDANT GABRIEL, ROEDER, SMITH & COMPANY'S NOTICE OF LODGMENT OF EXHIBITS IN OPPOSITION TO PLAINTIFF CITY OF SAN DIEGO'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT AND MOTION TO REMAND**<br><br>Date: June 19, 2006<br>Time: 11:00 a.m.<br>Judge: Hon. William Q. Hayes<br>Ctrm.: 4 |

Defendants Gabriel, Roeder, Smith & Company hereby lodge the following documents in opposition to plaintiffs the City of San Diego's motion for leave to file second amended complaint and motion to remand.

Exhibit 1:  City of San Diego's First Amended Complaint filed August 19, 2005.

Exhibit 2:  Complaint filed in <u>Gleason, et al. v. Gabriel, Roeder, Smith & Company, et al.,</u> San Diego Superior Court Case No. GIC849882, on June 28, 2005.

Exhibit 3:  Agreement between San Diego City Employees' Retirement System with Gabriel, Roeder, Smith & Company dated April 28, 1998.

Exhibit 4:  Amended Interim Report No. 6 dated July 1, 2005.

CASE NO. 06CV0792 WQH(POR)

| | |
|---|---|
| Exhibit 5: | Letter dated June 7, 2005 from Troy A. Dahlberg to Board of the San Diego City Employees' Retirement System. |
| Exhibit 6: | Search results from www.signonsandiego.com; June 8, 2005 and July 2, 2005 articles regarding GRS and Mr. Roeder. |
| Exhibit 7: | Portions of the Vinson & Elkins' Report dated September 16, 2004. |
| Exhibit 8: | Portions of the Redacted Settlement Demand Letter from Michael A. Conger dated October 28, 2005. |
| Exhibit 9: | Redacted Settlement Demand Letter from Heller Erhman dated December 8, 2005. |
| Exhibit 10: | Response of City of San Diego to Gabriel, Roeder, Smith Motion to Sever; and Declaration of Andra M. Donovan in Support served March 21, 2006. |
| Exhibit 11: | Reporter's Transcript of Proceedings dated March 27, 2006 |
| Exhibit 12: | Notice of Ruling on Gabriel, Roeder, Smith & Company's Motion for Severance. |
| Exhibit 13: | Letter dated April 6, 2006 from Donald A. English, Esq. to Michael J. Aguirre, Esq. and Donald A. McGrath, Esq. |
| Exhibit 14: | Complaint filed in Gleason, et al. v. San Diego City Employees' Retire System, San Diego Superior Court Case No. GIC803779. |
| Exhibit 15: | Notice of Removal filed April 5, 2006. |

Dated: June 5, 2006

ENGLISH & GLOVEN
A Professional Corporation


By: Donald A. English
    Donald A. English
    Christy I. Yee
    Attorneys for Defendant
    Gabriel, Roeder, Smith & Company



MICHAEL J. AGUIRRE, CITY ATTORNEY (CA BAR NO. 60402)
DONALD MCGRATH II, EXECUTIVE ASSISTANT CITY ATTORNEY (CA BAR NO. 44139)
Office of the City Attorney
1200 Third Avenue, Suite 1100
San Diego, California 92101-4100
Telephone: (619) 533-5800
Facsimile: (619) 533-5856

DAVID E. KLEINFELD (CA BAR NO. 110734)
BARRY J. TUCKER (CA BAR NO. 164163)
HELLER EHRMAN LLP
4350 La Jolla Village Drive, 7th Floor
San Diego, CA 92122-1246
TELEPHONE: (858) 450-8400
FACSIMILE: (858) 450-8499

Attorneys for Plaintiff
THE CITY OF SAN DIEGO

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SAN DIEGO

| | |
|---|---|
| THE CITY OF SAN DIEGO,<br><br>    Plaintiff,<br><br>    v.<br><br>CALLAN ASSOCIATES, INC., GABRIEL ROEDER SMITH & COMPANY, AND DOES 1-100,<br><br>    Defendants. | Case No.: GIC 852419<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br>**(1) PROFESSIONAL NEGLIGENCE**<br>**(2) INTENTIONAL FRAUD — AFFIRMATIVE MISREPRESENTATION**<br>**(3) INTENTIONAL FRAUD — CONCEALMENT**<br>**(4) UNFAIR COMPETITION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff The City of San Diego brings this complaint against defendants Callan Associates, Inc., Gabriel, Roeder, Smith & Co., and Does 1-100. San Diego seeks damages, recovery of the sums it has incurred as the employer contributor to the San Diego City Employees' Retirement System, and other relief resulting from the negligent and fraudulent conduct by each of the defendants named in this Complaint. San Diego alleges as follows:

/ / / /

/ / / /

ACCOUNTING

# I.    THE PARTIES AND JURISDICTION

1.    Plaintiff The City of San Diego ("San Diego" or "The City") is a municipal corporation with all municipal powers, functions, rights, privileges, and immunities authorized by the Constitution and laws of the State of California. As a "charter city" under Article XI of the California Constitution, the City has the power to make and enforce all ordinances and regulations with respect to municipal affairs. Charter provisions have the effect of legislative enactments, and charter city ordinances and regulations regarding municipal affairs prevail over state laws covering the same issues.

2.    Gabriel, Roeder Smith & Co. ("GRS") is a Michigan corporation having its principal place of business at 1 Towne Square, Suite 800, Southfield, Michigan 48076. GRS maintains an office at 9171 Towne Center, Suite 440, San Diego, California 92122. GRS does business in San Diego County and has sufficient contacts with this State to subject it to the personal jurisdiction of this Court.

3.    Callan Associates, Inc. ("Callan") is a California corporation having its principal place of business at 101 California Street, Suite 3500, San Francisco, California 94111. Callan does business in San Diego County and has sufficient contacts with this State to subject it to the personal jurisdiction of this Court.

4.    San Diego is ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of defendants Does 1 through 100, inclusive. Upon information and belief, each fictitious defendant is in some way responsible for, participated in, or contributed to, the matters and things of which San Diego complains herein, and in some fashion, has legal responsibility therefore. When San Diego ascertains the exact identity of each such fictitious defendant and the nature of such fictitious defendant's responsibility for, participation in, and contribution to, the matters and things herein alleged, San Diego will seek to amend this complaint to set forth the same.

////

////

////

2

## II. VENUE

5.     Venue is proper in San Diego County pursuant to section 395 of the California Code of Civil Procedure because all of the defendants do business in San Diego County and the facts which give rise to this litigation occurred in San Diego County.

## III. GENERAL ALLEGATIONS

### A.     THE RELATIONSHIP OF THE CITY AND SDCERS

6.     Section 141 of the City of San Diego City Charter (the "Charter") provides that the Council of the City is authorized and empowered by ordinance to establish a retirement system.

7.     The San Diego City Employees' Retirement System ("SDCERS" or "the System") is a multiple-employer, defined benefit plan established in 1927 by the City to provide retirement, disability, death, and retiree health benefits to its members and their beneficiaries.

8.     SDCERS is responsible for a) providing benefits to the retirement system participants and the beneficiaries, b) minimizing employer contributions thereto, and c) defraying reasonable expenses of administering the retirement system.

9.     In furtherance of and to support these objectives, the City has empowered a Board of Administration (the "Board") to retain consultants to assist SDCERS. These consultants assist SDCERS and the Board in a) providing benefits to the retirement system participants and the beneficiaries, b) minimizing employer contributions thereto, and c) defraying reasonable expenses of administering the retirement system.

10.     SDCERS' membership consists of employees of the three participating employers in the System: the City, the San Diego Unified Port District ("Port"), and the San Diego County Regional Airport Authority ("Airport"). Although SDCERS is a common administrative and investment agent for these employers, under Section 149 of the Charter, each respective employer adopts its own level of benefits and vesting schedule for its employees through its own plan. The funding status and required contributions are then determined separately for each employer plan.

3

11. The Plan for City employees ("city employee retirement fund") is by far the largest plan in SDCERS. As of June 30, 2004, SDCERS reported that the city employee retirement plan had valuation assets of $2.6 billion, the Port $141 million, and the Airport $16 million.

12. Pursuant to law, the City is responsible for making an annual contribution to the city employee retirement fund for the benefit of its employees and retired employees.

13. Section 143 of the Charter requires that: "The City shall contribute annually an amount substantially equal to that required of the employees for normal retirement allowances, as certified by [SDCERS'] actuary, but shall not be required to contribute in excess to that amount, except in the case of financial liabilities accruing under any new retirement plan or revised retirement plan because of past services of the employees. The mortality, services, experience or other table calculated by the actuary and the valuation determined by him and approved by the board shall be conclusive and final, and any retirement system established under this article shall be based thereon."

14. Pursuant to Section 145 of the Charter, all monies contributed by City employees or appropriated by the City Council to the retirement fund are placed in a special fund in the City Treasury called the "City Employees' Retirement Fund," a trust fund to be held and used only for the purpose of carrying out the provisions of Article IX of the Charter. Monies in the trust fund may not be merged with any other funds of the City.

15. Section 143 of the Charter prohibits any contracts or agreements that "delay[] full funding of City obligations to the system [SDCERS]."

16. Similarly, section 24.0801 of the San Diego Municipal Code ("Municipal Code") provides that the City must amortize within a period of 30 years "[a]ll deficiencies that occur due to the adoption of any Retirement Ordinances."

## B. SDCERS BOARD OF ADMINISTRATION AND THE HIRING OF THIRD-PARTY CONSULTANTS

17. SDCERS, a trust fund, is administered by 13 trustees (the "Trustees") who together comprise the Board of Administration.

////

4

18.    Section 144 of the Charter provides that the City's retirement system is to be managed by a Board of Administration.

19.    Prior to April 1, 2005, the Board consisted of: the City Manager; the City Auditor and Comptroller; the City Treasurer; three members of SDCERS elected by the general members; one member of SDCERS elected by the fire safety members; one member of SDCERS elected by the police safety members; one retired member of SDCERS elected by the retired membership; an officer of a local bank appointed by the City Council; and three other San Diego citizens appointed by the City Council. Each Board member served a six-year term on a staggered basis, with one term expiring each year.

20.    Section 144 of the Charter was amended by San Diego voters in November 2004 so that beginning April 1, 2005, the Board's membership changed. In addition to one Trustee elected by the police safety membership, one Trustee elected by the fire safety membership, and one Trustee elected by the retired membership, the Board now consists of: seven Trustees appointed by the Mayor and confirmed by the City Council who are neither City employees, SDCERS participants, nor City union representatives; two Trustees elected by the general membership; and one City management employee appointed by the City Manager. These Trustees serve staggered terms of four years.

21.    Beginning April 1, 2005, seven Trustees now constitute a quorum, and the concurring vote of seven Trustees is required for the Board to take any action. The seven Trustees appointed by the Mayor and confirmed by the City Council must have a college degree and at least 15 years of relevant professional experience.

22.    Section 145 of the Charter creates the Retirement Fund, into which "[a]ll moneys contributed" by the City are placed. These funds are held in the City Treasury.

23.    Section 144 of the Charter authorizes the Board to use some of these funds to hire third-party consultants to assist SDCERS.

24.    SDCERS hired GRS and Callan as third-party consultants pursuant to this provision.

////

////

5

25.     Section 144 of the Charter also directs the Board, through its investment advisors and consultants, to invest, in the name of SDCERS, monies held in trust by the city employee retirement fund.

26.     Section 144 of the Charter further provides that the Board shall be permitted to invest in additional classes or types of investments as are approved by resolution of the San Diego City Council.

27.     Municipal Code section 24.0911 provides that the Board's officers and all employees of the Retirement System shall comply promptly with all lawful requests for information by the City Council, the City Manager, the City Attorney, or their designees.

## C.     DEFENDANT GABRIEL, ROEDER, SMITH & COMPANY ("GRS")

### 1.     GRS' Relationship to SDCERS

28.     GRS is a professional services firm that provides actuarial and consulting services to a variety of businesses.

29.     GRS has a staff of more than 100 employees, with offices in California, Colorado, Florida, Illinois, Michigan, and Texas.

30.     GRS promotes itself as "dedicated to providing current and accurate information of use to the benefits community." GRS also promotes itself as "dedicated to providing services that encourage sound financing, innovative benefit design, efficient administration, and effective communication of employee benefits."

31.     Section 142 of the Charter requires that the Board retain a "competent actuary" with "expert or technical training."

32.     GRS has been the actuary for SDCERS from the early 1990's and continues in that role presently.

33.     In providing actuarial services to SDCERS during that time, Rick Roeder, a principal of GRS, has been the lead individual actuary.

34.     Section 142 of the Charter also provides that the SDCERS actuary submit to the Board "a report of the cost of establishing a general retirement system for all employees of The City of San Diego."

6

35.     Municipal Code section 24.1111 requires that the City's contribution to the retirement fund be an amount as determined by the SDCERS actuary pursuant to the annual actuarial evaluation performed by that actuary.

36.     Section 143 of the Charter provides that the SDCERS actuary certify as sufficient the City's annual contribution to the retirement system.

37.     As the principal actuary for SDCERS, for approximately the past 15 years, GRS has provided cost reports, set the amount that the City is required to contribute to SDCERS annually, and certified as sufficient, the City's annual contribution to the retirement system.

### 2.     GRS' Negligent and Fraudulent Conduct

#### a.     *GRS' Use of Corridor Funding Method for SDCERS*

38.     Beginning as early as 1996, GRS made the decision to adopt what is commonly referred to as the "corridor funding" method for determining the funding level of the City's annual contribution to SDCERS.

39.     The corridor funding method is a method of paying a certain rate into a retirement system as long as the funded ratio remains within a "corridor" range.

40.     The impact of using a corridor funding method is that if the payment amount falls below the acceptable funding floor, additional and larger contributions will be necessary—often in a short amount of time—to bring the system to a stable level.  The under-funding can result in a "net pension obligation," which is the difference between the annual cost of a pension plan and the employer's contributions to the plan.

41.     The Governmental Accounting Standards Board ("GASB"), the national policy-making body which publishes accounting rules and standards for governmental accounting, has never approved a corridor funding methodology as an acceptable accounting method for the setting of employer contributions to a pension fund like SDCERS.

42.     Since at least 1996 through 2004, GRS used the "corridor funding" method in order to set the City's employer contributions to SDCERS.  This resulted in the City contributing to the system at fixed annual rates that were below the actuarially required contribution rate.

/ / / /

7

43.   GRS used the corridor funding methodology even though GASB repeatedly told GRS, in direct response to petitions from GRS, that GASB did not find "corridor funding" to be an appropriate accounting method for entities like SDCERS.

44.   Indeed, from at least 1996 until 2001, GRS unsuccessfully petitioned the GASB to accept "corridor funding" as a sanctioned funding method for entities like SDCERS.

45.   Upon information and belief, GRS' continuous effort to seek approval from GASB for the "corridor funding" method was done to conceal the fact that GRS was setting a contribution level for the City to SDCERS that was not actuarially sound.

46.   Despite its knowledge that "corridor funding" was not a GASB-accepted funding method and that corridor funding understated the amount of the contribution that the City should have made to SDCERS using an appropriate, sanctioned actuarial method, GRS recommended to the Board on May 21, 1998, that corridor funding "is an excellent method for the City," and used the corridor funding method to set the City's contribution levels.

47.   Upon information and belief, GRS further knowingly misstated on May 21, 1998, that: "In the long term, we believe corridor funding will be SUPERIOR to Projected Unit Credit [PUC] funding because higher reserves to satisfy fund commitments will ultimately be built up."

48.   GRS knew that use of the "corridor funding" method was understating the City's contribution level and resulting in deficiencies in the city employee retirement fund.

49.   GRS concealed material facts from the City concerning the impact of the corridor funding method on the city employee retirement fund.

50.   Throughout the entire period of time that the corridor funding method has been in use, the City relied upon GRS' affirmative misrepresentations and half-truths that the corridor funding method was "SUPERIOR" and an "excellent method," and agreed to make annual contributions to SDCERS as set by GRS' calculations using the corridor funding method.

/ / / /

/ / / /

8

51.     Had the City known that the corridor funding method was not actuarially sound and would result in deficiencies in the pension fund system, it would have required GRS to use an actuarially sound method and would have made the required contributions on an actuarially sound basis.

52.     The City was damaged by GRS' negligence, affirmative misrepresentations and concealment of material facts in connection with GRS' use of the corridor funding method, as this has led to a deficit in the city employee retirement fund for which the City will be required to make additional employer contributions now and in the future.

### b.     *GRS' Use of Different Amortization Periods*

53.     In 1998, upon the recommendation of GRS, SDCERS adopted a 40-year amortization period for purposes of expensing and reporting its unfunded accrued actuarial liability ("UAAL").

54.     Amortization is the gradual reduction and elimination of an interest-bearing liability by paying or allocating that liability through a series of installments over time, as opposed to a lump-sum payment or allocation. The UAAL is the amount of shortfall between the actuarial value of pension plan assets and the actuarial accrued liability of the pension plan.

55.     Use of a longer amortization period obfuscates the gravity of the unfunded liability and understates the amount of contributions that are needed in the present to properly fund the unfunded liability.

56.     Despite the fact that GRS knew that the use of a 40-year amortization period was not actuarially sound, GRS nonetheless set the contribution rates for the City for unfunded liabilities on the basis of the 40-year amortization period.

57.     The City relied upon GRS' affirmative misrepresentations and half-truths that use of the 40-year amortization period was actuarially sound, and made annual contributions to SDCERS for unfunded liabilities as set by GRS' calculations that were based on the longer amortization period.

////

////

9

58. Had the City known that use of the 40-year amortization period was not actually sound and would result in deficiencies in the city employee retirement fund, it would have required GRS to use an actuarially sound method and would have made the required contributions on an actuarially sound basis.

59. As a result of GRS' negligent and intentional conduct, the City was harmed and it will be required to make additional employer contributions now and in the future.

### c. *GRS' Use of Actuarial "Smoothing" Method*

60. In FY 2001, the funded ratio of SDCERS was 89.9%, a decline from 97.3 % in FY 2000.

61. On September 19, 2002, GRS informed the Board of the 89.9% funding level.

62. Further declines in SDCERS' funded ratio were in part attributable to GRS' use of an actuarial "smoothing" method to calculate rates of return on fund assets.

63. Under GRS' actuarial "smoothing" method, GRS blended returns over a five-year period to conceal the full amount of loss in difficult years—for example, sharp declines in asset levels and resulting volatile contribution rates.

64. Throughout the entire period of time that GRS used this actuarial "smoothing" method, the City relied upon GRS' affirmative misrepresentations and half-truths that this methodology was actuarially sound, and agreed to make annual contributions to SDCERS as set by GRS' calculations using this methodology.

65. Upon information and belief, GRS used the actuarial "smoothing" method to conceal the true nature of the plummeting funding ratio of SDCERS.

66. Had the City known that use of the actuarial "smoothing" method was not actuarially sound and would result in deficiencies in the city employee retirement fund, it would have required GRS to use an actuarially sound method and would have made the required contributions on an actuarially sound basis.

67. As a result of GRS' conduct, the City was harmed and will be required to make additional employer contributions now and in the future.

////

10

### d. *GRS' Misconduct in Connection with MP I*

68.     On or about June 21, 1996, SDCERS, through its Board, desired to enter into an employer contribution deferral contract, commonly referred to as Manager's Proposal I ("MP I"), with the City. The purpose of the MP I agreement was to increase the pension benefits to be paid to beneficiaries of SDCERS, specifically including certain members of the Board of SDCERS. As a result of MP I, the City contributed hundreds of millions of dollars less to the SDCERS pension trust fund than was legally required under the California Constitution, Charter section 143, and Municipal Code section 24.0801.

69.     In connection with MP I, the San Diego City Council adopted ordinances that enhanced the retirement benefits of City employees and created millions of dollars of new pension benefits.

70.     The new or enhanced benefits included a significant increase in the formula for calculating the basic pension benefit, as the multiplier for general members increased from 1.45% to 2.00% per creditable year of service; expansion of the "Purchase Service Credit;" and the agreement of the City to implement a Deferred Retirement Option Plan ("DROP"), which would permit employees who have reached their maximum benefit level to receive a lump sum payment upon retirement in exchange for forgoing accrual of all other benefits under SDCERS.

71.     On or about June 21, 1996, a majority of SDCERS Trustees voted in favor of a motion to adopt MP I and/or to enter into a formal written agreement adopting MP I. The motion passed.

72.     At the time of passage of MP I, GRS knew or had reason to know that MP I created a pension funding scheme that was not actuarially sound, and that would ultimately result in a substantial increase to the City's employer contributions to SDCERS.

73.     GRS endorsed MP I in 1996, despite knowing that the funding level would drop below the trigger point of 82.3% for MP I in 5-6 years.

74.     GRS concealed material facts about the changes to the retirement system resulting from MP I. Specifically, GRS concealed that the City had ceased contributing to SDCERS

11

on an actuarily sound basis. GRS also concealed that the reduced City contribution would have a negative impact on the investment value and funding ratio of SDCERS.

75. The City relied upon GRS' affirmative misrepresentations and half-truths in deciding to approve ordinances implementing MP I.

76. Had the City known that adoption of MP I was not actuarily sound and would result in deficiencies in the city employee retirement fund, it would have required GRS to use an actuarily sound method and would have made the required contributions on an actuarily sound basis.

77. Had the City known that voting the increased pension benefits of MP I would lead to deficiencies in the city employee retirement fund, it would not have approved the ordinances implementing MP I or it would have fully funded such benefits.

78. The actions of GRS concealed the funding shortfall. As a result of GRS' conduct, the City has been harmed and will be required to make additional employer contributions now and in the future.

### e. *GRS' Misconduct in Connection with MP II*

79. On or about November 18, 2002, SDCERS, through its Board, decided to enter into a second employer contribution deferral contract with the City, commonly referred to as Manager's Proposal II ("MP II"). MP II was an expansion of the MP I scheme detailed above. The purpose of the MP II agreement was to substantially increase the pension benefits to be paid to beneficiaries of SDCERS, specifically including certain members of the Board of SDCERS. As a result of MP II, the City contributed hundreds of millions of dollars less to the SDCERS pension trust fund than was legally required under California Constitution, Charter section 143, and Municipal Code section 24.0801.

80. The new or enhanced benefits included an increase in the basic multiplier for retirement benefits for general employees to 2.5% at age 55, meaning that the cost of the basic retirement benefit would increase 25% over a two-year period; an agreement that the City Manager would propose to the Board that the Board transfer $25 million from surplus

////

1  earnings into a reserve to fund the healthcare benefit in future years when earnings were
2  insufficient to do so; and an agreement that changes in actuarial assumptions during the MP
3  II period would not affect the City's contributions until FY 2010.

4  81.    In connection with MP II, the San Diego City Council adopted ordinances that
5  enhanced the retirement benefits of City employees and created millions of dollars of new
6  pension benefits.

7  82.    On November 5, 2002, GRS gave its written approval to the Board for adoption of
8  MP II, stating that the Board's exercise of judgment was "reasonable."

9  83.    However, GRS concealed material facts about the changes to the retirement system
10  resulting from MP II. Specifically, GRS concealed that the City had ceased contributing to
11  SDCERS on an actuarially sound basis. GRS also concealed that the reduced City
12  contribution would have a negative impact on the investment value and funding ratio of
13  SDCERS.

14  84.    In addition, GRS intentionally and negligently misstated and misreported the annual
15  actuarial valuation of SDCERS as of June 30, 2001. GRS reported that the City's funded
16  ratio for SDCERS as of June 30, 2001 was 89.9%.

17  85.    Upon information and belief, GRS knew that the City of San Diego's funded ratio
18  for SDCERS was significantly less than 89.9%, but intentionally and negligently reported
19  the erroneous higher valuation.

20  86.    The funded ratio of SDCERS (after MP II had already been adopted) was reported
21  as 77.3% as of June 30, 2002—a precipitous decline from the prior year's report of 89.9%.

22  87.    The City relied upon GRS' affirmative misrepresentations and half-truths in deciding
23  to approve ordinances implementing MP II.

24  88.    Had the City known that adoption of MP II was not actuarially sound and would
25  result in deficiencies in the city employee retirement fund, it would have required GRS to
26  use an actuarially sound method and would have made the required contributions on an
27  actuarially sound basis.

28  / / / /

13

89. Had the City known that voting the increased pension benefits of MP II would lead to deficiencies in the city employee retirement fund, it would not have approved the ordinances implementing MP II or it would have fully funded such benefits.

90. The actions of GRS concealed the funding shortfall. As a result of GRS' conduct, the City has been harmed and will be required to make additional employer contributions now and in the future.

<strong>f. <em>GRS' Fraudulent and Negligent Endorsement of the Financial Health of SDCERS</em></strong>

91. On January 9, 1997, in its annual actuarial valuation for FY 1996, GRS stated: "Overall, we believe the City's Retirement System to be in sound condition in accordance with actuarial principles of level-cost financing."

92. However, for at least the reasons alleged throughout this Complaint, GRS knew that SDCERS was not in "sound condition" at the time it presented this conclusion to the Board.

93. Specifically, GRS concealed that the City had ceased contributing to SDCERS on an actuarially-determined basis, and was instead contributing on a basis of an agreement entered into between the Trustees and the City as described in MP I. GRS also concealed that the reduced City contribution would have a negative impact on the investment value and funding ratio of SDCERS.

94. On January 16, 1998, in its annual actuarial valuation for FY 1997, GRS stated: "Overall, we believe the City's Retirement System to be in sound condition in accordance with actuarial principles of level-cost financing."

95. However, for at least the reasons alleged throughout this Complaint, GRS knew that SDCERS was not in "sound condition" at the time it presented this conclusion to the Board.

96. Specifically, GRS concealed that the City had ceased contributing to SDCERS on an actuarially-determined basis, and was instead contributing on a basis of an agreement entered into between the Trustees and the City as described in MP I. GRS also concealed that the reduced City contribution would have a negative impact on the investment value and funding ratio of SDCERS.

14

97. On May 15, 1999, in its annual actuarial valuation for FY 1998, GRS stated: "Overall, we believe the City's Retirement System continues to be in sound condition in accordance with actuarial principles of level-cost financing."

98. However, for at least the reasons alleged throughout this Complaint, GRS knew that SDCERS was not in "sound condition" at the time it presented this conclusion to the Board.

99. Specifically, GRS concealed that the City had ceased contributing to SDCERS on an actuarially-determined basis, and was instead contributing on a basis of an agreement entered into between the Trustees and the City as described in MP I. GRS also concealed that the reduced City contribution would have a negative impact on the investment value and funding ratio of SDCERS.

100. On February 14, 2000, in its annual actuarial valuation for FY 1999, GRS stated: "Overall, we believe the City's Retirement System continues to be in sound condition in accordance with actuarial principles of level-cost financing."

101. However, for at least the reasons alleged throughout this Complaint, GRS knew that SDCERS was not in "sound condition" at the time it presented this conclusion to the Board.

102. Specifically, GRS concealed that the City had ceased contributing to SDCERS on an actuarially-determined basis, and was instead contributing on a basis of an agreement entered into between the Trustees and the City as described in MP I. GRS also concealed that the reduced City contribution would have a negative impact on the investment value and funding ratio of SDCERS.

103. On March 8, 2001, in its annual actuarial valuation for FY 2000, GRS stated: "Overall, we believe the City's Retirement System continues to be in sound condition in accordance with actuarial principles of level-cost financing."

104. However, for at least the reasons alleged throughout this Complaint, GRS knew that SDCERS was not in "sound condition" at the time it presented this conclusion to the Board.

105. Specifically, GRS concealed that the City had ceased contributing to SDCERS on an actuarially-determined basis, and was instead contributing on a basis of an agreement entered into between the Trustees and the City as described in MP I. GRS also concealed

15

1 that the reduced City contribution would have a negative impact on the investment value
2 and funding ratio of SDCERS.

3 106. On February 12, 2002, in its annual actuarial valuation for FY 2001, GRS stated:
4 "Overall, we believe the City's Retirement System continues to be in sound condition in
5 accordance with actuarial principles of level-cost financing."

6 107. However, for at least the reasons alleged throughout this Complaint, GRS knew that
7 SDCERS was not in "sound condition" at the time it presented this conclusion to the Board.

8 108. Specifically, GRS concealed that the City had ceased contributing to SDCERS on an
9 actuarially-determined basis, and was instead contributing on a basis of an agreement
10 entered into between the Trustees and the City as described in MP I. GRS also concealed
11 that the reduced City contribution would have a negative impact on the investment value
12 and funding ratio of SDCERS.

13 109. On January 9, 2003, in its annual actuarial valuation for FY 2002, GRS stated:
14 "Overall, the financial condition of the retirement system is in adequate condition in
15 accordance with actuarial principles of level-cost financing."

16 110. However, for at least the reasons alleged throughout this Complaint, GRS knew that
17 SDCERS was not in "adequate condition" at the time it presented this conclusion to the
18 Board.

19 111. For example, the funded ratio of SDCERS had dropped markedly to 77.3% for FY
20 2002, well below the trigger level for full repayment.

21 112. In addition, GRS concealed that the City had ceased contributing to SDCERS on an
22 actuarially-determined basis, and was instead contributing on a basis of an agreement
23 entered into between the Trustees and the City as described in MP I. GRS also concealed
24 that the reduced City contribution would have a negative impact on the investment value
25 and funding ratio of SDCERS.

26 113. The City relied upon GRS' repeated affirmative misrepresentations and half-truths in
27 the annual actuarial valuations from FY 1996 to FY 2002 that the pension fund system was
28 in "sound condition" or "adequate condition."

16

114. Had the City known the true nature of the financial health of SDCERS, the City would have required GRS to use an actuarially sound method and would have made the required contributions on an actuarially sound basis.

115. The actions of GRS also concealed the funding shortfall. As a result of GRS' conduct, the City has been harmed and will be required to make additional employer contributions now and in the future.

## D. DEFENDANT CALLAN ASSOCIATES ("CALLAN")

### 1. Callan's Relationship to SDCERS

116. Callan Associates ("Callan") is a professional services firm that provides investment consulting services to a variety of pension funds, both public and corporate.

117. Callan promotes itself as "one of the oldest firms in institutional consulting, bringing more than a quarter-century of investment expertise to each client relationship."

118. Callan also notes in promotional materials that its sole aim is to "help our clients achieve their goals by providing unbiased, relevant information and advice."

119. Callan has stated that it represents over 150 investment management firms who are responsible for more than $7 trillion in assets, and range in size from less than $100 million to over $700 billion in assets under management.

120. Section 144 of the Charter provides that the Board shall have exclusive control of "investment of such fund or funds as may be established" in the retirement system.

121. Municipal Code section 24.0901 permits the Board to retain "independent investment counselors as needed to provide professional services to support the Board's investment responsibilities."

122. Callan was hired by the SDCERS Board in 1982 as SDCERS' investment consultant, pursuant to the City granting SDCERS the authority to hire consultants.

123. The original scope of Callan's services consisted of providing investment advice as the sole investment consultant for SDCERS.

124. Callan's original duties included: 1) providing investment performance measurement reviews and reports; 2) performing quarterly reviews of investment transactions; 3)

17

1  providing input on new programs, procedures and policies concerning other investment

2  opportunities for the purpose of improving performance of the fund; and 4) performing all

3  other services normally rendered by investment performance measurement consultants as

4  the Board requested.

5  125.   Callan's duties expanded over ensuing years. In 1985, Callan started performing

6  asset manager searches for SDCERS.

7  126.   In 1988, Callan took on the additional responsibility of providing attribution analysis

8  on the performance of SDCERS' prior investment managers.

9  127.   In 1989, Callan became the investment manager liaison for SDCERS (making it

10  responsible for all fee negotiations, development and review of manager contracts and

11  specific investment guidelines, and management of asset transitions among managers). At

12  approximately the same time, Callan became responsible for manager peer group

13  performance reporting; asset allocation and liability modeling; investment policy and

14  guidelines statement development; and organizing and conducting educational seminars.

15  128.   Callan also currently provides a full Asset Allocation and Liability Study each three

16  to five years to evaluate the current allocation and target allocation for SDCERS.

17  129.   Callan's current duties also include providing information and data that assists

18  SDCERS in the analysis of alternative allocation schemes.

19  130.   Callan is also charged with providing in-depth monitoring services for SDCERS as a

20  whole, as well as for each individual investment manager.

21  131.   In short, Callan is the primary investment manager of SDCERS and the principal

22  overseer of investment decisions made for the benefit of the city employee retirement fund,

23  and for the purpose of minimizing employer contributions to the fund.

24      2.    **Callan's Negligent Conduct**

25          a.    ***Callan's Failure To Perform Competently as the Principal***
                  ***Investment Overseer of the City Employee Retirement Fund***

26

27  132.   The manner in which the city employee retirement fund is invested is governed by

28  Investment Policy Guidelines. These guidelines require that investment managers for

18

SDCERS rank in the top 40% of managers investing in a similar style during a three to five year period and rank in the top 40% of the total universe of equity managers during a three to five year period.

133. Callan was involved in the writing of these guidelines and is required to follow them when it recommends the selection of investment managers for the city employee retirement fund.

134. Upon information and belief, Callan recommended use of investment managers that did not rank in the top 40% of equity managers during a three to five year period. Many of these investment managers were hired to help manage the investments of the city employee retirement fund at Callan's urging.

135. For example, Callan referred Lincoln Capital Management ("Lincoln") to SDCERS despite Lincoln's poor performance record.

136. Upon information and belief, at the time Callan recommended Lincoln Capital Management, Callan knew that Lincoln Capital Management was ranked in the bottom 8% of its category in 2001 and in the bottom 12% of its category the previous three years.

137. Callan failed to recommend that SDCERS remove poor performers such as Lincoln from their positions working for SDCERS.

138. The City relied on Callan's recommendations and referrals when investing the funds held in the city employee retirement fund.

139. Callan concealed its negligence by failing to provide information when requested by SDCERS' Board members about these poor investment managers.

140. Because of Callan's negligence in selecting poor-performing investment managers to SDCERS, many of whom did not meet the criteria of the investment policy guidelines, the City has been harmed and will be required to make additional employer contributions to the city employee retirement fund now and in the future.

### b. *Callan's Pay to Play Scheme*

141. In selecting which investment managers to refer to SDCERS, Callan employed what is commonly referred to as a "pay to play" scheme.

19

142. Upon information and belief, under Callan's "pay to play" scheme, Callan recommended that SDCERS employ investment managers from whom Callan received under-the-table fees that were not disclosed to the City.

143. Upon information and belief, these fees were paid to Callan under the guise that Callan was providing educational or consulting services to these investment managers.

144. Upon information and belief, in 2002, Callan's referrals to SDCERS of large-cap growth investment managers consisted entirely of candidates who had purchased educational and/or consulting services from Callan.

145. Upon information and belief, from an original pool of 339 candidates of large-cap growth managers, six candidates were recommended for hire by Callan.

146. Upon information and belief, the large-cap growth investment managers Callan recommended to SDCERS had paid as much as $500,000 to Callan for so-called educational and/or consulting services.

147. Upon information and belief, four of the six investment managers Callan recommended were also members of an organization set up by Callan called the Callan Institute. Upon information and belief, these four investment managers paid another $188,000 annually to be members of the Callan Institute.

148. Upon information and belief, Callan was asked by at least one SDCERS Board member in 2002 to provide information regarding the process by which these six large-cap growth managers were selected and Callan categorically refused to provide the information.

149. Callan further concealed the fact that its referrals were not based solely on Callan's professional assessment of investment managers' suitability for SDCERS' investment needs, but rather that its referrals were based on this "pay to play" scheme.

150. Had the City known that Callan was employing managers based on how much money Callan was receiving from these investment managers, rather than on their suitability as managers for the city employee retirement fund, the City would have required Callan to disclose its conflicts of interests and employ only unbiased methods for selecting and recommending managers.

20

151.    The City relies on Callan as principal investment consultant to SDCERS to provide professional, unbiased and proper recommendations in stewardship of the city employee retirement fund.

152.    The City has been harmed by Callan's failure to provide unconflicted advice, and the City will be required to make additional employer contributions to the city employee retirement fund now and in the future as a result of Callan's conduct.

### c.    *Brokerage Firm Benefits*

153.    Callan has received financial or other benefits in exchange for encouraging SDCERS' investment managers to trade through selected brokerage firms.

154.    Callan has failed to disclose its financial relationships with such brokerage firms and the benefits it has received from these relationships.

155.    Callan's failure to disclose such relationships has harmed the City, as Callan's professional judgments have been compromised by Callan's own pecuniary self-interest.

156.    Because of Callan's unlawful conduct, the City has been harmed and will be required to make additional employer contributions now and in the future.

### FIRST CAUSE OF ACTION -
### PROFESSIONAL NEGLIGENCE
### (Against GRS and DOES)

157.    The City incorporates by reference and realleges paragraphs 1 through 115 as though fully set forth herein.

158.    As a professional actuarial firm, GRS had a duty to use the skill, prudence and diligence as other members of the actuarial profession commonly possess and exercise.

159.    GRS breached that duty by, *inter alia*: a) using the "corridor funding" method; b) using a 40-year amortization period for unfunded liabilities; c) using the actuarial "smoothing" method; d) endorsing MP I and not disclosing its true impact; and e) endorsing MP II and not disclosing its true impact.  GRS also breached its duty of care by failing to disclose the true financial health of SDCERS.

160.    GRS' negligent conduct was a direct and proximate cause of the City's injury.

/ / / /

21

161. As a result of GRS' negligent conduct, the City has suffered substantial loss and injury in an amount according to proof at trial.

162. The City recently discovered the facts alleged herein. After doing so, it promptly commenced an investigation of those facts and initiated this lawsuit. The City could not have reasonably learned of the magnitude of GRS' negligence earlier or otherwise have been put on notice of the negligence at an earlier date because GRS affirmatively misrepresented to and concealed from the City the true facts alleged herein. In addition, GRS' conduct has been ongoing and continues. Accordingly, any applicable statute of limitations period has been tolled and/or GRS is estopped from asserting a statute of limitations defense based on its affirmative misrepresentations or unlawful concealment.

## SECOND CAUSE OF ACTION -
## INTENTIONAL FRAUD - AFFIRMATIVE MISREPRESENTATION
### (Against GRS and DOES)

163. The City incorporates by reference and realleges paragraphs 1 through 115 and 159 through 162 as though fully set forth herein.

164. GRS engaged in affirmative misrepresentations to the City. These misrepresentations included, *inter alia*, statements concerning the propriety and actuarial soundness of: a) using the "corridor funding" method; b) using a 40-year amortization period for unfunded liabilities; c) using the actuarial "smoothing" method; d) MP I; and e) MP II. GRS also made numerous affirmative misrepresentations about the financial health of SDCERS.

165. GRS knew that its representations to the City were false, and GRS intended to induce the City to rely upon those misrepresentations.

166. The City reasonably and actually relied on GRS' misrepresentations discussed more fully above.

167. As a direct and proximate result of GRS' actions, the City has suffered substantial loss and injury in an amount according to proof at trial.

/ / / /

22

168. The City recently discovered the facts alleged herein. After doing so, it promptly commenced an investigation of those facts and initiated this lawsuit. The City could not have reasonably learned of the magnitude of GRS' fraud earlier or otherwise have been put on notice of the fraud at an earlier date because GRS affirmatively misrepresented to and concealed from the City the true facts alleged herein. In addition, GRS' conduct has been ongoing and continues. Accordingly, any applicable statute of limitations period has been tolled and/or GRS is estopped from asserting a statute of limitations defense based on its affirmative misrepresentations or unlawful concealment.

### THIRD CAUSE OF ACTION -
### INTENTIONAL FRAUD - CONCEALMENT
#### (Against GRS and DOES)

169. The City incorporates by reference and realleges paragraphs 1 through 115, 158 through 162, and 164 through 168 as though fully set forth herein.

170. GRS intentionally concealed material facts about the propriety and actuarial soundness of, *inter alia*: a) using the "corridor funding" method; b) using a 40-year amortization period for unfunded liabilities; c) using the actuarial "smoothing" method; d) MP I; and e) MP II. GRS also concealed numerous material facts about the financial health of SDCERS.

171. GRS was under a duty to tell the complete truth about the actuarial soundness of SDCERS, and not engage in obfuscation, half-truths, and omissions.

172. At the time of the concealment, GRS intended for the City to rely upon GRS' obfuscation, half-truths, and omissions. In concealing material facts, GRS intended to defraud the City.

173. The City reasonably and actually relied on GRS' obfuscation, half-truths, and omissions discussed more fully above.

174. Had the City known these concealed facts, it would have required GRS to use actuarially sound methods, it would made the required contributions on an actuarially sound basis, and it would not have agreed to enter into MP I or MP II.

////

23

175. As a direct and proximate result of GRS' actions, the City has suffered substantial loss and injury in an amount according to proof at trial.

176. The City recently discovered the facts alleged herein. After doing so, it promptly commenced an investigation of those facts and initiated this lawsuit. The City could not have reasonably learned of the magnitude of GRS' fraud earlier or otherwise have been put on notice of the fraud at an earlier date because GRS affirmatively misrepresented to and concealed from the City the true facts alleged herein. In addition, GRS' conduct has been ongoing and continues. Accordingly, any applicable statute of limitations period has been tolled and/or GRS is estopped from asserting a statute of limitations defense based on its affirmative misrepresentations or unlawful concealment.

**FOURTH CAUSE OF ACTION -
PROFESSIONAL NEGLIGENCE
(Against Callan and DOES)**

177. The City incorporates by reference and realleges paragraphs 1 through 27 and 116 through 156 as though fully set forth herein.

178. As a professional investment consulting firm, Callan had a duty to use the skill, prudence and diligence as other members of the investment consulting profession commonly possess and exercise.

179. Callan breached that duty by, *inter alia*: a) referring poor-performing investment managers, such as Lincoln, to SDCERS, even though such investment managers did not meet SDCERS' investment needs; b) referring investment managers based on a "pay to play" system, rather than basing referrals solely on SDCERS' investment needs; c) failing to avoid conflicts of interest which could compromise the integrity of Callan's advice to SDCERS; and d) failing to fully disclose all conflicts of interest which could compromise the integrity of Callan's advice to SDCERS.

180. Callan's negligent conduct was a direct and proximate cause of the City's injury.

181. As a result of Callan's negligent conduct, the City has suffered substantial loss and injury in an amount according to proof at trial.

24

182. The City recently discovered the facts alleged herein. After doing so, it promptly commenced an investigation of those facts and initiated this lawsuit. The City could not have reasonably learned of the magnitude of Callan's negligence earlier or otherwise have been put on notice of the negligence at an earlier date because Callan affirmatively misrepresented to and concealed from the City the true facts alleged herein. In addition, Callan's conduct has been ongoing and continues. Accordingly, any applicable statute of limitations period has been tolled and/or Callan is estopped from asserting a statute of limitations defense based on its affirmative misrepresentations or unlawful concealment.

## FIFTH CAUSE OF ACTION -
## UNFAIR COMPETITION
### (California Business & Professions Code § 17200 et seq.)
### (Against GRS and DOES)

183. The City incorporates by reference and realleges paragraphs 1 through 115, 158 through 162, 164 through 168, and 170 through 176 as though fully set forth herein.

184. GRS' fraudulent and negligent conduct, as alleged herein, constitutes unfair competition in violation of § 17200 et seq. of the Business and Professions Code.

185. As a direct and proximate result of GRS' wrongful conduct, the City has been damaged.

186. The City recently discovered the facts alleged herein. After doing so, it promptly commenced an investigation of those facts and initiated this lawsuit. The City could not have reasonably learned of the magnitude of GRS' unfair competition earlier or otherwise have been put on notice of the unfair competition at an earlier date because GRS affirmatively misrepresented to and concealed from the City the true facts alleged herein. In addition, GRS' conduct has been ongoing and continues. Accordingly, any applicable statute of limitations period has been tolled and/or GRS is estopped from asserting a statute of limitations defense based on its affirmative misrepresentations or unlawful concealment.

FIRST AMENDED COMPLAINT

## SIXTH CAUSE OF ACTION -
## UNFAIR COMPETITION
### (California Business & Professions Code § 17200 *et seq.*)
### (Against Callan and DOES)

187.   The City incorporates by reference and realleges paragraphs 1 through 27, 116 through 156, and 178 through 182 as though fully set forth herein.

188.   Callan's negligent conduct, as alleged herein, constitutes unfair competition in violation of § 17200 *et seq.* of the Business and Professions Code.

189.   As a direct and proximate result of Callan's wrongful conduct, the City has been damaged.

190.   The City recently discovered the facts alleged herein. After doing so, it promptly commenced an investigation of those facts and initiated this lawsuit. The City could not have reasonably learned of the magnitude of Callan's unfair competition earlier or otherwise have been put on notice of the unfair competition at an earlier date because Callan affirmatively misrepresented to and concealed from the City the true facts alleged herein. In addition, Callan's conduct has been ongoing and continues. Accordingly, any applicable statute of limitations period has been tolled and/or Callan is estopped from asserting a statute of limitations defense based on its affirmative misrepresentations or unlawful concealment.


## PRAYER FOR RELIEF

WHEREFORE, the City prays for judgment and damages against each defendant as follows:

1. For general damages according to proof;

2. For special damages according to proof;

3. For punitive damages for intentional fraud;

4. For a permanent injunction prohibiting the defendants from engaging further in the wrongful conduct alleged herein;

5. For disgorgement of profits, unjust enrichment and restitution;

26

6. For civil penalties pursuant to § 17200 *et seq.* of the Business and Professions Code;

7. For attorney's fees according to proof;

8. For the costs of suit herein; and

9. For such other and further relief as the court deems just and proper.

August 18, 2005

Respectfully submitted,

THE CITY OF SAN DIEGO

MICHAEL J. AGUIRRE, City Attorney

By _____
DON MCGRATH, Executive Assistant City Attorney

HELLER EHRMAN LLP

By _David E. Kleinfeld_____
DAVID E. KLEINFELD

Attorneys for Plaintiff The City of San Diego

////
////
////
////
////
////
////
////

27

## DEMAND FOR JURY TRIAL

The City of San Diego demands a trial by jury on all counts of this Complaint.

August 18, 2005

Respectfully submitted,

THE CITY OF SAN DIEGO

MICHAEL J. AGUIRRE, City Attorney

By _____
DON MCGRATH, Executive Assistant City Attorney

HELLER EHRMAN LLP

By _____
DAVID E. KLEINFELD

Attorneys for Plaintiff The City of San Diego

28



1    **MICHAEL A. CONGER, ESQUIRE**  (State Bar #147882)
    **LAW OFFICE OF MICHAEL A. CONGER**

2    16236 San Dieguito Road, Suite 4-14
    Mailing: P.O. Box 9374

3    Rancho Santa Fe, California 92067
    Telephone: (858) 759-0200

4    Facsimile: (858) 759-1906

5    Attorneys for Plaintiffs JAMES F. GLEASON,
    DAVID W. WOOD, and WILLIAM J. McGUIGAN,

6

7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              FOR THE COUNTY OF SAN DIEGO

10   JAMES F. GLEASON, DAVID W. WOOD, and      )    CASE NO: GIC   **849882**
    WILLIAM J. McGUIGAN,

11                        )

12            Plaintiffs,         )    COMPLAINT FOR FRAUD BY
                       )    CONCEALMENT AND

13   v.                        )    NEGLIGENCE
                       )

14   GABRIEL, ROEDER, SMITH & COMPANY,      )
    RICK A. ROEDER, and DOES 1-30,         )

15           Defendants.        )

16    _____ )

17        1.      The plaintiffs in this action are former employees of the City of San Diego ("the

18   City") who have acquired vested contractual rights to receive pension and related benefits from

19   the San Diego City Employees' Retirement System ("SDCERS"). Each of the plaintiffs is a

20   member of SDCERS.

21        2.      SDCERS is a public entity established in 1927 by the City, in accordance with

22   California Constitution article XVI, section 17, San Diego City Charter articles IX and X,

23   sections 141 to 148.1, and San Diego Municipal Code sections 24.0100, *et seq.* SDCERS

24   administers the City's defined benefit pension plan, and provides retirement, health insurance,

25   disability and death benefits to its members.

26        3.      GABRIEL, ROEDER, SMITH & COMPANY ("GRS"), is a Michigan

27   Corporation doing substantial business in the City, including providing actuarial services to

28

1

1    SDCERS and its members, including plaintiffs.

2         4.    RICK A. ROEDER ("Roeder") resides in San Diego County, California, is a

3    managing agent of GRS, and was at all times relevant to this complaint the principal actuary

4    providing actuarial services to SDCERS and its members, including plaintiffs.

5         5.    The true names or capacities, whether individual, corporate, associate, or

6    otherwise, of defendants DOES 1 to 30, inclusive, are unknown to plaintiffs, who therefore sue

7    said defendants by such fictitious names.

8         6.    Plaintiffs are informed and believe and thereon allege that each of the defendants

9    designated herein as a DOE is responsible in some manner for the events and happenings herein

10   referred to, and caused injury and damages proximately thereby to plaintiffs as herein alleged.

11   Plaintiffs will seek leave of court to amend this complaint to set forth the true names and

12   capacities of such named defendants when their identities become known to them.

13        7.    Plaintiffs are informed and believe and thereon allege that each defendant named

14   in this action, including DOE defendants, at all relevant times, was the agent, ostensible agent,

15   servant, employee, representative, assistant, joint venturer, and/or co-conspirator of each of the

16   other defendants, and was at all times acting within the course and scope of his, her, or its

17   authority as agent, ostensible agent, servant, employee, representative, joint venturer, and/or

18   co-conspirator, and with the same authorization, consent, permission or ratification of each of the

19   other defendants.

20        8.    The plaintiffs have a vested contractual right to an actuarially sound retirement

21   system. (*Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1131-1137.)

22        9.    Impairment of the plaintiffs' right to an actuarially sound retirement system is

23   unconstitutional. (*Board of Administration v. Wilson, supra*, 52 Cal.App.4th at p. 1161.)

24        10.   SDCERS owes each plaintiff a fiduciary duty.

25        11.   "The assets of a public pension or retirement system are trust funds and [are] held

26   for the exclusive purposes of providing benefits to participants in the pension or retirement

27   system and their beneficiaries and defraying reasonable expenses of administering the system."

28                                      2

30

1  (Cal. Const., art. XVI, § 17, subd. (a).)

2      12.    "A retirement board's duty to its participants and their beneficiaries shall take

3  precedence over any other duty." (Cal. Const., art. XVI, § 17, subd. (b).)

4      13.    From at least November 1, 2002, to the present, the defendants provided actuarial

5  services to SDCERS, in its capacity as the trustee of the plaintiffs pension trust fund.

6      14.    On November 15, 2002, SDCERS agreed to an underfunding scheme, commonly

7  known as Manager's Proposal II, which allowed the City to massively underfund the City

8  employee pension system administered by SDCERS. A key component of this scheme was for

9  the City to provide a financial benefit to certain key members of the SDCERS board of

10  administration so that they would vote in favor of Manager's Proposal II. This was a

11  constructive fraud and a breach by those trustees of their fiduciary duties to the plaintiffs.

12      15.    The defendants actively participated with, aided, and abetted in SDCERS' breach

13  of trust by concealing that Manager's Proposal II would render the City's employee pension trust

14  fund actuarially unsound.

15      16.    The defendants participated with, aided, and abetted in SDCERS's breach of trust

16  for defendants' own financial gain.

17      17.    The defendants also concealed their participation and assistance with SDCERS'

18  breach of trust.

19      18.    SDCERS has been unwilling to prosecute this action to recover assets belonging

20  to the trust.

21      19.    This action is brought in the public interest because members of the public,

22  including citizens of and visitors to the City of San Diego, benefit from a solvent pension system

23  which (a) keeps promises to loyal public servants and therefore promotes public service, (b)

24  reduces the specter of insolvency of the pension fund administered by SDCERS' board of

25  administration, and (c) reduces the chances of bankruptcy by the City of San Diego and/or

26  SDCERS.

27      20.    This suit is brought in a representative capacity on behalf of SDCERS and its

28

3

Complaint for Fraud by Concealment and Negligence

31

1  members and any recovery obtained in this action will be paid to SDCERS.

2        21.    Plaintiffs do not seek any relief greater that or different from the relief sought for

3  the class of SDCERS beneficiaries of which they are members.

4        22.    This action, if successful, would confer a significant pecuniary benefit to the

5  public trust fund administered by SDCERS, and therefore the general public and the more than

6  16,000 members of SDCERS.

7        23.    Private enforcement is necessary because SDCERS has refused to act to prosecute

8  this claim and has continued to employ defendants. This private enforcement has placed a

9  disproportionate financial burden on plaintiffs in relation to their stake in this matter.

10                 **FIRST CAUSE OF ACTION**

11              **FOR FRAUD BY CONCEALMENT**

12             (Against GRS, Roeder, and Does 1-15)

13        24.    Plaintiffs restate the previous paragraphs of this complaint as if fully set forth

14  here.

15        25.    The defendants disclosed some material facts to SDCERS and plaintiffs but

16  intentionally failed to disclose other material facts, making its disclosure deceptive.

17        26.    SDCERS, the City, and plaintiffs did not know of the concealed fact that entering

18  into Manager's Proposal II would render the pension trust fund actuarially unsound.

19        27.    The defendants intended to deceive SDCERS, the City, and plaintiffs by

20  concealing the fact that Manager's Proposal II would render SDCERS actuarially unsound.

21        28.    If the defendants had disclosed that Manager's Proposal II would render SDCERS

22  actuarially unsound, SDCERS' board of administration would not have entered into that

23  transaction.

24        29.    SDCERS and plaintiffs were harmed.

25        30.    The defendants' concealment was a substantial factor in causing this harm.

26        31.    The conduct of the defendants as described above caused the SDCERS' trust fund

27  and plaintiffs to sustain damages, including but not limited to: (a) lost contributions from the

28                       4

1   City of San Diego which would have been paid to the trust fund under either (i) the 1996

2   contribution agreement, (ii) the City Charter, or (iii) former San Diego Municipal Code section

3   24.0801; (b) earnings from those contributions; and (c) attorney fees, costs, and other expenses

4   incurred by SDCERS in attempting to defend the legality and actuarial soundness of Manager's

5   Proposal II.

6        32.    The conduct of the defendants and their agents and employees, and each of them

7   as described herein, was despicable and was carried on by defendants with wilful and conscious

8   disregard for the rights of the plaintiffs and other beneficiaries of the pension trust fund. Many of

9   these beneficiaries are elderly, dependent on the actuarial soundness of their pensions, and are

10  extremely vulnerable. The defendants were aware of the probable dangerous consequences of

11  their conduct and wilfully and deliberately failed to avoid those consequences. This conduct

12  constitutes malice, oppression and fraud such that the plaintiffs are entitled pursuant to California

13  Civil Code section 3294 to recover punitive damages in an amount sufficient to punish and set an

14  example of these defendants.

## SECOND CAUSE OF ACTION

### FOR NEGLIGENCE

(Against GRS, Roeder, and Does 16-30)

18       33.    Plaintiffs restate the previous paragraphs of this complaint as if fully set forth

19  here.

20       34.    Defendants owed SDCERS and plaintiffs a duty to perform actuarial services

21  competently.

22       35.    Defendants breached that duty by failing to disclose that Manager's Proposal II

23  would render the pension trust fund actuarially unsound.

24       36.    SDCERS and plaintiffs were harmed.

25       37.    The defendants' negligence was a substantial factor in causing this harm.

26       38.    Any applicable statute of limitations is tolled because (a) the defendants have

27  continued to provide actuarial services to SDCERS and plaintiffs, and (b) the defendants

5

33

1  concealed their negligence through a series of acts since November, 2002.

2       WHEREFORE, plaintiffs and others similarly situated pray for judgment as follows:

3       1. For general damages according to proof;

4       2. For special damages according to proof;

5       3. For punitive damages for concealment;

6       4. For cost of suit herein incurred;

7       5. For reasonable attorney fees under the common fund doctrine or Code of Civil

8  Procedure section 1021.5; and

9       6. For such other and further relief as the court deems just and proper.

10

11 Dated:  June 28, 2005          LAW OFFICES OF MICHAEL A. CONGER

12

13                          By:  _Michael Q. Conger_____
14                               Michael A. Conger
                                 Attorney for Plaintiffs
15

16 Jury trial demanded.

17

18

19

20

21

22

23

24

25

26

27

28
                                        6
                     Complaint for Fraud by Concealment and Negligence

34



## A G R E E M E N T

### SAN DIEGO CITY EMPLOYEES' RETIREMENT SYSTEM

### ACTUARIAL AGREEMENT

### WITH

### GABRIEL, ROEDER, SMITH & COMPANY

This Actuarial Agreement ("Agreement") is entered into this _28th_ day of _April, 1998_ by and between Board of Administration ("BOARD") for San Diego City Employees' Retirement System ("SDCERS"), 401 "B" Street, Suite 400, San Diego, California 92101-4227 and Gabriel, Roeder, Smith & Company, 9171 Towne Centre Drive, Suite 440, San Diego, California 92122 ("ACTUARY"), upon the following representations, terms and conditions.

### R E C I T A L S

1.  SDCERS was created by ordinance pursuant to Section 141 of the Charter for the City of San Diego ("Charter"); and

2.  SDCERS is administered by the BOARD pursuant to the authority granted by Charter section 144; and

3.  Pursuant to San Diego Municipal Code ("SDMC") section 24.0901, the BOARD has the authority to employ and contract with an actuary as may be necessary and required to provide professional services in support of the BOARD's responsibilities

set forth in Charter section 144; and

4.   Board requires the services of a competent actuarial firm for two fiscal years beginning July 1, 1997 and ending June 30, 1999, to properly administer the San Diego City Employees' Retirement System and to conform to the requirements of Section 24.0901 of the San Diego Municipal Code.

5.   ACTUARY represents that it is willing and capable of performing all of the services described in this Agreement and further that ACTUARY will notify BOARD immediately of any changes in ACTUARY's organization or legal status which may affect its willingness or capability to act effectively as BOARD's Actuary; and

6.   ACTUARY acknowledges that SDCERS is a governmental plan singularly headquartered, situated and administered in San Diego, California; and

7.   ACTUARY acknowledges that it has engaged in contacts with SDCERS in San Diego, California, as a material part of the negotiations with BOARD to enter into and continue this contract for ACTUARY's services;

NOW, THEREFORE, in consideration of the covenants and conditions in this Agreement, and other good and valuable consideration as provided herein, the parties agree as follows:

2

## 1. TERM OF AGREEMENT

The term of this Agreement is for a period of two years, commencing July 1, 1997 and terminating June 30, 1999, contingent upon approval of funding in the Fiscal Year 1998 and Fiscal year 1999 budgets.

## 2. COMPENSATION

Board hereby retains and employs Actuary for the performance of actuarial services for Board and the Retirement System for two fiscal years beginning July 1, 1997 and ending June 30, 1999. Compensation for the fiscal year beginning July 1, 1997 and ending June 30, 1998 is not to exceed "fifty thousand dollars ($50,000)," which compensation is payable in four (4) quarterly payments, commencing thirty (30) days after receipt of billing for each quarterly billing statement.

The fee schedule, as it relates to elements of the contract and adjustments during the three contract years, is included as Appendix A which is incorporated herein.

Payment for Services other than those included in Appendix A will be based on the Actuary's hourly billing rates as included in Appendix A and time spent.

## 3. SERVICES

Actuary shall perform the following services for Board

3

according to the terms and conditions of this Agreement:

a. Perform and report on an experience analysis, particularly with respect to demographic assumptions of the Retirement System, for the five-year period ending June 30, 1997, with recommendations relative to actuarial assumptions to be used in subsequent valuations.

b. Make an actuarial evaluation of the assets and liabilities of the Retirement System as of June 30, 1997, and annually thereafter for the term of this Agreement, on the basis of the results of the most recent investigation utilizing an interest rate assumption approved by the Board and make a report to Board of the same, together with recommendations relative to revisions in the rates of contribution of the members and the City as may be necessary to provide the benefits for which the rates of contribution are required to be calculated. The report shall contain a glossary of terms and explain the major causes of change in contribution rates from the previous valuation.

c. Recommend and furnish to the Board such tables of mortality, annuities, etc., commonly referred to as operating tables, as may be needed by Board in the operation and administration of the Retirement System based upon the interest rate assumption approved by the Board.

4

d.   Determine the amounts, if any, to be transferred under Section 24.0904 of the San Diego Municipal Code.

e.   Be available for conferences and discussions as reasonably required at any time at the office of Actuary with any duly authorized agent of Board to assist with office forms and general procedures on any actuarial matters relating to the proper operation and administration of the Retirement System. Such communication could include "seat of the pants" actuarial estimates of items required by the System.

f.   Provide the following services, as necessary: Make recommendations relative to possible improvements in the financing and benefit structure of SDCERS; Perform additional studies, cost projections and/or analyses of contemplated benefit changes or evaluation of alternative funding methods; Provide ongoing information on Federal or State legislative changes which affect or limit the administration of the SDCERS Benefit program, taxation of retirement benefits, etc.  Assist with implementation of compliance programs as necessary.

4.   **BOARD REQUIREMENTS**

The Board agrees to furnish the ACTUARY with required accurate member data in a magnetically readable format.

5

## 5. TERMINATION

This Agreement between SDCERS and ACTUARY may be terminated upon thirty (30) days' notice and without cause by either party at any time by giving written notice of such termination by registered or certified mail sent to the addresses set forth supra, or such other addresses as may be provided in writing by the parties.

ACTUARY shall not assign nor transfer any interest in this Agreement without prior written approval from BOARD. No such assignment or transfer shall relieve ACTUARY from its obligations and liabilities under this Agreement.

ACTUARY shall promptly notify BOARD of any change in ACTUARY's organization or legal status which may affect its willingness or capability to act effectively as Board's ACTUARY.

## 6. ENTIRE AGREEMENT

This Agreement, together with the attached Appendix A, constitutes the entire agreement between the parties and supersedes any other oral or written agreement between the parties. This Agreement may neither be modified nor any of its provisions waived, except in writing signed by both parties.

6

## 7. GOVERNING LAW

This Agreement shall be governed by the laws of the State of California. Venue for any action arising from this Agreement, including but not limited to matters concerning validity, construction, performance or enforcement shall be exclusively in the state or federal courts located in San Diego County, California.

Accepted and agreed to this _28th_ day of _April_, 1998.

GABRIEL, ROEDER, SMITH & COMPANY

SAN DIEGO CITY EMPLOYEES' RETIREMENT SYSTEM

By: _Richard Roeder_
    Richard Roeder

By: _Keith W. Enerson_
    Keith W. Enerson
    President

_Lawrence B. Grissom_
Lawrence B. Grissom
Retirement Administrator

I HEREBY APPROVE the form and legality of the foregoing Agreement this _28th_ day of _April_, 1998.

By _Loraine E. Chapin_
    Loraine E. Chapin
    General Counsel

LEC:mrh
04/28/98
Or.Dept:Retire.
W:\ATTY\CONTRACT\ROEDER.AGR

7

# APPENDIX A

**FEES**

Fees for the first year of the contract are as follows:

| | | |
|---|---|---|
| A. | Experience Investigation | $10,000 |
| B. | Annual Valuation | 23,000 |
| C. | Other Services and Consulting | 17,000 |

Payment for other services will be on an incurred cost basis based upon actuary's hourly billing rates. Billings for any additional requested work (such as supplemental proposed valuations or other special project work) would be based on hourly billing rates and time spent. No hourly rate of senior staff will be billed at a rate greater than $175 per hour for the next two years.

| Service | Hourly Rate |
|---|---|
| Actuaries and Consultants | $110 - $175 |
| Technical Staff | $ 40 - $ 70 |
| Clerical Staff | $ 15 - $ 30 |
| Computer Time | $400 |
| Other Expenses, Charges | NONE |

Fees and rates include all Actuary expenses such as letters, phone calls, travel time, and travel expenses.

# FEES

The services outlined on pages 3-5 represent what we believe to be comprehensive actuarial, consulting services for your system.

Our proposed fees will not be in excess of the following:



| | |
|---|---|
| **Actuarial Valuation** | Year 1 - $30,000 |
| | Year 2 - $31,000 |
| | Year 3 - $32,000 |
| **Meetings and Routine Services** | $3,100 semiannually |
| **Experience Study, if needed** | $13,500 |

The above fees would be in effect for the first three years of the contract any subsequent fee quotes would be adjusted. These fees thereafter would be adjusted in accordance with the Consumer Price Index for All Urban Consumers - San Diego - All Items from June 30, 1997.

Quoted fees assume that we receive timely and accurate data. Our quote assumes up to eight meetings annually. Up to ten benefit calculations annually related to actuarial equivalents, mortality factors and community property calculations are included. Meetings or calculations above this level will be billed in accordance with the next paragraph.

43

Billings for any additional requested work not specified in our proposal (such as supplemental proposed valuations, discrimination testing or other special project work) would be based on hourly billing rates, expenses incurred and time spent. However, as an indication of the value we put on retaining SDCERS as a GRS client we would guarantee that no hourly rate of senior staff would be billed at a rate greater than $200/hour for the first three years of the contract. This hourly fee cap of $200 represents a significant cost savings relative to the top hourly rate charges by consulting actuaries at other national firms and is indicative of our strong desire to serve you.

AMENDED

INTERIM REPORT NO. 6

REGARDING THE SAN DIEGO CITY

EMPLOYEES' RETIREMENT SYSTEM FUNDING
SCHEME

REPORT OF THE

SAN DIEGO CITY ATTORNEY

MICHAEL J. AGUIRRE

OFFICE OF
THE CITY ATTORNEY
CITY OF SAN DIEGO

1200 THIRD AVENUE, SUITE 1620
SAN DIEGO, CALIFORNIA 92101-4178
TELEPHONE: (619) 236-6220

1 JULY 2005

# I.
# INTRODUCTION

San Diego's pension funding crisis began on 21 June 1996, when the board of the City's pension system agreed to allow the City to reduce contributions to the plan below amounts needed to pay for benefits already granted. On 2 July 1996, then-San Diego Mayor Susan Golding and the City Council acquiesced in this plan. In order to induce pension officials to not require the City to meet its legal duty to fully fund existing pension benefits, the Mayor and City Council granted hundreds of millions of dollars of new benefits in violation of the liability limits of the State Constitution and the City Charter. These 1996 decisions set in motion the worst financial crisis in the history of the City of San Diego.

The elaborate scheme concocted by certain City officials was also aimed at concealing the depth of the funding crisis from San Diego taxpayers and the investors who bought the City's bonds. This scheme was carried out for seven years by City officials, who will be identified in this Sixth Interim Report of the San Diego City Attorney. Currently, the pension benefit liabilities of the pension fund exceed its assets by more than $1.7 billion dollars.

In this report the San Diego City Attorney concludes that substantial evidence exists that is consistent with a finding that, in 1996 and 1997, City and pension officials violated their fiduciary duty owed to the City of San Diego and the San Diego City Employees' Retirement System (SDCERS) in connection with the creation of a pension benefit and funding contract known Manager's Proposal 1 (MP-1).

There is also substantial evidence that these officials engaged in fraudulent and deceptive acts and practices in connection with the creation of hundreds of millions of dollars of pension benefits related to MP-1.

There is also substantial evidence that, in violation of Government Code § 1090, these officials held prohibited contractual interests in the pension benefits that they voted to create.

There is also substantial evidence that by offering to exchange and exchanging a thing of value with the pension board, these officials created, in MP-1, an illegal and unenforceable contract.

There is also substantial evidence that by creating and representing the terms of MP-1, then-City Manager Jack McGrory acted as a fiduciary to the City's pension plan participants and that by engaging in the acts and practices detailed in this report, he violated his fiduciary duty to those participants.

There is also substantial evidence that professionals providing expert services to both the City and the pension board members violated their duties of conduct and care in connection with the creation and implementation of MP-1.

2

There is also substantial evidence that in creating these unpaid-for pension benefits City and pension officials violated the liability limits of the City Charter and the State Constitution.

The legal remedies available to the City and the pension board will be discussed in detail in Interim Report No. 7.

## II.

## BACKGROUND

The San Diego City Attorney has issued five interim reports focusing on possible illegal acts by City officials in connection with the audit of the City's 2003 financial statement. The reports found as follows:

(1)    In Interim Report No. 1 (January 14, 2005), regarding possible abuse, fraud, and illegal acts by San Diego City officials and employees, the City Attorney released evidence that the 2002 final report of the Mayor's Blue Ribbon Committee on City of San Diego Finances understated the severity of the City's pension fund liability by 318% or $215 million.

(2)    In Interim Report No. 2 (February 2, 2005), regarding possible abuse, fraud, and illegal acts by San Diego City officials, the City Attorney revealed substantial evidence consistent with a finding that the Mayor and Council authorized the issuance of certain City bond offerings and related disclosure documents that they knew to be false.

(3)    In Interim Report No. 3 (April 9, 2005), regarding violations of State and local laws related to the SDCERS Pension Fund, the City Attorney concluded that City officials violated the California Constitution, State law, the San Diego City Charter, and the San Diego Municipal Code in causing the underfunding of the San Diego City Employees' Retirement System.

(4)    In Interim Report No. 4 (May 9, 2005), regarding additional funding for outside professionals reviewing alleged illegal acts, the City Attorney questioned whether the Outside Professionals' Audit Committee could finish its work in an economical and timely manner and recommended that the Council not approve any additional funds for the Committee until a complete review of its scope of work had been conducted.

(5)    In Interim Report No. 5 (May 18, 2005), regarding the legal status of the elected officers' retirement program, the City Attorney determined that the City Council violated the Charter's pension vesting rules when members passed an ordinance that granted benefits to elected officials who had not served for 10 years and who had not reached age 62.

3

# III.

# DISCUSSION OF FACTS

## A. INTRODUCTION

On 21 June 1996, the San Diego employees' pension plan board of trustees adopted a radical benefit funding proposal made by then-City Manager Jack McGrory. The McGrory proposal was designed to relieve the City of its legal duty to pay into its pension plan the amounts needed to ensure that benefits would be paid promptly.[1] In exchange, City officials agreed to create hundreds of millions of dollars of new benefits that had no funding source.[2] This reduced-funding-for-increased-benefits agreement is referred to as Managers' Proposal No. 1 (MP1).

## B. MCGRORY PROPOSAL: EXCHANGE VIOLATION OF CHARTER EXPENDITURE CONTROL LIMITS FOR VIOLATION OF STATE CONSTITUTIONAL PROMPT PAYMENT OF BENEFITS FUNDING REQUIREMENT

City officials, pension trustees, and plan participants must comply with the expenditure control provisions contained in the San Diego Charter.[3] Pension board members administering the City's pension must require the City to pay for legally created benefits so that these benefits can be paid to retirees promptly.[4] These two legal mandates frame and limit the City's ability to create pension benefits.

In 1996, City and pension officials acted outside these mandates by entering into MP-1. Under MP-1, these officials, led by McGrory and pension administrator Lawrence Grissom, agreed to increase pension benefits and to decrease pension benefit funding. This agreement, which was violative of both the City Charter and the State Constitution, when combined with a similar agreement that City officials entered into in 2002, has resulted in the worst financial crisis in modern San Diego history.

San Diego Charter § 99 prohibits the City from incurring "any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year unless the qualified electors of the City, voting at an election to be held for that purpose, have indicated their assent ... ."[5] California State Constitution

---

[1] Cal. Const. art. XVI, § 17(a).

[2] See 23 July 1996 Lexin Memorandum and City Attorney Interim Reports Nos 1-5; see City Attorney's Website.

[3] San Diego Charter § 99.

[4] Cal. Const. Art. XVI, § 17(a). See n. 1.

[5] San Diego Charter § 99. See n. 3.

4

Article XVI, § 17(a) requires that the City's pension plan be administered "in a manner that will assure prompt delivery of benefits" to the participants and their beneficiaries.[6]

## C. ORIGINS OF MP-1

MP-1 originated in a series of meetings among Mr. McGrory, Mr. Grissom, and pension board president Keith Enerson. A "Draft" and "Confidential" 29 February 1996 memorandum from Mr. McGrory to "Distribution" provided an "outline of the package we discussed with Keith [Enerson] and Larry [Grissom]."[7] This outline detailed a proposal that the City's pension plan funding level would not be set by actuarial determination[8] but instead would be limited to "the lower bifurcated rate in FY 96."[9] In exchange for this limitation of the City's pension contribution, benefits were to be increased:

> 3. WE PROVIDE THE ½ AND ¾ EMPLOYEE BENEFIT THAT WAS AT COUNCIL
> 4. WE ELIMINATE THE DISABILITY INCOME OFFSET.
> ***
> 9. WE PROVIDE A 3 YEAR OPEN ENDED BUY BACK TO BE PAID, BOTH EMPLOYEEE AND CITY CONTRIBUTIONS, BY THE EMPLOYEE-THIS WOULD BE A ONE TIME BENEFIT BUT COULD BE PAID BY ALLOWING EMPLOYEES TO TRADE SOME % OF THEIR ANNUAL LEAVE AT TERMINATION.

Obviously, in 1996, City officials were focused on increasing the money that they could take out of the pension plan beyond those amounts diverted from "surplus earnings." Their proposal was to continue to take money from the pension fund and beginning in 1997, to put less in by underfunding the pension benefits that they created. On 1 March 1996, pension administrator Mr. Grissom wrote a more extensive memorandum regarding a 26 February 1996 meeting that he had attended with Mr. McGrory and Mr. Enerson. In his memorandum Mr. Grissom acknowledges that the heart of their negotiations was the City's existing practice of diverting money from the pension plan to pay for non-pension purposes. This acknowledgement demonstrates that City officials had previously engaged in an unlawful practice of diverting funds from the pension system.[10]

---

[6] Cal. Const Art. XVI, § 17(a). See n. 1.

[7] February 1996 Jack McGrory memorandum to "Distribution."

[8] San Diego Charter §§ 142 and 143 and Article XVI § 17(a) of the California Constitution require that the City's pension fund payment be determined by an actuary; see fn. 1.

[9] 29 February 1996 Jack McGrory memorandum to "Distribution;" see n. 7.

[10] See 16 September 2004 Report on Investigation the City of San Diego, California's Disclosures of Obligation to Fund the San Diego City Employees' Retirement System and Related Disclosure Practices 1996-2004 with Recommended Procedures and Changes to the Municipal Code pp. 31-34 (16 September 2004 Report). The money diverted from the pension funds were euphemistically referred to as "surplus

Mr. Grissom began his 1 March 1996 memorandum by alluding to the central role played by "undistributed earnings." He then went on to describe the "package" that would allow the City to put less money into the system in exchange for creating new benefits. "I will start with reserve crediting of <u>undistributed income</u> since the rest of the <u>package</u> flows out of this."[11] Mr. Grissom explained that the new unfunded benefits would solve the "perception" that the pension board was "giving the City a lot of money":

> What follows is a proposal for implementing the <u>package</u> that you Jack and I discussed on February 26. It is necessarily a little rough due to the time of constraints. I will start with reserve crediting of undistributed income since the rest of the package flows out of this.
> \*\*\*
> 1.  Perception. It <u>looks like the Board is "giving" the City a lot of money</u>. This is, frankly, a political and negotiation issue. The negative perception should be at least partially offset by increasing benefits as discussed below.[12]

Mr. Grissom was understandably skeptical about the reaction of outside legal counsel to a package in which unfunded benefits would be exchanged for lowered funding. He knew that the plan would have to be carefully framed in order to get it past outside counsel:

> 2.  Outside counsel. I have no idea whatsoever how outside counsel will react to this plan. We should consider this carefully and <u>thoroughly strategize</u> out [sic] approach.

Mr. Grissom brought home in no uncertain terms that funds diverted from surplus earnings into reserves directly increased the pension fund's unfunded liability. He explained the ratio between increases in the system's unfunded liability due to diversions of pension funds into reserve accounts and increases in the City's contribution rate into the system to make up for the earlier diversions:

---

earnings" or "undistributed income." These diverted pension funds were "transferred" to "reserves." Funds held by the pension plan and all earnings thereon are required to be used so that benefits can be delivered promptly to plan participants. Diversions of surplus earnings are unlawful under the State Constitution and fiduciary laws. In *Board of Administration v. Wilson*, 52 Cal. App. 3d 1109, 1131-1137 (1997), the court held that vested state employee members of CalPERS have a contractual right to an actuarially sound retirement system; see City of San Diego Website.

[11] 1 March 1996 San Diego City Employees' Retirement System Memorandum from Larry Grissom to Keith Enerson regarding "Proposed Retirement Package" p. 2.

[12] 1 March 1996 San Diego City Employees' Retirement System Memorandum from Larry Grissom to Keith Enerson regarding "Proposed Retirement Package" p. 2. See n. 11.

3. Holding Stabilization Reserve outside valuation assets. This means that Rick does not count that amount as assets in the actuarial valuation. The net effect is to <u>increase</u> the System's <u>unfunded liability</u>. For each $10 million in unfunded liability, the City contribution rate will increase approximately 0.13% all else being equal.

Although Mr. Grissom suggested that the diversions and the related increases in the City's future contribution rate be "capped" at $75 million, he admitted that predicting the effect of the "package" on the level of future underfunding was "nearly impossible," thus undermining the parties' ability to set any caps on diversions or on the related future rate increases:

This is why I recommended <u>capping</u> this reserve at $75 million, since that would mean an increase in the City Contribution rate of about 1%. Two factors mitigate the rate increase. First, while it is nearly impossible to predict with any accuracy, I don't think the reserve will get that high. Second, it is a question of trade-offs. At current payroll levels, 1% amounts to between $4.5 and $4.0 million, which is the maximum only if the reserve reaches it cap.[13]

In his 1 March 1996 memorandum, Mr. Grissom also estimated that under the MP-1 package, a "stabilization" of the City's rate of contribution into the pension system would be set in order to reduce the City's annual payment by at least $5 million per year: "The City will be getting a reduction of <u>at least $5 million annually</u> on its contribution cost for the next five years."[14]

According to his memorandum, pension system actuary Rick Roeder had already signaled that he was comfortable with the "concept," including the increase of diverted funds into the reserve accounts: "I have also discussed this concept with Rick [Roeder] and <u>he is comfortable</u> from an actuarial standpoint with this reserve."[15]

Mr. Grissom described in detail the predicament faced by the pension system that was caused both by past efforts to reduce the contribution rate that the City had to pay into the system and by the City's use of pension funds to pay for non-pension benefits. One factor in the predicament was the decision to use alternative methods for measuring the amounts due the pension fund from the City. Prior to 1996, the City and pension system officials had agreed to shift from the EAN method to the PUC computation

---

[13] 1 March 1996 San Diego City Employees' Retirement System Memorandum from Larry Grissom to Keith Enerson regarding "Proposed Retirement Package" pp. 2-3. See n. 11.

[14] 1 March 1996 San Diego City Employees' Retirement System Memorandum from Larry Grissom to Keith Enerson regarding "Proposed Retirement Package" p. 3. See n. 11.

[15] 1 March 1996 San Diego City Employees' Retirement System Memorandum from Larry Grissom to Keith Enerson regarding "Proposed Retirement Package" p. 3. See n. 11.

7

method with the expectation that rates would be reduced. However, as Mr. Grissom stated in his memorandum, the actual outcome varied from the predicted, leading him to conclude that the system should return to the EAN method:

RATE STABILIZATION

The central recommendation to this discussion is to change from PUB back to EAN effective July 1, 1996. Rick has indicated that the EAN rate for the FY95 valuation (effective July 1, 1996) would be approximately 10.2%. The PUC rate for the FY 95 valuation is 9.2%, or a difference of 1%. When the conversion was made for rates effective July 1, 1992, the difference was 2.77%.

The analysis by the actuary of the time of conversion showed that PUC was cheaper in the beginning, but that, since PUC rates would increase slightly annual while EAN remains stable (all else being equal), the "lines will cross" around year 22 of a 30 year amortization period. The PUC rate will be higher than EAN at the end of 30 year amortization period. What has happened is that the gap has narrowed by 1.77% in only four years. If things keep going the way they have been, the lines will cross in the next 2 to 5 years, less than 10 years after implementation. At the end of the amortization period, PUC could logically be very significantly higher.[16]

The 1 March 1996 memorandum went on to describe the proposed "Implementation Plan," in which the City's contribution rates between fiscal year 1996 and fiscal year 2000 would be reduced below the actuarially required rate with a resultant temporary savings to the City of $45 million.[17] The Grissom memorandum then described the increased unfunded benefits that the City would agree to in order to offset the appearance that the pension system was "giving the City a lot of money":[18]

---

[16] 1 March 1996 San Diego City Employees' Retirement System Memorandum from Larry Grissom to Keith Enerson regarding "Proposed Retirement Package" p. 3. See n. 11.

[17] 1 March 1996 San Diego City Employees' Retirement System Memorandum from Larry Grissom to Keith Enerson regarding "Proposed Retirement Package" p. 4. See n. 11.

[18] 1 March 1996 San Diego City Employees' Retirement System Memorandum from Larry Grissom to Keith Enerson regarding "Proposed Retirement Package" p. 2. See n. 11.

8

## BENEFITS CHANGES

1. Elimination of the disability income offset. This is a win win. Since we are already increasing contributions to pay off the unfunded liability and we have established that any recovery under the presently structured plan will be minimal we are assuming 0 offset in our actuarial assumptions. This means that this is a cost free benefit.

2. Grant the Virginia Silverman purchase. Roll this into purchase of service changes described below.

3. Make pre 80 health insurance coverage a permanent benefit. Projected cost for FY 96 is $622,400. Cost will decline in the future assuming continuation of current level of benefit since this is a closed group. Cost is built in to projections of total health insurance benefit.

4. Double 13th check amount for pre 80 retirees. Projected cost for FY 97 (FY 96 has already been paid) is $571,000 based on those with received a 13th check for FY 96. Actual cost will be slightly less because this is a closed group and some will be gone by October.

5. Change purchase of service. My recommendation is as follows:
   a. Keep refunds, probationary period, 1981 Plan waiting period, and Military & Veterans Code required military service intact.
   b. Eliminate all other existing categories of purchase.
   c. ›Replace with a program allowing any member to purchase up to 5 (3?) years of additional service any time or at retirement; Purchase cost to be calculated based on individual contribution rate including offset, City contribution rate, and current salary.
   d. Purchase at time of retirement can be made using some form of negotiated credits for unused annual leave. ***

6. Increase general member formula.[19]

The purchase-of-service-credit benefit increase drew special mention from Mr. Grissom, who called it a "potentially great benefit." Although he described problems associated with the amount a member would be allowed to pay, he dismissed all impediments and indicated that he already had outside legal counsel Bob Blum and pension system actuary Rick Roeder working on the problems: "There are always solutions. I have talked to Bob Blum and Rick [Roeder] and we are working on a variety of ideas . . . [w]orking with Rick [Roeder] on design and costs. I may not have time to offer a good solution by March 5, but will shortly thereafter."[20]

---

[19] 1 March 1996 San Diego City Employees' Retirement System Memorandum from Larry Grissom to Keith Enerson regarding "Proposed Retirement Package" p. 5. See n. 11.

[20] 1 March 1996 San Diego City Employees' Retirement System Memorandum from Larry Grissom to Keith Enerson regarding "Proposed Retirement Package" p. 6. See n. 11.

According to Mr. Grissom, Mr. McGrory agreed to "go to the Council and recommend that they direct the Manager and Board to study and report back" with regard to certain aspects of the plan. Mr. Grissom then ends his memorandum with a summary of the MP-1 package:

> This is a good plan. It gives the city nearly 445 million of rate relief over the next 5 years. . . . It provides an equitable distribution of earnings while providing a measure of protection. It solves some gnawing administrative problems. It should provide a sufficient ratio of increased benefits and costs to satisfy fiduciary counsel. It does not give safety members and retirees, particularly thereafter, all that they might want, but it does represent a significant improvement.[21]

On 19 March 1996, 18 days after Mr. Grissom recorded Mr. McGrory's agreement to take parts of the proposed MP-1 package to the City Council, the Council held a closed session on meet and confer issues.[22] The docket for the meeting reflects a closed session for the purpose of labor negotiations: "Conference with Labor Negotiator, Pursuant to Government Code § 54957.6." The City's negotiators were identified as Jack McGrory, Bruce Herring, Cathy Lexin, and Bill Lopez. Three of the City's four unions, AFSME Local 127, Firefighters Local 145, and the San Diego Police Officers Association, were also identified.[23] The minutes, which indicate that Mr. McGrory and Mr. Herring were present, list the eighth item on the agenda as "Meet and Confer."[24] As reflected in the minutes, the City Clerk employee keeping the minutes left the room when the meet and confer issue was reached: "Recorder Skelley left at 9:57 a.m. and the Council continued in Closed Session for meet and confer until 10:02 a.m."[25]

On 28 March 1996, Bruce Herring faxed a version of the MP-1 package ("draft 1996 SDCERS Plan Revision Outline") to attorney Jeffrey S. Leavitt, a partner in the Jones, Day Reavis & Pogue law firm.[26] The proposal was the result of discussions between the plan administrator of the San Diego City Employees' Retirement System

---

[21] 1 March 1996 San Diego City Employees' Retirement System Memorandum from Larry Grissom to Keith Enerson regarding "Proposed Retirement Package" p. 7. See n. 11.

[22] 1 March 1996 San Diego City Employees' Retirement System Memorandum from Larry Grissom to Keith Enerson regarding "Proposed Retirement Package" p. 7. See n. 11.

[23] 19 March 1996 San Diego City Council Closed Session Docket.

[24] 19 March 1996 San Diego City Council Closed Session Agenda.

[25] 19 March 1996 San Diego City Council Closed Session Minutes p. 3.

[26] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring re: "Fiduciary Aspects of Plan Revisions." A 2 April 1996 letter from Jeffrey S. Leavitt to Bruce Herring confirms the City's retention of the Jones Day law firm "regarding the fiduciary and federal tax implications of the proposed revisions to benefits for City employees under the San Diego City Employees' Retirement System."

(SDCERS or the System) and the City Manager.[27]  At the time this proposal was "being discussed with labor organizations representing the City's employees as part of the [then] current meet and confer process."[28]

The proposal as of 28 March 1996, was described by the City's outside counsel as follows:  First, it included various changes in benefits, most of which constituted benefit increases.[29]  Second, it contained a change in the method of providing medical benefits.[30]  Third, the final portion of the proposal concerned rate stabilization and changes to reserves.[31]  The proposal also included a statement that there would be no changes in actuarial assumptions or actuarial methodology that could conceivably effect contribution rates prior to July 1, 2000.[32]  From the City's point of view, the rate stabilization and changes to reserves were the quid pro quo for the proposed benefit improvements.[33]

On the 9 April 1996 City Counsel closed session agenda, the fifth item was "Meet and Confer."  Minutes of the session indicated that Mr. McGrory was present.  They further indicated that at 9:55 a.m., the closed session discussion began again absent a City Clerk minute taker: "This portion of the Closed Session Meeting halted at 9:55 a.m.  Council discussion followed pertaining to the Meet and Confer issues."[34]

An 11 April 1996 memorandum from Deputy City Attorney John M. Kaheny regarding "Closed Session Agenda Items for April 16, 1996" had recorded that labor negotiations were to take place at the 16 April 1996 closed session.[35]  The memorandum identified the City's negotiators as Jack McGrory, Bruce Herring, Cathy Lexin, and Bill Lopez.

---

[27] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring re: "Fiduciary Aspects of Plan Revisions" p. 1.  See n. 26.

[28] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring re: "Fiduciary Aspects of Plan Revisions" p. 1.  See n. 26.

[29] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring re: "Fiduciary Aspects of Plan Revisions" p. 4.  See n. 26.

[30] The medical benefits issues are not discussed in this report.

[31] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring re: "Fiduciary Aspects of Plan Revisions" p. 5; see n. 26.

[32] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring re: "Fiduciary Aspects of Plan Revisions" p. 4; see n. 26.

[33] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring re: "Fiduciary Aspects of Plan Revisions" pp. 4-5; see n. 26.

[34] 9 April 1996 San Diego City Council Closed Session Minutes p. 3.

[35] 11 April 1996 Closed Session Item Memorandum from Deputy City Attorney John M. Kaheny to City Clerk p. 2.

.  The 16 April 1996 City Council closed session agenda indicated that the eighth item was "Meet and Confer."[36] Minutes of the session indicated that Mr. McGrory and Mr. Herring were present. They further indicated that at 10:17 a.m., the City Council's closed session halted and that Council continued with a discussion about meet and confer.[37] At 2:00 p.m., the Council reconvened to continue meet and confer discussions.[38] Again, apparently no City Clerk employee kept minutes of these discussions.

On 23 April 1996 San Diego City Attorney John Witt issued a report to the Board of Administration of the San Diego City Employees' Retirement System.[39] In the report City Attorney Witt recorded the fact that on 18 April 1996, pension administrator Lawrence Grissom told the pension board that they would convene in a special meeting on 30 April 1996. The purpose of the meeting was to discuss the MP-1 proposal offered by City Manager Jack McGrory.[40] City Attorney Witt indicated that he had read MP-1 and that it concerned "benefits improvements, contribution rates, and reserve accounting."[41] Mr. Witt went on to describe what he considered to be a personal conflict of interest and to state that he would not be advising the pension board on MP-1:

> I have reviewed the Manager's proposal. It concerns benefit improvements, contribution rates and reserve accounting. With my concurrence, the City Manager has retained the services of outside legal counsel to assist him with the fiduciary implications of this proposal. The City Manager has also retained the services of an outside actuary.
>
> In accordance with Rule 7.20, Rules of the Retirement Board of Administration, I am also advising you to seek the services of outside fiduciary counsel to assist you in reviewing the Manager's proposal. In my view, this proposal raises important fiduciary considerations which must be fully examined as part of your decision-making process. I am uncomfortable in providing you this needed fiduciary guidance for several reasons.
>
> First, I will be retiring after the conclusion of my present term in office. The Manager's proposal involves proposed benefit increases which

---

[36] 16 April 1996 San Diego City Council Closed Session Agenda.

[37] 16 April 1996 San Diego City Council Closed Session Minutes p. 3.

[38] 16 April 1996 San Diego City Council Closed Session Minutes p. 3.  See n. 37.

[39] 23 April 1996 City Attorney Report to the Board of Administration for the San Diego City Employees' Retirement System.

[40] 23 April 1996 City Attorney Report to the Board of Administration for the San Diego City Employees' Retirement System p. 1.  See n. 39

[41] 23 April 1996 City Attorney Report to the Board of Administration for the San Diego City Employees' Retirement System, p. 1.  See n. 39.

12

substantially enhance my retirement benefits. Although, I realize that I do not have a legal conflict of interest, I am very concerned about the appearance of a conflict of interest. Second, the proposal addresses other significant benefit enhancements, future contribution rates, a change in the funding method (a return to EAN from PUC), and other changes with the Reserves maintained and administered by the Board. As both the legal advisor to the Board and the City Manager, my concern over the appearance of a conflict of interest in this sensitive and volatile area is exacerbated.

Mr. Witt then described the possibility of litigation between the pension board and the City Manager as an additional reason for his decision to withdraw from representation. This 23 April 1996 memorandum underscores the significant changes that were being considered by the Council, the City Manager, and the pension board. At this key point the City Attorney should have stepped forward and stopped the proposal to exchange the creation unfunded benefits for a reduction in the constitutionally mandated funding.

An 18 April 1996 memorandum regarding closed session items that was authored by Deputy City Attorney John M. Kaheny identified a conference with the City's labor negotiators as an item to be discussed at the 23 April 1996 closed session.[42] It also named the City's negotiators as Jack McGrory, Bruce Herring, Cathy Lexin, and Bill Lopez. The 23 April 1996 Closed Session Agenda identified "Meet and Confer" as the second of two items to be discussed.[43]

The 23 April 1996 closed session docket identified a conference with the City's labor negotiator as the second and last item to be discussed at the closed session on 23 April 1996. The City's negotiators were identified as Jack McGrory, Bruce Herring, Cathy Lexin, and Bill Lopez.[44] The minutes for the 23 April 1996 closed session indicate that the City Council continued with the meet and confer items until 10:00 a.m. The minutes reflect that Jack McGrory and Bruce Herring were in attendance at the closed session.[45] Again, apparently no City Clerk employee kept minutes of these meet and confer discussions.

The essential features of what was to become MP-1 were set forth in a draft "Concept Overview" prepared by Mr. McGrory and dated 29 April 1996. Stressing that "substantial financial implications to the City compel that certain actions occur in time

---

[42] 18 April 1996 Closed Session Item Memorandum from Deputy City Attorney John M. Kaheny to City Clerk.

[43] 23 April 1996 San Diego City Council Closed Session Agenda.

[44] 23 April 1996 San Diego City Council Closed Session Docket.

[45] 23 April 1996 San Diego City Council Closed Session Minutes p. 1.

for Fiscal Year 1997 budget decisions,"[46] Mr. McGrory proposed reducing the City's contribution rate to a fixed amount below that required by actuarial computation. He did so despite the fact that the plan beneficiaries have a contractual right to an actuarially sound fund. *Claypool v. Wilson*, 4 Cal. App. 4th 646, 676 (1992). In addition under San Diego Charter § 143, the City is required to make pension plan contribution rates as set by an actuary.

The 29 April 1996 version of MP-1 represented a two-part increase in the pension deficit. First, there would be an increase in six pension benefits, the costs of which would be added to the long-term pension deficit. Second, there would be a significant reduction in the amount that the City would be required to pay into the pension system for benefits already adopted.[47] The combination of increased unpaid-for benefits and decreased contributions for benefits already created eventually led to the $1.7 billion deficit facing the pension system as of 15 June 2005.[48]

Two of the proposed benefits in the 29 April 1996 Concept Overview involved the purchase of service credits. Under this proposed program, all employees would be permitted to buy up to five years of service credits for "an amount, including interest, determined by the Board in such manner and at such time as the Board may by rule prescribe."[49] In addition those employees with 15 or more years of creditable service as of 1 July 1996, would be permitted to "purchase up to five (5) years of service . . . at a discounted rate subject to the individual employee's IRS 415 limitations."[50] The total costs of the proposed discount for the service credit program, which were not to exceed $6 million,[51] were to be paid from "surplus earnings."[52] The final version of MP-1, dated 23 July 1996, stated that employees were to pay "full cost" for the purchase of service credits.[53] The pension system's 2004 actuarial report shows that 2900 plan participants purchased over 13,000 years of service credits. The system actuary has

---

[46] 29 April 1996 City Employees Retirement System "Concept Overview" p. 1-4.

[47] 29 April 1996 City Employees Retirement System "Concept Overview" p. 1. See n. 46

[48] Although the pension system actuarial report for the fiscal year ending 30 June 2004, estimated the pension deficit at $1.4 billion, work done by the City's outside auditor, KPMG, has caused the estimated shortfall to be put at closer to $1.7 billion.

[49] 29 April 1996 City Employees' Retirement System "Concept Overview" p. 2. See n. 46.

[50] 29 April 1996 City Employees' Retirement System "Concept Overview" p. 2; IRS Code § 415 provides for dollar limitations on benefits and contributions under qualified retirement plans. It also requires that the IRS Commissioner annually adjust these limits for cost of living increases. See n. 46.

[51] 29 April 1996 City Employees' Retirement System "Concept Overview" p. 2; IRS Code § 415 provides for dollar limitations on benefits and contributions under qualified retirement plans. It also requires that the IRS Commissioner annually adjust these limits for cost of living increases. See n. 46.

[52] 29 April 1996 City Employees' Retirement System "Concept Overview" p. 2. See n. 46.

[53] 23 July 1996 memorandum from Cathy Lexin to Larry Grissom p. 2, 6; see fn 2.

14

estimated that these 13,000 years of service credits were sold at a cost to the City of in excess of $100 million.[54]

Another benefit increase proposed in the 29 April 1996 Concept Overview was the Deferred Retirement Option Plan (DROP). Under the DROP program employees would receive their annual salary <u>and</u> their retirement benefit with 8% interest on the retirement portion of their DROP takings. The 29 April 1996 version of MP-1 provided that DROP "would have no cost impact to the City or CERS."[55] Employees could "participate in this program subject to management approval, and [could] be terminated by Management at the end of three (3) years."[56]

Contrary to the earlier assessment, it is now estimated that the DROP program does have a cost effect on CERS.[57] The power to terminate the program after three years, contained in the 29 April 1996 Concept Overview, was changed in the final version: "If the cost impact to the City or CERS is greater than the savings, the City agrees to meet and confer to impasse prior to imposing any changes in the DROP Plan."[58] Other benefit increases in the City Manager's 29 April 1996 Concept Overview included both increases in the percentage formula used to calculate general employees' per-year pension benefits and an increase for industrial disability. The costs of the increase in the former were to be paid "from any surplus undistributed excess earnings."[59] The creation of pension benefits with no or an inadequate funding source violated San Diego Charter § 99, the City's expenditure control provision that prohibits the incurring of "any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year" unless approved by the voters.[60]

While proposing to increase the pension deficit by creating new unpaid-for benefits, in the 29 April 1996 Concept Overview the City Manager also proposed an increase in the deficit that would result from decreasing the City's payments into the pension fund to amounts below those needed to pay for benefits already adopted. These decreased payments took two forms. The first proposed by Mr. McGrory was a reduction, beginning in fiscal year 1997, in the City's pension contribution rate. The second reduction was caused by diversions of pension funds already in the pension

---

[54] The system actuary first estimated the cost of past service liability to be in excess of $120 million. After the City Attorney published this estimate, the system actuary reduced his cost estimate.

[55] 29 April 1996 City Employees' Retirement System "Concept Overview" p. 3. See n. 46.

[56] 29 April 1996 City Employees' Retirement System "Concept Overview" p. 3. See n. 46.

[57] The CERS actuary has estimated the cost at several million dollars.

[58] 23 July 1996 memorandum from Cathy Lexin to Larry Grissom p. 6. See n. 2.

[59] 29 April 1996 City Employees' Retirement System "Concept Overview" p. 3. See n. 46.

[60] San Diego Charter § 99. See n. 3.

system. The pension board allowed both to occur in violation of Article XVI § 17 of the California Constitution.[61]

Under the 29 April 1996 Concept Overview, the City would pay 7.08% of payroll in fiscal year 1996 and 7.33% in 1997.[62] The City would then increase the rate by "0.50% each year until the rate paid reaches the EAN calculated rate."[63] The City was to make contributions at agreed-upon rates through fiscal year 2000; these rates would be in amounts substantially below those required under actuarial computations. This proposal to make payments at agreed upon levels and not at rates determined by an actuary violated the City Charter, which requires contributions at rates "certified by the actuary."[64]

The 29 April 1996 proposal stated that if the pension system's assets became less than 80% of the pension system's liabilities, the plan would "sunset the year following the actuarial valuation which show [sic] this funded ratio."[65] Under this plan no changes in actuarial assumptions were to occur prior to July 2000:

> There will be no changes in actuarial assumptions or actuarial methodology which would conceivably impact contribution rates prior to July 1, 2000. If the CERS Board feels its fiduciary responsibility requires a change in actuarial assumption prior to that date, this plan will sunset immediately at that time. Any additional benefits granted herein may be eliminated prospectively.[66]

Although the proposal suggested that various reserve accounts be created, the source of funds for the new accounts was to be pension fund assets. Despite discussions about them, these accounts played no significant role in the implementation of MP-1.[67] However, they did play a significant role in creating the false impression that funds were available to pay for the increased benefits. The source of funds that were to be placed into the various reserve accounts had a common origin -- trust fund assets. In other

---

[61] Cal. Const. Art. XVI, § 17(a). See n. 1.

[62] These proposed contribution rates were blended -- this is, the rates paid for general member employees were averaged with those paid for public safety employees.

[63] The contribution rate paid by the City in 1996 was the PUC rate, which tended to require lesser payments into the plan in the early years and much greater amounts later. Under the EAN method the payments were level and remained stable year to year.

[64] San Diego Charter § 143; see n. 8.

[65] 29 April 1996 City Employees' Retirement System "Concept Overview" p. 4; see n. 46.

[66] 29 April 1996 City Employees' Retirement System "Concept Overview" p. 4; see n. 46.

[67] 16 September 2004 Report pp. 53-56. Although the reserve accounts did not play a major role in the implementation of MP-1, they did serve as a basis for issuing false and misleading statements to the investment community; see City of San Diego Website.

words, Mr. McGrory proposed using trust fund assets to pay for new benefits when the trust funds were already in the pension system and already belonged to the plan participants.

City Manager McGrory made clear that benefit increases proposed under the 29 April 1996 plan were contingent and dependent upon the pension board agreeing to accept less than the actuarially required contribution rates from the City: "The interrelationship of these various issues to each other necessitates that the entire proposal be considered and acted upon concurrently."[68]

On 29 April 1996, in his capacity as outside counsel for the City of San Diego, Jeffrey S. Leavitt, an attorney with the Cleveland, Ohio law firm of Jones, Day, Reavis & Pogue, wrote a six-page letter to Deputy City Manager Bruce Herring addressing the fiduciary implications of MP-1.[69] Mr. Leavitt concluded that the City was not acting as a fiduciary "with respect to the members of the System when revising benefits."[70] He did, however, find that the City Manager, the City Auditor and Comptroller, and the City Treasurer are fiduciaries when acting as members of the pension board.[71]

The implications of City Manager Jack McGrory acting as a fiduciary to the pension plan participants while simultaneously serving as a City fiduciary in connection with MP-1, raises a significant legal issue that was not addressed directly in Mr. Leavitt's 29 April 1996 letter. Mr. Leavitt also did not address the related legal question of Mr. McGrory's duty as a City fiduciary. Mr. Leavitt should have analyzed whether Mr. McGrory was a fiduciary to the pension plan in light of the role that Mr. McGrory was playing in reshaping the pension plan's contribution rates and reserves. Courts have uniformly held that the test for determining if an individual in Mr. McGrory's position qualifies as a fiduciary is whether the "individual exercises . . . authority or control over the plan or its assets."[72] Mr. McGrory was an agent of the pension plan's sponsor, the

---

[68] 29 April 1996 City Employees' Retirement System "Concept Overview" p. 1. See n. 46.

[69] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring; the letter was purportedly provided to Mr. Herring by Mr. Leavitt "as counsel to the City with the understanding that neither Jones, Day, Reavis & Pogue nor I are assuming any professional responsibility to any other person whatsoever." See n. 26.

[70] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring p. 2. See n. 26.

[71] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring p. 2 (n. 5). See n. 26.

[72] See *When is Employer, Labor Union, Affiliated Entity or Person or Pension or Welfare Plan 'Fiduciary" within meaning of §3(21)(A)(i) or (III) or Employee Retirement Income Security Act of 1974* 178 A.L.R. Fed 129; see also, *Pension Ben. Guar. Corp. v. Solmsen*, 671 F. Supp. 983 (E.D.N.Y. 1987) (sponsor fiduciary under pension plan); *Schwartz v. Interfaith Medical Center*, 715 F. Supp. 1190 (E.D.N.Y. 1989) (employer acted in fiduciary capacity); *Ches v. Archer*, 827 F. Supp. 159 (W.D.N.Y 1993) (unresolved factual question about whether corporate officers acting as fiduciaries); *Hanley v. Giordano's Restaurant, Inc.*, 1995 WL 442143 (S.D.N.Y. 1995); *NYSA-ILA Medical & Clinical Services Fund v. Catucci*, 60 F. Supp. 2d 194 (S.D.N.Y. 1999).

17

*City of San Diego.* The agent of a plan sponsor can become a fiduciary by exercising <u>any</u> authority or control respecting management or disposition of plan assets. 29 U.S.C. § 1002(21)(A)(i); *Kendal Corp. v. Inter-County Hospitalization Plan, Inc.*, 771 F. Supp. 681 (E.D. Pa. 1991); *Landy v. Air Line Pilots Ass'n Int'l, AFL-CIO*, 901 F.2d 404 (5th Cir. 1990). Thus Mr. McGrory, as an architect of MP-1, may have, as to the particular tasks and issues contained therein, acted as a fiduciary to the pension plan participants. See *Spann v. Chicago Physicians II, P.C.*, 2000 WL 263976 (N.D. Ill. 2000) (failure of employer to perform duty related to pension plan); see also, *When is Employer, Labor Union, Affiliated Entity or Person, Or Pension or Welfare Plan 'Fiduciary' Within Meaning of §3(21)(A)(i) or (iii) of Employee Retirement Income Security Act of 1974*, 178 A.L.R. Fed. 129 (2005).

At the same time when he may have acted as a fiduciary to the pension plan, Mr. McGrory was clearly and certainly acting as fiduciary to the City of San Diego. Mr. Leavitt mentioned that the "City Council represents and is responsible to the voters and taxpayers."[73] It is universally agreed that local government officers owe their government and the people of their locality a fiduciary duty of the highest possible fidelity and of the greatest skill and diligence in their work, of which they are capable. Osborne, Reynolds, M. Jr., *Handbook of Local Government Law* (2d ed. 2001); *see Terry v. Bender*, 143 Cal. App. 2d 198 (1956); *People v. Sullivan*, 113 Cal. App. 2d 510 (1952); *see also Pharmacare v. Caremark*, 965 F. Supp. 1411 (D. Haw. 1996); *United States v. Sawyer*, 239 F.3d 31 (1st Cir. 2001) (citizens entitled to honest government services at the local level). These dual fiduciary roles and their legal implications will be discussed *infra.*

In his 29 April 1996 opinion, Mr. Leavitt does not address whether the City's representatives were acting on behalf of the City or of the pension plan. Instead, he concludes that "as settler, the City should not need to be concerned about the fiduciary implications of these proposals [MP-1]." Thus he avoided analyzing whether the City Manager and City Council were directing the City's pension board representatives to favor the City over pension plan participants. If they were doing so, a key issue would have been whether the City was acting as a fiduciary in connection with the plan to raise the system's deficit in order to allow the City to reduce the rate of its pension contributions. In his opinion Mr. Leavitt cites, but does not discuss, the case of *NLRB v. Amax*, 453 U.S. 322 (1981).[74]

In the *Amax* case the United States Supreme Court found that the fiduciary provisions of federal pension trust law (the Employee Retirement Income Security Act or ERISA) "were designed to prevent a trustee from being put into a position where he has dual loyalties, and therefore, he cannot act exclusively for the benefit of a plan's

---

[73] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring p. 2. See n. 26.

[74] Mr. Leavitt cites the *NRLB v. AMAX* case for the proposition that when the employer's representatives serve on pension boards, they act on behalf of the pension board, not of the employer. However, the case also should have alerted Mr. Leavitt to the legal problems that arise when these pension board members act to advance the employer's interest at the expense of pension participants.

18

participants and beneficiaries." *NRLB v. Amax*, 453 U.S. at 334. According to the court in *Amax*,

> The management-appointed and union-appointed trustees <u>do not bargain with each other</u> to set the terms of the employer-employee contract; they can neither require employer contributions not required by the original collectively bargained contract, nor compromise the claims of the union or the employer with regard to the latter's contribution. *NRLB v. Amax*, 453 U.S. at 336. (Emphasis added.)

Despite the clear <u>warning</u> contained in *Amax*, the facts and circumstances show that such bargaining was going on between the board's management and labor representatives in connection with the consideration and ultimate adoption of MP-1. This reality was memorialized in writing by pension trustee John F. Casey, who complained at the time that the board, in having to deal with MP-1, was being placed in the position of a negotiator:

> With respect to the City Manager's request for benefits and changes to the retirement system, I have serious concerns that the Board action of June 21, 1996, is flawed.
>
> The proposal as submitted by the Manager, i.e., a benefit increase for a reduction in actuarial rates, placed the Board in the position of <u>negotiator</u>. I submit that the Board function is to administer the benefits granted by the plan sponsor <u>and not negotiate</u> what the benefits should be with the plan sponsor. There is no authority for the Board to engage in this activity.[75]

Pension trustees "bargain[ing] with each other to set the terms of the employer-employee contract," the very behavior condemned in *Amax*, was in play during the Spring of 1996 as board members grappled with MP-1. Moreover, it appears that pension board members who were also City employees were placed in a conflict over whether to act "for the sole benefit of the beneficiaries of the fund." *NLRB v. Amax*, 453 U.S. at 337. Again, the issue of whether the fact that the City's representatives on the pension board were negotiating benefits on behalf of the City violated their fiduciary duties to the pension system was <u>not</u> directly raised in Mr. Leavitt's opinion letter of 29 April 1996.

However, Mr. Leavitt did discuss features of the fiduciary issues raised by MP-1. After categorizing "the parties to the plan revision process,"[76] he found that pension board members had a trust duty to pension plan members.[77] He also found that labor

---

[75] 16 July 1996 memorandum from John Casey to Fiduciary Counsel via Retirement Administrator.

[76] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring p. 1. See n. 26.

[77] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring pp. 1-2. See n. 26.

organizations representing City employees "should not be fiduciaries under the System with respect to SDCERS members."[78] In addition Mr. Leavitt determined that California State Constitution (Article XVI §17) "subjects public pension systems to the law of trusts[79] and acknowledged that the "solely in the interest" and "exclusive purpose" language contained therein "represents the trustee's common law duty of loyalty."[80] He then admitted that pension board members have "a duty to deal fairly and in good faith with the members of SDCERS."[81]

Then at this point in his opinion, Mr. Leavitt turned California employee pension trust law on its ear. He found that "the duty of loyalty set forth in the Constitution does not automatically preclude acts which incidentally benefit persons other than members of the System."[82] However, the reduction in the City's contribution rate called for a substantial, not incidental, reduction in the City's rate of contribution. In *Board of Administration v. Wilson*, 52 Cal. App. 4th 1109, 1118 (1997), "in arrears" financing of the State pension fund by which the California Legislature attempted a six-month delay in payments to the fund was found to be "an unconstitutional impairment of contract." *Board of Administration*, 52 Cal. App. 4th at 1118.

Mr. Leavitt knew that both the reduction in the City's pension contribution rate, which was euphemistically called "rate stabilization," and changes in the plan's reserves were, from the City's point of view, "the *quid pro quo* for the proposed benefit improvements."[83] Nonetheless, Mr. Leavitt opined that the City "should not need to be concerned about the fiduciary implications of these proposals."[84] He was saying, in other words, that despite the fact that the City was paying a quid pro quo in new benefits to pension board members in exchange for a reduction in the actuarially required contribution rates, no breach of fiduciary duties by the City occurred. Even if this assessment were true and the City were not acting as a fiduciary of the pension plan, the proposal certainly raised serious issues about whether the City was inducing board members to violate their fiduciary duties by lowering the contribution rate and disconnecting the actuary from the rate setting process. See *Reich v. Hall Holding Co.*, 990 F. Supp 955 (N.D. Ohio 1998); *Williams v. Wright*, 783 F. Supp. 1392 (S.D. Ga. 1992); *Schaefer v. Arkansas Medical Soc.*, 853 F.2d 1487 (8th Cir. 1988); *Varity Corp. v. Home*, 516 U.S. 489 (1996).

---

[78] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring p. 2. See n. 26.

[79] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring p. 3. See n. 26.

[80] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring p. 3. See n. 26.

[81] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring p. 4; Mr. Leavitt cited *Hittle v. Santa Barbara County Employees Retirement Association*, 29 Cal. 3d 374, 392 (1985) and *Symington v. Albany*, 5 Cal. 3d 23, 33 (1971). See n. 26.

[82] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring p. 4. See n. 26.

[83] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring p. 5. See n. 26.

[84] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring p. 5. See n. 26.

Moreover, in communicating the terms of the proposed changes, the City was acting as a fiduciary. Thus when City officials, like City Manager Jack McGrory, represented that the costs of the new benefits would be paid for with "surplus earnings," they were acting as fiduciaries to the plan participants, and when Mr. McGrory stated that the City would be able to reach full actuarial funding by increasing the rate of contributions into the plan by 0.50% after reducing the rate of contributions below those actuarially required, he was acting a fiduciary to the plan participants. See *Devlin v. Empire Blue Cross and Blue Shield*, 274 F.3d 76 (2d Cir. 2001); *Degnan v. Publicker Industries, Inc.*, 42 F. Supp. 2d 113 (D. Mass. 1999); *Anderson v. Resolution Trust Corp.*, 66 F.3d 956 (8th Cir. 1995); *Dall v. Chinet Co.*, 201 F. 3d 426 (1st Cir. 1999). Again, this issue was not addressed by Mr. Leavitt, and again, Mr. Leavitt was incorrect when he said that the City need not be concerned about the fiduciary implications of these proposals.[85]

In his 29 April 1996 opinion letter, Mr. Leavitt also argued that in satisfying their fiduciary duties, board members should consider "the Proposal as a whole rather than any individual component of the Proposal that is subject to this standard."[86] Mr. Leavitt argued that the pension board should consider the funding-related changes as part of an overall program of plan revisions that would be advantageous from the perspective of the members. Again, Mr. Leavitt ignored the fact that pension board members were being asked to negotiate benefits as part of the meet and confer process and to trade off new pension benefits for a relaxation of the City's contribution rate. On its face, this plan violated the role of the pension board. *NLRB v. Amax*, 453 U.S. 322 (1981).

Mr. Leavitt did admit that the MP-1 provision that no changes in actuarial assumptions or actuarial methodology would occur if they would conceivably affect contribution rates prior to July 1, 2000, "may raise fiduciary concerns."[87] This provision violated the fundamental principle that guarantees plan participants "a contractual right to an actuarially sound retirement system." *Board of Administration,* 52 Cal. App. 4th at 1118. Mr. Leavitt's assertion that disconnecting the actuary from the process to be followed in setting the funding needs of the City's pension system was thus in error. He suggested that it would be preferable for the proposal to provide the City with "acceptable alternatives" if the board had to "change actuarial assumptions or methodology prior to July 1, 2000."[88] This advice is more akin to aiding the scheme than to offering cautionary legal advice. Mr. Leavitt failed to provide the City needed professional services with the skill, prudence, and diligence that an ordinary and reasonable lawyer would use under similar circumstances. California Civil Instruction (Standard of Care §600).

---

[85] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring p. 5. See n. 26.

[86] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring p. 5. See n. 26.

[87] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring p. 5. See n. 26.

[88] 29 April 1996 letter from Jeffrey S. Leavitt to Deputy City Manager Bruce A. Herring p. 5. See n. 26.

On 2 May 1996 City Manager Jack McGrory presented MP-1 to the pension board. In doing so, he represented both that "the City has been working to resolve various problems facing the Retirement System and related benefit problems"[89] and that "it has become difficult for the City to work with the System's fluctuating rates."[90] It was not so much a question of fluctuating rates as an increase in the pension's funding deficit. The unfunded liability in the pension fund had gone up from $41.3 million in 1993 to $104 million in 1995, a 153% increase.[91] Mr. McGrory was dealing with a growing unfunded liability caused by the diversion of funds from the plan and by plan mismanagement.[92]

Board member John Casey raised several red flags about the proposal:

> Mr. Casey stated that a similar proposal had been brought forward last year, and after expending a significant amount of money, the Board was advised by outside fiduciary counsel that they could not move forward with the City's proposal. He strongly stated that he did not want this to occur again. Additionally, he questioned why Mr. Wyatt's firm would not be used when they are already familiar and have been educated about our system.[93]

Board President Enerson, who had attended the 26 February 1996 meeting with Mr. Grissom and Mr. McGrory where MP-1 had been hatched, admitted that he personally directed that another lawyer be retained to replace Mr. Wyatt:

> Mr. Enerson responded that the Board had been dissatisfied with the timeliness of receiving legal opinions from that firm and their lack of responsiveness to this Board. Mr. Enerson stated that because of these reasons, he had directed Staff to contact Attorney Dwight Hamilton, who had provided the Board with a fiduciary presentation at their Strategic Planning Workshop.[94]

Mr. McGrory's 2 May 1996 Concept Overview is included in the SDCERS 2 May 1996 board meeting minutes. According to the Concept Overview:

---

[89] 2 May 1996 SDCERS Retirement Board of Administration Special Meeting p. 1.

[90] 2 May 1996 SDCERS Retirement Board of Administration Special Meeting p. 1. See n. 89.

[91] 1994 SDCERS Annual Actuarial Valuation 2004; see fn 48.

[92] *See* 16 September 2004 Report p. 31 et seq. See n. 10.

[93] *See* 16 September 2004 Report p. 3; Mr. Casey was referring to Mr. Joseph Wyatt's law firm Morrison and Foerster. The firm had previously advised against a program that had some of the elements contained in MP-1. Mr. Casey raised an implied concern that Mr. Wyatt was set aside in favor of another lawyer who would under an opinion supporting MP-1. See n. 10.

[94] 2 May 1996 SDCERS Retirement Board of Administration Special Meeting p. 3. See n. 89.

The City Manager's proposal is being reviewed by outside fiduciary counsel engaged through the City Attorney's Office and has been presented to the CERS Board's actuary for his review and advice to the Board. All proposed changes are conditioned upon and subject to final approval by fiduciary counsel, City Council approval, Retirement Board approval, vote of plan participants, and confirmation of cost estimates by the System's actuary.[95]

The MP-1 proposal described in the 2 May 1996 Concept Overview reflected the plan changes from the 28 March 1996 and the 29 April 1996 versions. First, the cost to purchasers of past service credits was set at the "full cost of such service."[96] Second, the 29 April 1996 version of MP-1 had provided that any change made by the pension board in the actuarial assumptions affecting the City's contribution rates would cause the plan to sunset immediately and any additional benefits granted under MP-1 would be eliminated prospectively.

Under the 2 May 1996 version of MP-1, an increase in actuarial rates would be "added to the PUC rate to be achieved through the phased-in rate increases."[97] Mr. McGrory also prepared a power point presentation stressing that the "Employer Rate Stabilization Plan" would have "Phased Rate Increases" and that the difference between what was paid and what needed to be paid would come from the "Stabilization Reserve."[98] However, as of 7 May 1996, City labor official Cathy Lexin had yet to receive a formal written actuarial report costing the benefits that would be created under MP-1. On 7 May 1996 Ms. Lexin asked pension plan administrator Larry Grissom if the system's actuary, Rick Roeder, was "preparing something formal in writing on the costing of the benefits we've been talking about."[99]

Representatives of the San Diego City Municipal Employees Association (MEA) also joined in the negotiations taking place among City officials and pension trustees over MP-1. On 14 May 1996, Ann Smith, MEA's attorney, asked Bruce Herring for the "dollar savings" to the City if the rate stabilization plan was implemented:

What is the total dollar savings for the general fund during FY97 and FY 98 if the CITY's proposed retirement system funding changes—

---

[95] 2 May 1996 City Employees' Retirement System Concept Overview p. 1.

[96] 2 May 1996 City Employees' Retirement System Concept Overview p. 2. See n. 95.

[97] 2 May 1996 City Employees' Retirement System Concept Overview p. 4. See n. 95.

[98] 2 May 1996 MP-1 Power Point presentation documents attached to 2 May 1996 SDCERS Board of Trustees' Minutes of Meeting.

[99] 7 May 1996 Cathy Lexin to Larry Grissom subject: "Retirement Questions."

23

stabilization reserve, contingency reserve, PUC to EAN funding method conversion –are adopted?[100]

On 14 May 1996, the City Council held a closed session regarding meet and confer issues. The minutes of the closed session indicate that Mr. McGrory and Mr. Herring attended. However, as with the earlier meet and confer matters, the 14 May 1996 minutes indicate the point at which the meet and confer was brought up: "This portion of the meeting ended at 10:50 a.m. Council continued the meeting to discuss Meet and Confer matters and then adjourned to open session."[101] On 15 May 1996, City Manager Jack McGrory sent a memorandum to the City Council and Mayor summarizing "the major changes you authorized yesterday for the Police Officers Association, Local 145, Municipal Employees Association, and Local 127. Ratification votes are scheduled for this week."[102]

On 15 May 1996, the City's pension board had additional discussions about the MP-1 proposal. Board member John Casey raised concerns about a new fiduciary counsel being retained to review MP-1 in place of the board's existing fiduciary counsel, Mr. Joseph Wyatt of Morrison & Foerster:

> Mr. Saathoff stated that any proposal would need approval by the Board's actuary and fiduciary counsel.
>
> Ms. Webster questioned whether the Administrator has the authority to move forward in retaining outside fiduciary counsel at this point.
>
> Mr. Saathoff responded that the Board could seek a one-time legal opinion and issue an RFI for future fiduciary services.
>
> Mr. Grissom stated that he had spoken with Dwight Hamilton regarding this issue and would be following up with him in the morning.
>
> Mr. Casey stated that the Board had previously retained Joseph Wyatt's firm as outside fiduciary counsel and has never voted to cancel that contract. He asked why new counsel was being sought for this issue when no discussion had taken place related to canceling the existing contract with Morrison and Foerster. He requested that this item be placed on the June agenda so that the Board could set a policy on how to retain/terminate counsel moving forward.

---

[100] On 15 May 1996, Ms. Lexin informed Ms. Smith that the estimated difference between PUC actuarial rates and agreed-to rates in the May 2 proposal for FY97 and FY98 was $15.7million and that the general fund portion would be approximately "$10.8 million." 15 May 1996 letter from Ms. Lexin to Ms. Ann Smith.

[101] 14 May 1996 San Diego City Council Closed Session Minutes p. 2.

[102] 15 May 1996 Jack McGrory memorandum to Honorable Mayor and City Manager.

Mr. Saathoff ensured Mr. Casey that his request would be granted and that a policy would be put place.

During the 15 May 1996 meeting, Mr. Saathoff also indicated that the pension board was anticipating a formal proposal for its consideration by June 30, 1996. Bruce Herring reported that the "Manager's office has been meeting daily to try and reach an agreement on a formal proposal."[103] Mr. Herring stated that once agreement had been reached on MP-1, the City would be asking that the "Board act expeditiously to have their actuary and fiduciary counsel review the proposal."[104]

A 17 May 1996 letter from MEA attorney Ann Smith to Cathy Lexin showed how deeply the 1996 meet and confer process over labor agreements with the City's employee unions had become entangled with the administration of the City's pension system. In her 17 May 1996 letter to Ms. Lexin, Ms. Smith wrote that the MEA wanted a "vast improvement" in the formula used to calculate pension benefits for the City's general member employees:

> I cannot state strongly enough how committed MEA's leadership and Negotiating Team are to the following outcomes: (1) a vast improvement in the retirement formula for general members in view of the resources available to the system [which resources constitute participants' money], and in view of the richness of the present and projected benefits for safety members by comparison; and (2) parity in general salary increases for all CITY employees regardless of job classification.[105]

Ms. Smith acknowledged that the resources available to the system that were the focus of her 17 May 1996 letter were the "participant's money" already in the pension system.[106] As such, the sole and exclusive responsibility over these assets (the participant's money) rested with the pension board of administration: "The retirement board of a public pension or retirement system shall have the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system."[107]

Because the MP-1 package proposed to make changes in the reserves and funding methods used by the pension system, the board of administration acting in their fiduciary duties, not City officials, should have determined how to use those funds. However, as

---

[103] 15 May 1996 SDCERS Retirement Board of Administration Minutes pp. 13-14.

[104] 15 May 1996 SDCERS Retirement Board of Administration Minutes pp. 13-14. See n. 103.

[105] 17 May 1996 Letter from Ann Smith to Cathy Lexin re: MEA's Proposal for Resolution of Retirement System Issues and Contract Extension Covering FY98.

[106] 17 May 1996 Letter from Ann Smith to Cathy Lexin re: MEA's Proposal for Resolution of Retirement System Issues and Contract Extension Covering FY98. See n. 105.

[107] Cal. Const. Art. XVI, § 17(a). See n. 1.

Mr. Casey wrote, the MP-1 call for "a benefit increase for a reduction in actuarial rates" put the board in the position of a negotiator rather than administrator of the plan assets. Ms. Smith ignored that distinction in her 17 May 1996 letter.

Moreover, Ms. Smith acknowledged how difficult it would be to get plan participants to go along with the "tampering with funding methods" proposed in MP-1. Therefore, Ms. Smith proposed a quid pro quo arrangement in which the MEA would undertake the "formidable task" of persuading plan participants to go along with MP-1 in exchange for "respectable and credible" increases in benefits for MEA members:

> I also cannot over-emphasize that the level of employee skepticism and distrust regarding any tampering with funding methods related to the retirement system is enormous and will require a yeoman's effort by every person associated with MEA to overcome. MEA will not undertake this formidable task unless the gains in benefit levels for the employees MEA represents are clearly respectable and credible rather than de minimus. Frankly, at this juncture, the proposal to increase the general member's formula from 1.48% to 1.75% at age is de minimus when contrasted with a proposed safety formula of **3% at age 55** and **2.74% at age 50**.[108]

Ms. Smith closed her 17 May 1996 letter by noting that she and Cathy Lexin would be meeting on Monday, 20 May 1996.[109] On 25 May 1996, the City's pension system actuary, Rick Roeder, provided pension administrator Grissom with the "latest version" of the contribution cost estimates for MP-1. Mr. Roeder had determined that the general benefit formula and disability increases under MP-1 would require a contribution rate increase of 3.64% of general payroll. Mr. Roeder's estimates of MP-1's effect on contribution rates were as of 30 June 1995. Mr. Roeder concluded by stating that the "total increase in accrued liabilities as a result of the benefits improvements is estimated to be $76.3 million dollars."[110]

The City Council held another closed session regarding MP-1. Closed session materials that were recovered from Ms. Lexin's documents include a document entitled "Closed Session Meet and Confer 28 May 1996."[111] Among the items listed was: "1. Retirement Proposal Page No. 10-1 thru 10-4."[112] The second page of this document was entitled "Proposal Overview." One of the headings on the second page was:

---

[108] 17 May 1996 Letter from Ann Smith to Cathy Lexin re: "MEA's Proposal for Resolution of Retirement System Issues and Contract Extension Covering FY98." See n. 105.

[109] 17 May 1996 Letter from Ann Smith to Cathy Lexin re: MEA's Proposal for Resolution of Retirement System Issues and Contract Extension Covering FY98" p. 3. See n. 105.

[110] 25 May 1996 Letter from Rick Roeder to Larry Grissom.

[111] 28 May 1996 Closed Session Meet and Confer documents.

[112] 28 May 1996 Closed Session Meet and Confer documents. See n. 111.

RATE STABILIZATION PROPOSAL:
Increase Employer Rates .50%/year
Provide Benefit Improvements
Pay Difference From Excess Earnings.[113]

Also contained on the second page of the 28 May 1996 closed session materials was an alternative clearly demonstrating that City officials were looking for ways to balance the City's budget:

ALTERNATIVE:
Pay the Actuarial Rate
Cut $8.66 m from FY97 Budget.[114]

Page 3 of the 28 May 1996 closed session materials described the MP-1 proposal under the heading "San Diego City Employees' Retirement System (SDCERS) P R O P O S A L."[115] Below this heading were listed the following proposed items that clearly show that the document would have fully informed the City Council of the details of the MP-1 proposal:

I.     BENEFIT CHANGES
   - a.     Eliminate Disability Income
   - b.     Pre-1980 Retirees Health Insurance ($600/yr)
   - c.     Increase 13th Check from $30/yr of service to $60/yr for Pre-10/6/80 retirees and to $75/yr for Pre-12/31/71 retirees
   - d.     Provide for purchase of up to 5 years service credit
   - e.     Improve General Member Formula
   - f.     Increase Disability Benefit Formula for General Members from 33-1/3% to 50%
   - g.     Improve Safety Member Formula
   - h.     Establish a Deferred Retirement Option Plan (no cost to City/CERS)

* * *

III.     RATE STABILIZATION
   - a.     Pay Budgeted Employer Rates for FY96 and FY97
   - b.     Increase Employer Rate by .50 until Rate Reaches PUC (Projected Unit Credit) Rate/Switch to EAN (Entry Age Normal) Rates When Rates Cross
   - c.     Pay Difference Between Actuarial Rate and Agreed-To Rate from Undistributed Surplus Earnings

---

[113] 28 May 1996 Closed Session Meet and Confer documents p. 2. See n. 111.

[114] 28 May 1996 Closed Session Meet and Confer documents p. 2. See n. 111.

[115] 28 May 1996 Closed Session Meet and Confer documents p. 3. See n. 111.

IV.  RESERVES
    a.    Create Contingency Reserve (1% of assets)
    b.    Create Stabilization Reserve (up to $75m from Surplus
        Undistributed Earnings

V.  APPROVAL PROCESS
    a.    Contingent Upon All Labor Organizations Ratifying FY98
        MOU Extensions and Supporting Changes with CERS and
        Participant Vote
    b.    Contingent Upon Approval of CERS Board, Fiduciary
        Counsels, City Attorney & Actuary
    c.    Contingent Upon Final Approval of City Council.[116]

The 28 May 1996 minutes of the City Council's closed session indicate that Mr. McGrory and Mr. Herring were present. The minutes show that after considering unrelated litigation matters "Council continued with meet and confer items until 10:00 A.M."[117]

On 29 May 1996 Ms. Cathy Lexin, the City's labor relations manager, provided the City's outside fiduciary counsel with "what we believe to be the final draft of the City Manager's Proposed Changes to the San Diego City Employee's Retirement System." Ms. Lexin noted that the major difference in the new draft dated 28 May 1996 is "the inclusion of a benefit/formula improvement for the Safety Members."[118]

On 4 June 1996, the San Diego City Council held a closed session to discuss meet and confer items. In attendance were City Manager Jack McGrory and Deputy City Manager Bruce Herring.[119] Materials for the 4 June 1996 closed session contained meet and confer documents, including the "Retirement Proposal" and a "City Employees Retirement System June 4, 1996 Proposal."[120]

By June 5, 1996, Ron Saathoff, president of San Diego City Fire Fighters Local 145, Garry Collins, president of the San Diego Police Officers Association (POA), Ed Lehman, president of AFSCME Local 127, and Judy Italiano, president of MEA, had signed off on the 4 June 1996 proposal.[121] In each instance the signatures of the union

---

[116] 28 May 1996 Closed Session Meet and Confer documents p. 3. See n. 111.

[117] 28 May 1996 San Diego City Council Closed Session Minutes p. 2.

[118] 29 May 1996 Letter from Cathy Lexin to Jeffrey Leavitt (with 28 May 1996 proposal attached) with a copy to Deputy City Attorney John Kaheny.

[119] 4 June 1996 San Diego City Council Closed Session Minutes.

[120] 4 June 1996 Closed Session Agenda "City Employees Retirement System June 4, 1996 Proposal."

[121] 4 June 1996 Management Proposal with Fire Fighters Local 145 (signed 5 June 1996), the POA, AFSCME Local 127, and the MEA for the FY98 MOU Extensions.

representatives were preceded by a provision, acknowledged and agreed to by the union presidents on behalf of their respective unions, that the "interrelationship of these various issues to each other necessitates that the entire proposal be considered and acted upon concurrently."[122]

On 6 June 1996, City Manager Jack McGrory informed the Mayor and City Council that an agreement had been reached on 5 June 1996, with MEA and Locals 127 and 145 on the "proposed changes to the City Employees Retirement System" contained in the 4 June 1996 proposal.[123]

The 4 June 1996 proposal agreed to by the City and its four union presidents, which was based upon an estimated cost of $110.35 million, provided not only that the cost would be "paid from excess earnings [and] includes $71.31 million in contributions as a result of benefit improvements"[124] but also that employees would pay the "full cost" of the pension service credit benefits. The proposal also increased the percent of salary that general members earn each year from 1.48% to 2.0% at age 55. This was certainly the "respectable and credible rather than de minimus" increase that Ms. Smith had sought in exchange for the MEA's support of the MP-1 proposal.

The past liability for increases in general member pension and disability payments was to "be paid for by the City through excess earnings." The employer's share was to be "added to the actuarial rate (PUC) calculations beginning mid-year FY97. The employee's share was in part to be "paid from excess earnings for FY97."[125] Again, this was an agreement simply to increase the pension deficit and push the costs of the benefits onto future generations. Regarding the DROP program, the 4 June 1996 proposal provided that it "would have no cost impact to the City or CERS" and that the City would, at the end of three years, have the right to evaluate the effect of the program and the unilateral right to prospectively terminate it.[126]

The 4 June 1996 proposal was revised on 6 June 1996, and then again on 7 June 1996. Under the terms of the latter version, the City was offering seven benefit increases

---

[122] 4 June 1996 Closed Session Agenda "City Employees Retirement System June 4, 1996 Proposal." See n. 120.

[123] 6 June 1996 Memorandum from City Manager Jack McGrory to Mayor and City Council re: Labor Negotiations FY 98 Tentative Agreements.

[124] 4 June 1996 Closed Session Agenda "City Employees Retirement System June 4, 1996 Proposal," p. 5. See n. 120.

[125] 4 June 1996 Closed Session Agenda "City Employees Retirement System June 4, 1996 Proposal" p. 3. See n. 120.

[126] 4 June 1996 Closed Session Agenda "City Employees Retirement System June 4, 1996 Proposal" p. 5. See n. 120.

in exchange for a reduction of the City's contribution rate to the pension fund,[127] and the City's power to rid itself of the DROP program was weakened:

> At the end of three (3) years, the City will evaluate the cost impact of this program. If the cost impact to the City or CERS is greater than the savings, the City agrees to meet and confer to impasse prior to imposing any changes in the DROP plan. If the City proposes to change the DROP Plan, the 90% cap on CERS would also be re-negotiated.[128]

On 11 June 1996, the City's pension board convened a "special workshop" to discuss the 7 June 1996 version of City Manager Jack McGrory's MP-1 proposal. The purpose of this meeting, which was held with the understanding that "no action" would be taken on the MP-1 proposal "until the regularly scheduled Board meeting of 21 June 1996,"[129] was to receive "1) presentation of the Manager's proposal by Mr. McGrory; 2) questions and comments from the Board; fiduciary counsel Dwight Hamilton; and actuary Rick Roeder."

During his 11 June 1996, presentation at the workshop, Mr. McGrory reminded the pension board that on 2 May 1996, he had provided a draft of MP-1.[130] Mr. McGrory indicated that representatives from his office had discussed MP-1 with the board's actuary and the City's independent fiduciary counsel.[131] He then summarized the proposal:

> Mr. McGrory summarized the proposal stating that it offers improved retiree cost-of-living benefits and health insurance which if adopted, would become a System liability; it recommends elimination of the disability offset; offers a wider purchase of service program at no additional cost to the City; includes a DROP plan which is similar to a deferred retirement; and would assist the City in stabilizing their contribution rates. This would be accomplished through changing the System's funding methodology by eliminating the current PUC (Projected Unit Credit) method, and phasing in the original EAN (Entry Age Normal) method over a period of time.[132]

---

[127] 4 June 1996 Closed Session Agenda "City Employees Retirement System June 4, 1996 Proposal" pp. 2-6. See n. 120.

[128] 7 June 1996 City Employees Retirement System Proposal p. 5.

[129] 11 June 1996 Minutes of the SDCERS Special Workshop meeting p. 1.

[130] 11 June 1996 Minutes of the SDCERS Special Workshop meeting p. 1. See n. 129.

[131] 11 June 1996 Minutes of the SDCERS Special Workshop meeting p. 2. See n. 129.

[132] 11 June 1996 Minutes of the SDCERS Special Workshop meeting p. 2. See n. 129.

After discussing the benefits to be given in exchange for reduced City contributions to the plan, Mr. McGrory represented that the City would increase its contributions to the pension plan:

> As the proposal related to the City's contribution rates, Mr. McGrory stated that it is recommended that the employer contribution rate be increased beginning in fiscal year 1998, but that the increase be phased in over time at a rate of 0.5% per year, until such time as the rates equal Entry Age Normal (EAN) as determined by the Board's actuary. At that time, it is recommended that the City convert from the PUC (Projected Unit Credit) funding to EAN. Until then, the difference between the PUC rate, as determined by the actuary, the rate of the 0.5% per year would be paid from the System's earnings stabilization rate reserve. He stated that the City had budgeted 7.08% for the current fiscal year and that the PUC rate is 8.06%-this would increase to 10.87% and up to 12.18% in the year 2007. *** This reserve would be used for two purposes: 1) to pay for all of the costs for employees who would receive the retirement formula benefit increase (approximately $71.31 million); and, 2) to assist the City in stabilizing and increasing their contribution rates using the additional $39 million.
>
> He stated that currently there is approximately $10.07 million in the earnings stabilization reserve which was created last year and an additional $18.85 million which is 50% of the 1995 surplus, for a total of $29.55 million. He stated that the City is proposing to transfer the $29.55 million into the stabilization reserve, and that the actuary has estimated $116 million in total earnings to the System in FY 96. Once the distribution to the employer/employee reserve, the retirement administration costs, the health insurance and 13[th] check benefit have occurred, there would be approximately $70.7 million remaining, with $79.3 million in surplus undistributed earnings. The City is proposing that 50% of that be transferred to the earnings stabilization reserve for an additional $39.65 million. This would result in the creation of a System earnings stabilization reserve of $69.2 million this year.[133]

According to the San Diego City Attorney, in representing the MP-1 proposal to the board, Mr. McGrory was acting as a fiduciary to the board. As such, he failed in his duty to advise the board that the moneys in the pension system that he proposed to use for the stabilization reserve already belonged to the system.

At the 11 June 1996 workshop, Mr. McGrory told the pension board members that the meet and confer process had been completed.[134] In addition, Mr. McGrory stated

---

[133] 11 June 1996 Minutes of the SDCERS Special Workshop meeting p. 4. See n. 129.

[134] 11 June 1996 Minutes of the SDCERS Special Workshop meeting p. 4. See n. 129.

that "the Board's actuary had provided the City with all of the cost information related to these proposals."[135] The discussion then turned to how the "surplus earnings" could be used to finance the costs of the increased benefits, and the pension administrator attempted to explain how the process works:

> In response to Ms. Wilkinson's question, Mr. Grissom stated that the stabilization reserve is money held outside of the assets used for the purpose of the actuarial valuation. When this occurs, money is transferred from that fund back into System assets. While the fund is not "whole" per se, a step has been made toward keeping the liability from growing to a much higher level.

> Ms. Wilkinson then asked if the numbers were arbitrary as far as the difference is concerned.

> Mr. Grissom responded that once all has been paid as required by the Municipal Code, the remainder is considered to be surplus earnings. As it now stands, 100% of surplus earnings is put back into the employer contribution reserve for the sole purpose of reducing the System's unfunded liability. What this plan visualizes is that 50% of that surplus would be put in the stabilization reserve, while the other 50% would be put into the employer's contribution reserve. As a means to make this rebalancing possible, money would be taken from the stabilization reserve and put back into the employer contribution reserve.

Article XVI § 17 of the California Constitution is clear that public pension plan assets are to be administered by the pension board -- that is, not by City Manager Jack McGrory: "the retirement board of a public pension or retirement system shall have plenary authority and fiduciary responsibility for investment of moneys and administration of the system"[136] and the "sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system."[137] Moreover, the assets of the pension fund belong to the pension fund and should not have been used to finance the City's contribution rate reductions: "The assets of a public pension or retirement system are trust funds and shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system."[138]

---

[135] 11 June 1996 Minutes of the SDCERS Special Workshop meeting p. 4. See n. 129.

[136] Cal. Const. Art. XVI, § 17(a). "The power of the board of administration of a pension plan is subject to conditions discussed herein." See n. 1.

[137] Cal. Const. Art. XVI, § 17(a). See n. 1.

[138] Cal. Const. Art. XVI, § 17(a)(b). See n. 1.

In addition, the retirement board and plan administrator were wrong when they allowed the City's budget priorities to take precedence over their duties to plan participants by their agreement to permit the City to pay less than the actuarially required funds needed by the plan:

> The members of the retirement board of a public pension or retirement system shall discharge their duties with respect to the system solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system. A retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty.[139]

During the 11 June 1996 workshop, Mr. McGrory told the board that he had "spent a significant amount of time working with members of Staff and the Retirement Board on the MP-1 proposal. Board president Enerson concurred"[140] and admitted that on numerous occasions he had met with the manager's office to develop a proposal that would be acceptable to all parties involved.[141] The pension plan administrator, Lawrence Grissom, was a fiduciary to the plan and should not have been involved in using plan assets ("surplus earnings") to reduce the City's legal liability to make actuarially determined contributions to the plan.[142]

Mr. Roeder verified that his firm had generated the numbers that were presented:

> Mr. Roeder confirmed that the numbers that were presented were generated by his firm. He stated that if all of these benefits are put into place and are reflected in the 6/30/96 valuation, from a technical standpoint, there would be approximately $80 million which will have the impact of a 5% reduction in whatever the funding ratio would be at that point.
>
> ***
>
> Mr. Casey asked about the long-term impact of creating the contingency and stabilization reserves and how this would affect the System 10-15 years in the future.

---

[139] Cal. Const. Art. XVI, § 17(b). (Emphasis added.) See n. 141.

[140] 11 June 1996 Minutes of the SDCERS Special Workshop meeting p. 12. See n. 129.

[141] 11 June 1996 Minutes SDCERS board of trustees Special Workshop p. 12. See n. 129.

[142] San Diego Charter § 143. ("City shall contribute annually an amount substantially equal to that required of the employees for normal retirement allowances, as certified by the actuary."). See Cal. Const. Art. XVI, § 17(a); see also Employee Retirement Income Security Act (ERISA) § 404(a)(1), requiring fiduciaries to act solely in the interest of plan participants and beneficiaries. See n. 8.

Mr. Roeder responded that the impact would be relatively negligible to the extent that the amounts that are set aside would be periodically reviewed and used to fund part of the City's contributions in bad market years.

\*\*\*

In relation to the 10% drop, Mr. Roeder stated that if the funded ratio drops 10% from the June 30, 1996 funded ratio, the proposal sunsets. Additionally, he said that there may be actuarial gains this year. Absent any benefit increases, he reported that the System may have been at a 90%-95% funding level.

Ms. Wilkinson stated that a 15% drop would lower the System's funding level to the high 70 percent range and asked what this amounts to in dollars.

Mr. Roeder responded that the 10% drop would not occur for another 5-6 years and that this would be hard to predict. However, he stated that currently, the amount at 15% would be approximately $225 million.

Mr. Roeder responded that he would have been reluctant to recommend this plan without some sunset provisions. However, he stated that he believes that this is a sound proposal as long as the funded ratio does not drop significantly, and with the <u>appropriate sunset</u>[143] <u>provisions</u> in place.[144]

It was at this point that Mr. Roeder's firm and clear advice could have made a critical difference in stopping the ill-fated MP-1 proposal from going forward. However, Mr. Roeder at this meeting and throughout MP-1 negotiations instead adopted the role of facilitator rather than independent adviser working for the best interests of plan participants. With his advice to the pension board in considering MP-1, Mr. Roeder's conduct fell below applicable professional standards,[145] for in providing guidance to the pension board on explaining the actuarial affect of MP-1 to plan participants and board members, he was acting as a plan fiduciary.

---

[143] In 2002 when the trigger was hit, the sunset provisions should have kicked in, and the benefits created under MP-1 should have been set aside. This result did not occur. During the 11 June 1996 workshop, Mr. Grissom stated that the sunset provision "is applicable to the entire proposal." 11 June 1996 Minutes of the SDCERS Retirement Board Special Work Shop meeting. See n. 129.

[144] 11 June 1996 Minutes SDCERS board of trustees Special Workshop p. 12-15. See n. 129.

[145] See generally June 2005 letter from the City of San Diego Audit Committee relating to Mr. Roeder; *When Is Employer, Labor Union, Affiliated Entity or Person or Pension or Welfare Plan 'Fiduciary' within meaning of §3(21)(A)(i) or (iii) or Employee Retirement Income Security Act of 1974* 178 A.L.R. Fed. 129 (2005). See n. 72.

The central reality of the MP-1 proposal was the agreement among all the parties to pass on the costs of the new benefits and intentional underfunding of the pension plan to future generations. The pension board's 11 June 1996 discussion focused on this reality:

> She [Ms. Jamison] questioned whether future tax payers would be placed in a position of having to pay for these benefit increases if they are adopted, and how this curve would affect the City's obligation.[146]

> ***

> Mr. Casey stated that there is an underlying statement in the Charter that indicates that today's service credit must be paid for by today's taxpayers. He stated that this proposal gives him the distinct impression that future taxpayers will be paying for these benefit increases. He questioned if this would be the case.

> ***

> Mr. Casey stated that if this proposal is implemented, he has concerns that the younger generation will be expected to pay retirement benefits for today's generation. He stated that he does not believe this is appropriate.

> Mr. Roeder responded that there is no question that the rate that is being agreed upon is less than what he considers to be the 'ivory tower' actuarial rate over the next ten years. Therefore, some of these costs will be borne by the future generation. (Pension Board's 11 June 1996 Meeting)

In assessing the effect of MP-1 on the pension system, neither the pension board members, the pension administrator, nor the actuary asked the right questions or took the right actions, and because of their failure, the San Diego City pension plan faces a historic financial crisis. The pension plan has a deficit of at least $1.7 billion dollars. Plan participants hold paper interests that are worth about 60 cents on the dollar. Pension plan fiduciaries violated their constitutional duty to prudently manage the City's pension plan:

> (c)    The members of the retirement board of a public pension or retirement system shall discharge their duties with respect to the system with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with these matters would use in the conduct of an enterprise of a like character and with like aims.[147]

---

[146]  11 June 1996 Minutes SDCERS board of trustees Special Workshop p. 15. See n. 129.

[147]  *See* Cal. Const. Art. XVI, § 17(c). (Emphasis added.) See n. 1.

The pension board also heard from a privately retained legal counsel regarding the fiduciary implications of the MP-1 proposal. Mr. Wyatt from Morrison & Foerster, whom the board had previously retained to advise it on fiduciary matters, had cautioned against using pension money to fund a reserve account without an actuarial determination that the moneys so used were not needed by the fund to meet its actuarially determined funding needs.[148]

Mr. Hamilton told the board that "there were 'red flags' raised in his mind by this proposal as it relates to the Board's duty of loyalty to the integrity of the fund and addressed those individually."[149] Mr. Hamilton also indicated that he was troubled by the ambiguity of MP-1's sunset provision:

> Additionally, he said that he was troubled by Issue #3. More specifically, he was troubled by the fact that the sunset provision does not spell out what would occur if the funded ratio were to fall lower than 10% and the sunset were to go into effect. He stated that this could have a drastic change or effect on the fund itself and the investment benefits. He stated that as it relates to the Board's loyalty to the beneficiaries, he believes that it is important that the proposal spell out exactly what will occur if [it is] sun setting.[150]

Mr. Hamilton raised additional concerns that MP-1 provisions would violate the right of the pension participants to a sound actuarial system:[151]

> Another troublesome area to Mr. Hamilton was the specific agreement that there would be no changes in actuarial assumptions or methodology until fiscal year 2007. He reminded the Board that the pension beneficiaries and members have a vested right to an actuarially sound system and that the Board has a duty of loyalty to the integrity of the fund that cannot be contracted away. He stated that he believes that the Board's right to annually and continually review their methodology and assumptions is essential. He was concerned that the agreement says that this will not change until the year 2007. Additionally, the statement that reads "...under extraordinary circumstances, the Board might be able to change those actuarial assumptions ..." troubled him because the definition of "extraordinary circumstances" is unclear. He stated that this language needs to be specific.

---

[148] *See* 22 August 1995 letter from Morrison & Foerster to SDCERS administrator Lawrence Grissom.

[149] 11 June 1996 Minutes SDCERS Board of Trustees Special Workshop p. 18. See n. 129.

[150] 11 June 1996 Minutes SDCERS Board of Trustees Special Workshop pp. 19-20. See n. 129.

[151] See *Board of Administration v. Wilson*, 52 Cal. App. 4th 1109 (1997); see Addendum of Cases.

As MP-1 was revised, the underlying funding flaw became apparent. For fiscal year 1996, the City was to reduce its contribution rate from its current level of 8.6% to 7.08%. While it was reducing its contribution rate, the City would significantly increase the contribution rate needed to pay for the new benefits. After fiscal year 1997, the City would begin fixed payments, which would increase by .05% through 2006.

The pension board should have computed whether a .05% increase in the City's contribution rate starting in 1998 would be greater than the contribution rate needed to pay for the new benefits and for the growth of plan liabilities. Moreover, for the pension board to meet its duty to provide an actuarially sound system to the plan beneficiaries and for the City to ensure that its funding needs were met, an actuarial analysis should have been completed. Mr. Hamilton did not focus on the needed computation of any gap between the increased costs for the new benefits and the .05% increase in the City's contribution rate starting in 1998. However, as set forth above, he did focus on the failure of the MP-1 plan to provide for regular annual actuarial analyses of the funding needs of the City's pension plan.

Under the funding plan any difference between the system's actuarially determined funding needs and the amounts that the City paid into the system were to be paid out of a stabilization reserve. Although plan administrator Grissom stated that the stabilization reserve "would be capped at $75 million,"[152] the stabilization fund was to be funded with "surplus earnings," which were already plan assets.

The use of "surplus earnings" to fund the stabilization fund would dollar-for-dollar increase the unfunded liability -- that is, for each dollar transferred out of the system into the stabilization fund, the City would have to pay another dollar back. Thus the funding plan to pay for the new benefits was merely smoke and mirrors. This assessment was confirmed by the fact that the complicated reserves were not used to pay for any of the additional benefits. Rather, these costs were simply added to the unfunded liability of the pension plan. Moreover, actuary Roeder's cost estimates for the new benefits proved to be understated.[153]

During the 11 June 1996 workshop, Mr. Hamilton was grilled about the fact that MP-1 would be transferring the costs of the new benefits to the next generation:

> Ms. Parode raised concerns about Mr. Hamilton's statement that the decision to enrich benefits at the expense of the funding future of the fund would be one of a business issue and not a fiduciary issue seemed inappropriate. ***

---

[152] 11 June 1996 Minutes SDCERS Special Workshop p. 10. See n. 129.

[153] Although the gap between the actual costs of the new benefits created by MP-1 and those estimated by actuary Roeder will have to be determined by a new independent actuary, the amount will be multiple millions of dollars.

Mr. Hamilton responded that if this is what he said, it was not what he meant. He clarified that the Board has a duty to protect the integrity of the fund. Therefore, benefits could be increased whereby the integrity of fund is not destroyed. On that the Board must rely on their actuary to ensure that the decision is actuarially sound. Additionally, he stated that just because the Board would be increasing the unfunded ratio does not necessarily mean that this would be a breach of fiduciary duty.

Ms. Parode asked if there are any standards available to fiduciaries regarding funding levels, stating that she assumes not all systems are fully funded. However, she questioned how far unfunded a system can become before becoming susceptible to a challenge on the Board's management of the fund.

Mr. Hamilton responded that it is not so much that the System is becoming unfunded, but that the liability of current employees/retirees are being transferred to future taxpayers.[154]

Missing from this discussion was the fact that the City was not operating within its Charter § 99 expenditure control provisions and that City Manager Jack McGrory and the City Council owed a fiduciary duty to the City of San Diego and its taxpayers just as the pension board owed a duty to plan participants.

Ms. Parode did not let Mr. Hamilton off the hook; instead she pressed him to explain the nature of the pension board's duty to assess the City's financial ability to pay for the new benefits:

Ms. Parode asked whether the Board has a fiduciary duty to look at the future financial situation of the City prior to approving this.

Mr. Hamilton responded that the City is the settlor of the trust and that it is their employees' basic responsibility to fund it. He stated that in what he had heard today, he believes that there had been some unrest between the City and the Board based upon this exact issue. He stated that although the fund has earnings, the City does not understand why those monies cannot be used to alleviate their basic responsibility. He stated that these are difficult issues and that the Board must work with their actuary and fiduciary counsel to determine this. Decreasing the amount the employer would be paying to fund the trust on the basis that this will eventually come together from an actuarial standpoint does not necessarily mean that this would be a breach of fiduciary duty.

---

[154] 11 June 1996 Minutes SDCERS board of trustees Special Workshop pp. 22-23. See fn. 129.

Mr. Hamilton responded to direct questions about the previous opinion issued by Mr. Joseph Wyatt of the Morrison & Foerster firm regarding the use of plan assets to fund the stabilization reserve:

> Mr. Hamilton responded that he had reviewed Mr. Wyatt's opinion. He stated that the key to the stabilization reserve is under the Claypool case, which says that the funds must be actuarially available. Because the Board has no way of knowing whether those funds would be actuarially available, he stated that he agreed with Mr. Wyatt's opinion regarding the annual funding of the stabilization reserve from the surplus.[155]

Thus Mr. Hamilton had concluded that the funds that Mr. McGrory had indicated would be available to pay for the increased costs and reduced contributions from the City were not yet determined to be "actuarially available" -- a precondition to the intended use. Ms. Parode had uncovered the major defect in the MP-1 plan. No legal source of funds was identified to pay for either the reduced contributions or the increased benefits.

There was a flurry of activity during the 10 days following the 11 June 1996 MP-1 workshop and before the pension board was to meet on 21 June 1996, to consider the approval of MP-1. On 19 June 1996, the pension board administrator described additional revisions to MP-1 following the 11 June 1996 workshop. With regard to the reduction of the City's contribution rate, a new trigger feature was added to MP-1, requiring that, if the pension plan's funded ratio fell below 10% of its 30 June 1996 ratio of 92.3%, or in other words, if it fell below the 82.3%, the City would increase its contribution as the actuary determined was necessary.

> B. The city will pay the agreed to rates shown above for FY 96 through FY 2007. In the event that the funded ratio of the System falls to a level 10% below the funded ratio calculated at the June 30, 1996, actuarial valuation in which the shortfall in funded ratio is calculated. The increase in the City paid rate will be the amount determined by the actuary necessary to restore the funded ratio to the proper level.
>
> C. If the System's actuary makes changes in actuarial assumptions or methodology which are approved by the Board prior to July 1, 2007, any changes in the employers contribution rate will adjust the PUC rate to be achieved through extended incremental increases shown in paragraph A. above. If the phase in would require an extension past July 1, 2009, in order to achieve the full actuarial PUC rate, the City paid rate will be adjusted by the amount necessary to achieve full phase in by that date.[156]

---

[155] 11 June 1996 Minutes SDCERS board of trustees Special Workshop p. 23. See n. 129.

[156] 19 June 1996 memorandum form Larry Grissom to Cathy Lexin re: San Diego City Employees' Retirement System Issue No. 3 Employer Contribution Rates.

Although these revisions created several problems, one central fact emerged: The revised MP-1 removed any possible doubt that the benefit costs were going to be passed on to the next generation of San Diegans. Any increase in the pension deficit due to the benefit increases or contribution rate reductions was going to be added to the pension short-fall, and the amortization period was to be extended indefinitely into the future. The hard questions asked by Ms. Parode and Mr. Casey forced revisions to MP-1 that led City, pension, and union officials pushing MP-1 to engage in ever more blatant fraudulent and unlawful behavior.

On 21 June 1996 SDCERS outside counsel Dwight Alan Hamilton provided Cathy Lexin with a draft of his opinion letter supporting MP-1.

An undated memorandum written before but in reference to the 21 June 1996 retirement board meeting and secured from the files of City labor negotiator Mike McGhee established that the following were "matters of fact for the record that are part of the deal":[157]

> If the retirement deal is approved by the Retirement Board, at the June meeting, we believe the following are matters of facts for the record are part of deal:
>
> 1.  Fiduciary Council [sic] will have unequivocally approved the deal as being legal.
>
> 2.  The Actuary needs to be on record as to the total cost of the deal (Rick Roder's June 13[th] memo is not the total cost. It doesn't include the cost of pulling funds out of the system to bridge the short falls and the un-assumed (by the Retirement Board) benefit increases. The Actuary needs to be on the record point by point in the deal. The point by point costing by the Actuary should include the drop plan will not cost the City money, and the buy back will not cost the City money.)
>
> 3.  After we have that cost signed on by the Actuary, we must also get from the Actuary the funding level drop in the system. For the record, only after the funding level has dropped from all facets of this proposal, will the 10% drop in funding level that counts toward sunseting the deal start. Not before.
>
> 4.  By doing this deal the Retirement Board is agreeing to keep the rates at the attached schedule.
>
> 5.  In agreeing to this deal the Retirement Board is implicitly agreeing to not arbitrarily change Actuarial's [sic] assumptions to the

---

[157] Undated check list compiled on or after 13 June 1996, and before 21 June 1996, relating to MP-1; secured from the files of City labor negotiator Mike McGee. See n. 157.

detriment of the City. This doesn't mean they can't change Actuarial assumptions, it just means they won't do so arbitrarily to the determent of the City. It also means that if they do, the rate changes will be phased in at the end of the agreed to schedule.

6. It would be a point of good faith on the Retirement Board's part to agree not to count any of their unilateral assumption changes toward the 10% sunset provision.

7. Fifty percent (50%) of excess earnings will go to a stabilization reserve as long as necessary to cover the costs of implementing this agreement. [A wavy line appears on the document through No. 7.]

8. ** .

9. **

10. The cost of the five-year buy back plan (purchase of service credit), is to be implemented at no cost to the City. ***

11. General members are eligible for the drop plan.

12. The drop plan negotiations will not cause this plan to sunset.

13. If the Retirement Board approves this deal and it is subsequently overturned after implementation, by the terms of the deal by City can reduce the benefits back to the position it was before the deal.[158]

On 21 June 1996 SDCERS outside counsel Dwight Alan Hamilton provided Cathy Lexin with a draft of his opinion letter supporting MP-1. The final version of Mr. Hamilton's opinion, also dated 21 June 1996, was forwarded to pension administrator Lawrence Grissom. In his letter Mr. Hamilton stated in reference to the proposed rate stabilization plan that "[n]othing in this proposal changes the Board's discretion to adjust the actuarial assumptions on which the System is based as needed in order to insure the long-term funding integrity of the System."

This statement is false. The proposal limited the pension board's ability to impose an immediate increase in the City's contribution rate to meet the pension system's actuarial funding needs as is mandated by San Diego Charter § 143 and California Constitution Article XVI, § 17(a)-(c). Mr. Hamilton was aware that MP-1 restricted the

---

[158] Undated check list dated on or after 13 June 1996, and before 21 June 1996, relating to MP-1; secured from the files of City Labor negotiator Mike McGee.

board's discretion to manage the pension system in a way reflective of the actuarial needs of the pension system, not of the budget priorities of the City.

In his 21 June 1996 letter to pension board administrator Grissom, Mr. Hamilton admitted that he was aware of these limitations on the pension board to set actuarial rates under MP-1:

> If the phase in would require an extension past July 1, 2009, in order to achieve the full actuarial PUC rate, the City-paid rate will be adjusted by the amount necessary to reach by July 1, 2009, the rate calculated by use of the entry age normal method.[159]

Mr. Hamilton did not address the City's practical ability to make the rate adjustments by 1 July 2009, in order to fulfill the promise to adjust the contribution rate needed to reach EAN by 2009. Moreover, this agreement substantially extended the period during which the pension system would be underfunded. This extension violated the contractual rights of the pensioners to an actuarially sound pension system. *Board of Administration v. Wilson*, 52 Cal. App. 4th 1109 (1997) (arrears financing of pension contribution for only six months violated contractual right to actuarially sound pension system). By limiting the power of the board to impose contribution increases, the delayed implementation of full actuarial rates served the interests of the City at the expense of plan participants.

Mr. Hamilton also opined that it was "appropriate and the Board will be discharging its fiduciary responsibility to credit the employer contribution reserve" in the amount of $106,700,000.[160] This allocation to the reserve was to come from both "surplus" undistributed earnings and a balance in the earnings stabilization reserve.[161] However, Mr. Hamilton did not discuss the fact that these funds added directly to the underfunding of the pension plan. The scheme chosen was a convoluted way of admitting that the City did not have enough money and was therefore borrowing it from the pension plan. Eventually, the borrowing was dropped, and the costs of the increased benefits were simply added to the pension deficit. Again, Mr. Hamilton's statements in this regard were false and misleading to taxpayers, the San Diego media, and investors in San Diego City bonds.

On 21 June 1996 Assistant City Auditor Terri Webster sent an email to "city-mgr.CTL" (Cathy Lexin) regarding the 21 June 1996 revised version of MP-1. In her e-mail, Ms. Webster noted there was to be a 1:00 pm meeting with City Manager Jack McGrory, preceded by a meeting in which Ms. Webster briefed City Auditor Ed Ryan.

---

[159] 21 June 1996 letter from Dwight A. Hamilton to Lawrence B. Grissom.

[160] 21 June 1996 letter from Dwight A. Hamilton to Lawrence B. Grissom p. 3. See n. 159.

[161] 21 June 1996 letter from Dwight A. Hamilton to Lawrence B. Grissom p. 3. See n. 159.

Ms. Webster told Ms. Lexin about the "4 main points that need to be added to the [MP-1] proposal."

1) The proposal needs to state that ALL costs associated with the proposal need to be worked into the 6-30-96 valuation that will be used as the base from which the 10% decrease will be measured. (this includes costs associated with 13th check, health, etc. We know that Rick doesn't normally calculate it that way but it needs to be done somehow to give as much breathing room from the 10% deal breaker.

2) City needs protection from scenario where third party actions result in killing the deal AFTER benefits have been given and cannot be taken back.

ie. No Charter amendment and therefore City has to keep health; or no DROP plan; or determination that City can not pay the lower rates. The City cannot afford to pay the higher benefits without the offset of rate relief and elimination of health expense.

3) The proposed needs to specify that an experience valuation will not occur until 6-30-99. This is needed to reduce the risk that the deal will die within the first five years do to funding ration (sic) dropping more than 10% below the 6-30-96 valuation.

4) Since the proposal was changed to eliminate the contingency and stabilization reserve the City needs to be told of the replacement to ensure that there is a minimum of 2 years coverage for health and 13th check ($18M).[162]

Ms. Webster's memorandum makes it clear that the MP-1 proposal was directed at allowing the City to pay less than the actuarially required rate for as long as possible. This memorandum contradicts the letter in which Mr. Hamilton found no fiduciary breach, for in the letter he described the relief provided to the City in more obscure terms that simply did not comport with the realities of contribution rate relief Ms. Webster admitted to in her 21 June 2001 memo to Ms. Lexin.[163]

Although some board members complained about being rushed into making a decision, on 21 June 1996 the San Diego pension board approved MP-1 by a vote of 8 to 3. The pension trustees voting in favor of MP-1 were Terri Webster, Bruce Herring, Sharon Wilkinson, Robert Scannell, Keith Enerson, Ron Saathoff, John Torres, and Conny Jamison. The three voting in opposition were Jack Katz, Ann Parode, and Paul

---

[162] 21 June 1996 memorandum from Terri Webster to city_mgr.CTL.

[163] 21 June 1996 memorandum from Terri Webster to city_mgr.CT. See n. 162.

Barnett.[164] Mr. Barnett noted that that the board was being asked to allow the "[s]ystem to remain under-funded by a considerable amount and using the system's surplus to help pay for additional benefits and assisting the employer with their contribution rates."[165]

Ms. Parode, who believed that board members should judge the City's ability to make the payments that would be due by fiscal year 2008, asked attorney Hamilton if, during 2000, the board would be required to evaluate the City's ability to make its financial commitments. Mr. Hamilton disingenuously responded that "if the City had not been involved with this particular proposal, the Board might be asking the same question."[166]

Three months later Mr. Hamilton had to revise the opinion that he had given in response to Ms. Parode's assertion that the pension board needed to evaluate whether the City would be able to meet its obligations under MP-1. Contradicting the statement that he had made at the 21 June 1996 board meeting, Mr. Hamilton, in a 19 September 1996 letter, agreed with Ms. Parode:

> Ms. Parode, in her comments at the 21 June 1996, public hearing on the City's Manager's proposal, compared the approval of employer contribution payments at a level less than that recommended by the actuary to that of a retirement system loaning money to an employer. Before a bank makes a loan, it has the duty to determine the ability of the borrower to repay it. We believe that the Board is held to the standard of professional bankers and bank investment advisors. If a pension fund is asked to approve employer contribution payments at a level less than the amounts recommended by the actuary, because of the unfunded liability created, the fiduciary must determine the ability of the employer to provide the funds to deliver benefits and related services to the participants and their beneficiaries when they become payable.

> To discharge the duty of determining the ability of the City to provide the funds to deliver benefits and related services to participants and their beneficiaries, the Board should give appropriate consideration to audited financial statements of the City; determine whether the City is reasonably carrying out and performing the municipal services required of it by the City Charter; determine whether it establishes a budget each fiscal year that anticipates the expenditures for those mandated services and the revenue necessary to fund them from a reasonable level of taxation, state aid, and other funds; and determine whether the City is paying its debts as they become due and is doing so without stress.[167]

---

[164] 21 June 2002 minutes of SDCERS Board meetings p. 16.

[165] 21 June 2002 minutes of SDCERS Board meetings p. 16. See n. 164.

[166] 21 June 2002 minutes of SDCERS Board meetings pp. 119-20. See n. 164.

[167] 19 September 1996 letter from Dwight A. Hamilton to Lawrence B. Grissom p. 4.

The City of San Diego was clearly not intending to pay its debts to the pension plan as they became due. This after-the-fact letter underscored the complete break down in the administration of the City's pension plan and the failure of Mr. Hamilton to meet his legal duties to the board and to participants in a timely manner. The the board conduct financial due diligence should have been given <u>before</u> the pension board approved MP-1 on 21 June 2002.

On 25 June 1996, the San Diego City Council held a closed session. Minutes of that meeting indicate that the meeting "halted at 9:41 a.m. Council continued with Meet and Confer Issues."[168] The closed session agenda indicates that the seventh item to be discussed was "Meet and Confer." A 21 June 1996 closed session memorandum from the City Attorney to the City Clerk identifies item three "Conference with Labor Negotiator, pursuant to Govt Code § 54957.6." The City's negotiators were identified as "Jack McGrory, Bruce Herring, Cathy Lexin, and Bill Lopez."[169]

On 28 June 1996, City Manager Jack McGrory sent a memorandum entitled "Retirement Summary" to the Mayor and City Council. According to the memorandum, "Attached is a summary of the Retirement proposal that you requested last week." A hand-written note indicates that the docket coordinator distributed the memorandum on 1 July 1996, at 1:30 pm. The attachments to the memorandum were (1) June 28 Retirement Summary; (2) June Modifications Proposal; (3) June 7 Retirement Proposal; (4) CERS Fiduciary Counsel Opinion.[170]

The 28 June 1996 retirement summary was identified as "San Diego City Employee Retirement System (SDCERS) Proposal identified and discussed above."[171] The Mayor and Council members receiving this one-page document were informed of the "Benefit Changes," the "Rate Stabilization" program, and the "Process" followed to secure approval of MP-1.[172] The document dated 21 June 1996, entitled "Modifications to Retirement System Proposal Dated June 7 1996," provided that changes were made to MP-1 "[a]s a result of issues raised by Dwight Hamilton, Fiduciary Counsel to the CERS

---

[168] 25 June 1996 San Diego City Council closed session minutes p. 2.

[169] 21 June 1996 Memorandum "Closed Session Agenda Items for June 25, 1996." The memorandum was signed by Deputy City Attorney John M. Kaheny.

[170] 28 June 1996 Memorandum from City Manager Jack McGrory to Mayor and City Council re: "Retirement with four attachments."

[171] The Council and Mayor were provided with the 7 June 1996 MP-1 proposal at the 25 June 1996 closed session, where it was handed out to those in attendance. 7 June 1996 City Employees Retirement System Proposal, with handwritten note "Handed Out @ Closed Session 6/25/96."

[172] 28 June 1996 Memorandum from City Manager Jack McGrory to Mayor and City Council attachment "San Diego City Employee Retirement System (SDCERS) Proposal." See n. 170.

Board."[173] The final attachment to Mr. McGrory's 28 June 1996 memorandum was Mr. Hamilton's 21 June 1996 letter approving MP-1, which was discussed in detail above. The letter described the balloon payment that would be made if the funded ratio of the pension plan fell below 10% of the funded ratio calculated on 30 June 1996:

> In the event that the funded ratio of the System falls to a level ten percent below the funded ratio calculated in the June 30, 1996, actuarial valuation, the City-paid rate will be increased on July 1 of the year following the date of the actuarial valuation in which the shortfall in funded ratio is calculated by an amount, determined by the actuary, that is necessary to restore the funded ratio to the proper level.[174]

However, Mr. Hamilton's letter is ambiguous on the question of the proper amount. Despite being put on notice, he failed to provide any legal advice in the 21 June 1996 opinion letter that the Council or the SDCERS Board should evaluate the practical ability of the City to pay what the trigger would require.

It is interesting to recall that during the 11 June 1996 workshop discussed above, Mr. Roeder had estimated that a 15% drop would cost the City $225 million. And when the trigger was hit in 2002, after the pension's funded ratio dropped below 82.3% (more than 10% below the 1996 funded ratio of 92.3%), a dispute arose over the amount that the City was required to contribute to the pension plan

On 25 June 1996, the City Manager had requested that the MP-1 item, scheduled for that session, be continued "for further discussion."[175] The closed session minutes for 2 July 1996 indicate that the recorder was excused from the closed session meeting.

The closed session agenda states "2. Meet and Confer." The Closed Session memorandum signed by Deputy City Attorney John M. Kaheny indicates that the second item to be discussed was closed session and identified the City's labor negotiators as Jack McGrory, Bruce Herring, Cathy Lexin, and Bill Lopez.[176] The supplemental docket "Adoption Agenda" identified item 500 for the 2 July 1996 public meeting of the City Council to be the fiscal year 1998 labor contract extensions. A consent motion was made by Council Member Valerie Stallings to adopt the resolution approving MP-1. The vote was unanimous:

---

[173] 28 June 1996 Memorandum from City Manager Jack McGrory to Mayor and City Council attachment, 21 June 1996 memorandum entitled "Modifications to Retirement System Proposal Dated June 7, 1996." See n. 170.

[174] 21 June 1996 letter from Dwight Hamilton to SDCERS Administrator Lawrence Grissom purporting to approve MP-1 p. 3. See n. 159.

[175] 25 June 1996 Continued Item request form related to Item 208.

[176] See 25 June 1996 Closed Session minutes of the San Diego City Council. See n. 168; 2 July 1996 Closed Session Agenda, and the 27 June 1996 Closed Session memorandum regarding the Closed Session Agenda Items for July 2, 1996.

46

CONSENT MOTION BY STALLINGS TO ADOPT RESOLUTION (R-287582) Second by Stevens. Passed by the following vote: Mathis-yea, Wear-yea, Kehoe-yea, Stevens-yea, Warden-yea, Stallings-yea, McCarty-yea, Vargas-yea, Mayor Golding-yea.[177]

Because MP-1 was approved by consent, the public was not provided a clear warning of the dangers that it threatened to the City's fiscal integrity. It would be eight years before any meaningful public discussion of MP-1 occurred, and that discussion was prompted by an investigation of City and pension officials, the loss of the City's credit rating, and the inability of the City, over the course of three years, to issue financial statements free of material error.

A 23 July 1996 memorandum from Cathy Lexin, the City's labor relations manager, to pension plan administrator Lawrence Grissom, entitled "City Manager's Retirement Proposal," set forth the "final Retirement Proposal as presented to the Retirement Board at its meeting of June 21, 1996." Subsequently, at its 2 July 1996 meeting, this proposal was presented to and approved by the City Council.[178] The 23 July 1996 memorandum from Cathy Lexin describing the final version of MP-1 reflected an additional change in the adjustments that would be made if the below-10%-of-the-1996-funded-ratio provision was triggered by the funded ratio dropping below 82.3%. According to the 23 July 1996 Lexin memo, in the event the 82.3% trigger point was reached, the following would occur:

> The City will pay the agreed-to rates shown above for FY 96 through 2007. In the event that the funded ratio of the System falls to a level 10% below the funded ratio calculated at the June 30, 1996 actuarial valuation which will include the impact of the benefit improvements included in this Proposal, the City-paid rate will be increased on July 1 of the year following the date of the actuarial valuation in which the shortfall in funded ratio is calculated. The increase in the City-paid rate will be the amount determined by the actuary to restore a funded ratio no more than the level that is 10% below the funded ratio calculated at the June 30, 1996 actuarial valuation.

The parties failed to make the agreement precise enough to determine the exact remedy that would follow should the 82.3% trigger point be reached. The failure to make the consequence of a trigger event precise underscored the real objective of MP-1 to -- increase benefit liabilities beyond available same-year revenues and make the next generation pay for those benefits from later-year funding sources. As will be explained subsequently, this feature of MP-1 grossly violated the liability limit provisions of Charter § 99.

---

[177] 2 July 1996 San Diego City Council Meeting Minutes pp. 1, 21-22.

[178] 23 July 1996 Memorandum from Cathy Lexin to Lawrence Grissom regarding the approval of the final version of MP-1; see fn. 2.

In a 31 July 1996 internal memorandum, the City pension plan administrator made clear that the MP-1 costs provided to the pension board and City Council were only "projections": "We must remember that the projections of increased liability resulting from the implementation of the Proposal are <u>only projections</u> and that the actual numbers for any given year may be higher or lower."[179]

This memorandum also stated that the actuary would track liabilities to the pension system caused by MP-1:

> The actuary will track the liabilities associated with the Proposal separately from other System liabilities and make recommendations as part of each annual actuarial valuation of an amount to transfer from the Reserve for Proposed Retirement Changes to the Employer year.[180]

As was found by the City's outside disclosure practices lawyers, the use of reserve funds to pay for the costs of MP-1 made no financial sense:

> In application, however, this approach would have had no practical effect on SDCERS' funding. Whenever surplus earnings are diverted to a reserve held outside System assets, the result is a dollar-for-dollar reduction to the Employer Contribution Reserve (which receives all amounts not allocated to other uses). Under this proposal, surplus earnings placed in the Earnings Stabilization Reserve would be bled annually into the Employer Contribution Reserve in amounts equal to the contribution shortfall. Upon the exhaustion of the Earnings Stabilization Reserve, the balance of the Employer Contribution Reserve would be essentially the same as if there had there been no intervening transfers. In no sense would this process compensate the System for the contribution shortfalls contemplated in MP1.[181]
>
> ***
>
> The error in this approach lies in the mistaken idea that assigning previously unallocated surplus earnings to the Employer Contribution Reserve could effectively offset the contributions lost as a result of Manager's Proposal 1. Much like the idea, previously considered and discarded, that the shortfall could be erased by allocating surplus earnings into an account held outside System assets, then, over time, transferring them back again, this approach accomplished nothing of practical value.[182]

---

[179] 31 July 1996 memorandum from Lawrence Grissom to Business Procedures Committee p. 2.

[180] 31 July 1996 memorandum from Lawrence Grissom to Business Procedures Committee p. 2. See n. 179.

[181] 16 September 2004 Report pp. 52-53. See City of San Diego Website.

[182] 16 September 2004 Report pp. 53-54. See City of San Diego Website.

Running previously "unallocated" excess earnings through a special reserve account before booking them into the same "inside" account to which they otherwise would have gone directly does not affect System funding levels or employer contribution rates. It resolves itself into accounting entries that ultimately cancel out. <u>The approach outlined in MP1 was, in fact, never followed.</u>[183]

The Earnings Stabilization Reserve – containing $10.7 million in FY 1994 surplus earnings – was closed into the Employer Contribution Reserve at June 30, 1996, rather than being applied as described in the Manager's proposal. According to SDCERS administrator Lawrence Grissom this was done because the Board found that its lacked authority under the Municipal Code to use the funds as proposed. The attempt to use FY 1995 and 1996 surplus earnings to provide contribution relief to the City <u>also proved futile</u>. In FY 1996, $144.3 million was taken from FY 1995 and 1996 surplus earnings and placed in a "Proposed Retirement Changes Reserve," in anticipation of the implementation of MP1.[184]

In FY 1997, $82.5 million of this amount was credited to a Reserve for Retirement Changes (City)" and $4.3 million to a "Reserve for Retirement Changes (Port District)." Another $3.5 million from the Proposed Retirement Changes Reserve was transferred to a newly created 13th Check Reserve, to provide a back-up source of payment for the benefit arising from the *Andrews* litigation. The remaining balance of approximately $53.6 million was folded into the Employer Contribution Reserve, where it would have gone initially had it not been diverted into the Proposed Retirement Changes Reserve.[185]

This amount appears to correspond to the portion of the Proposed Retirement Changes reserve derived from FY 1995 excess earnings. This $87 million in the City and Port Reserves for Retirement Changes, the only funds purportedly dedicated to offset the funding shortfall created by MP1, was then left dormant, with no crediting of interest or additional allocations from earnings, and no withdrawals to "fund" the contribution shortfall in the years following the adoption of the Manager's proposal. As mentioned, because these funds were held inside SDCERS assets, their allocation into designated accounts had minimal effect on the System's funding ratio.[186]

---

[183] 16 September 2004 Report p. 54. See City of San Diego Website.

[184] 16 September 2004 Report p. 54. See City of San Diego Website.

[185] 16 September 2004 Report p. 54. See City of San Diego Website.

[186] 16 September 2004 Report p. 54. See City of San Diego Website.

According to Mr. Grissom, <u>nothing was done with these reserves</u> because, again, SDCERS found it had no authority under the Municipal Code to dispense them for their designated purpose and, in addition, because he and others concluded that shifting funds from one inside account to another accomplished no more than moving "money from the left pocket to the right."[187]

On 10 October 1996, Dwight Hamilton's 19 September 1996 opinion to the SDCERS Board was provided "to Mayor & Council only, not full distribution. Bcc: Ed Ryan Pat Frazier."[188] Written at the behest of Ann Parode, this opinion indicated that the pension board had a duty "to determine the ability of the borrower" (the City) to pay the underfunding as required in MP-1. The pension board never fulfilled its duty to check into the City's financial ability to make a balloon payment in the amount of hundreds of millions of dollars. At the 20 December 1996 SDCERS Board meeting, there was a brief discussion of the issue.[189]

As of 18 December 1996, MP-1 was not yet fully implemented according to a memorandum from Jack McGrory to Keith Enerson relating to "Implementation Schedule for Manager's Proposal.[190] Mr. McGrory suggested that full implementation be pushed back to after the SDCERS target date of 27 January 1996.[191] In the memorandum Mr. McGrory admitted that he was a plan fiduciary:

> I am concerned that if we push to achieve implementation at too early a date, something could be overlooked. Part of the <u>fiduciary duty</u> to the members and beneficiaries of the System <u>which we all share</u> is to insure that benefits are accurately and equitably defined and properly administered.[192]

According to a SDCERS Bulletin dated April 1997, the SDCERS plan participants' final vote on MP-1 was held from Friday, 4 April 1997, through Sunday, 13 April 1997.[193] The SDCERS bulletin that was addressed to plan participants contained

---

[187] 16 September 2004 Report pp. 54-55. See City of San Diego Website.

[188] 10 October 1996 memorandum from Jack McGrory to Mayor and City Council regarding Legal Opinionfrom CERS Fiduciary Counsel.

[189] 20 December 1996 SDCERS Board Minutes pp. 11-12.

[190] 19 December 1996 Memorandum from Jack McGrory to Keith Enerson at the SDCERS Retirement Board.

[191] 19 December 1996 memorandum from Jack McGrory to Keith Enerson at the SDCERS Retirement Board. See n. 190.

[192] 19 December 1996 memorandum from Jack McGrory to Keith Enerson at the SDCERS Retirement Board. See n. 190.

[193] SDCERS Bulletin "BENEFITS ELECTION" April 1997.

false and material misrepresentations and misleading statements. The bulletin asserted that the SDCERS fiduciary counsel had approved the proposal. However, it did not disclose the fact that the fiduciary counsel had also advised the pension board to determine "the ability of the City to provide the funds" to pay the costs of MP-1. In addition, the bulletin did not disclose that the pension board had failed to determine whether the City had the practical ability to pay the balloon payment required by the 82.3% trigger provision. When the trigger was hit in 2002, those payments would exceed $500 million dollars.[194]

The SDCERS bulletin falsely stated that the proposal "includes a provision to assure the funding level of the system will not drop below a level the Board's actuary deems reasonable in order to protect the financial integrity of the Retirement System." MP-1 provided that if the funding level dropped, the City would have at least until 2009 to make good unless the level dropped more than 10% below the 1996 funding ratio of ·82.3%. Again, the bulletin did not disclose that the City would not have the practical ability to make funding contributions needed to keep the system at 82.3%. (Currently, the funding level is 27.3% below the 1996 funding ratio of 92.3%.)

Further, the SDCERS bulletin did not disclose that, in possible violation of California Government Code § 1090, board members agreed to the proposal while they held interests in the contract creating collective bargaining improvements provisions. The SDCERS bulletin also did not disclose that the duty to fund the new pension benefits was created in likely violation of San Diego Charter § 99, which prohibits the debt undertaken by the City to pay the benefits, and that the quid pro quo agreement was entered into to help the City's budget priorities and was likely an illegal and unenforceable contract.

The SDCERS bulletin falsely stated that MP-1's five-year-purchase-of-service provision would be funded with payments from employees that would "make the system whole for such time." A 24 February 1997 MEA PUL (Pass Up the Line) noted that the cost of the pension service credits had not been set and explained how it would be established:

> The Retirement Board based on the advice of their actuary has the task of setting the employee cost of the Purchase of Service Credit (buy back) changes. The cost will be calculated by taking the percentage price the Retirement Board sets and multiplying it times your annual salary. **(For example: If the cost were 15% and you earn $30,000.00 per year, [15% x 30,000.00] would equal $4,500.00 for each year you wish to purchase.)**

The pension board has not taken effective action to recapture the losses caused by the underpricing of this program. The plan participants approved MP-1, and the plan was

---

[194] See San Diego City Attorney Interim Report II; see San Diego City Attorney Website.

implemented by the City Council in March 1997.[195] Approximately 2,900 of the 18,000 plan participants bought more than 13,000 pension year credits at a discount that cost the system more than $100 million in underfunding.[196]

There has been extensive speculation about why City Manager Jack McGrory, City pension plan administrator Lawrence Grissom, Mayor Susan Golding, and the City Council created MP-1. The City's motivation was clearly to find money to spend on other priorities. An 11 October 1996 letter from Mr. McGrory to John Gibson, Director of the Reports & Analysis Division of the Federal Election Commission, stated that the City of San Diego had spent $6,473,032 on the Republican Convention.[197] The 28 May 1996 closed session writing stated that the alternative to adopting MP-1 would be a reduction in the 1997 fiscal year budget of $8.66 million.[198]

The San Diego City Charter and the California State Constitution limit municipal power to create liabilities.[199] The liability limit contained in San Diego City Charter § 99 is "meant to establish the 'pay-as-you-go' principle as a cardinal rule of municipal finance." *Westbrook v. Mihaly* 2 Cal. 3d 765, 776 (1970); *San Francisco Gas Co. v. Brickwedel* 62 Ca. 641 (1882). The "underlying philosophy of § 99 in its current form is to prevent City officials from mortgaging future revenues for present benefits." That objective is also reached by a similar liability limit clause in the California State Constitution.[200] Charter liability limit clauses, like San Diego Charter § 99, mandate "that each year's income and revenue must pay each year's indebtedness and liability, and that no indebtedness or liability incurred in any one year shall be paid out of the income or revenue of any future year." *San Francisco Gas Co. v. Henery Brickwedel* 62 Cal. 641, 642 (1882).

As was pointed out by pension board members John Casey and Ann Parode, MP-1 created liabilities in years that exceeded those years' revenues. MP-1 pushed the

---

[195] MP-1 was implemented in a series of City Council meetings during March 1997.

[196] See San Diego City Attorney Interim Report II. See City Attorney's Website, and 2004 SDCERS Actuarial Valuation. See also n. 91.

[197] 11 October 1996 letter from City Manager Jack McGrory to John Gibson, Director Reports and Analysis Division, Federal Election Commission ("City of San Diego Expenditures" attachment).

[198] 28 May 1996 Closed Session Meet and Confer documents, p. 2. See n. 111.

[199] San Diego City Charter § 99. See n. 3; California State Constitution Art. XVI § 18, and n. 1. This part of the report presents a legal analysis that shows MP-1 is void. The San Diego City Attorney's Interim Report 3 analyzed other provisions of law that require MP-1 to be set aside. The analysis here also would apply to MP-2, the add-on contract created by the pension board and City Council in 2002. The legal basis for setting aside MP-1 offered in the City Attorney's Interim reports does not exhaust all options that the City has for setting aside MP-1 and MP-2.

[200] The liability limit clause in the California State Constitution Article II § 18 discussed in the San Diego City Attorney Opinion was moved to Article XVI § 18. City Attorney City of San Diego Opinion (18 March 1968) *City Charter § 99-Continuing Contracts* p. 2.

unpaid liabilities into future years and onto the next generation.[201] Because the MP-1 contract was created in violation of the liability limits of San Diego Charter § 99, MP-1 is void. Again, under San Diego Charter § 99 each year's revenue must pay each year's indebtedness, and no indebtedness incurred in any one year may be paid out of the revenue of any future year. *Tehama County v. Sisson* 152 Cal. 167 (1907). In 1996 and 1997, the City was unable to incur the MP-1 liabilities because they had to be paid from the revenues of subsequent years. *Bradford v. City and County of San Francisco* 112 Cal. 537 (1896).

By requiring City officials to limit the City's liabilities to its same year revenues, San Diego Charter § 99 enshrines the pay-as-you-go mandate for financing City services:

> The City shall not incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year unless the qualified electors of the City, voting at election to be held for that purpose, have indicated their asset as then required by the Constitution of the State of California, nor unless before or at the time of incurring such indebtedness provision shall be made for the collection of an annual tax sufficient to pay the interests on such indebtedness as it falls due.

In 1968 the voters amended San Diego Charter § 99 to bring it into conformity with a similar provision in the California State Constitution (Article XVI § 18). Former City Attorney Ed Butler explained that the intent behind the amendment was "to bring our Charter into conformity with the protections afforded by the State Constitution."[202] Article XVI §18 of the California State Constitution requires a 2/3 vote of the electorate before liabilities exceeding revenue in the same year may be incurred:

> No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the voters of the public entity voting at an election to be held for that purpose ... .[203]

Under the debt limit language in San Diego Charter § 99 and California Sate Constitution Article XVI § 18, the San Diego City Council may incur liabilities that exceed same year revenues only after an election. The election mode becomes the measure of the City's power to incur any liability beyond the limit fixed by Charter § 99.

---

[201] See Minutes of 11 June 1996 SDCERS board workshop. N. 129; 21 June 1996 minutes of 21 June 1996 SDCERS board; 20 December 1996 SDCERS board, n. 189; 31 July 1996 memorandum from pension fund administrator Lawrence Grissom. N. 179.

[202] Argument For Proposition A Signed by San Diego City Attorney Ed Butler. Proposition A was adopted by the voters at the 1968 Primary Election.

[203] Article XVI § 18 (a) of the California State Constitution. See n. 1.

*City of San Ta Cruz v. Wykes*, 202 F. 357 (1913). When a City's power to make a contract is statutorily limited to a certain prescribed method and a contract is created in violation of the prescribed method, the contract is void:

> [T]he contract is void because the statute prescribes the only method in which a valid contract can be made, and the adoption of the prescribed mode is a jurisdictional prerequisite to the exercise of the power to contract at all and can be exercised in no other manner so as to incur any liability on the part of municipality. Where the statute prescribes the only mode by which the power to contract shall be exercised the mode is the measure of the power. A contract made otherwise than as so prescribed is not binding or obligatory as a contract and the doctrine of implied liability has no application in such cases. *Reams v. Cooley*, 171 Cal. 150, 154 (1915).

Because of San Diego Charter § 99, the City Council was without power to incur the pension liabilities caused by MP-1:

> Here, neither the officers of the corporation nor the corporation, by any of the agencies through which they act, have any power to create the obligation to pay for the work, except in the mode which is expressly prescribed in the charter; and the law never implies an obligation to do that which it forbids the party to agree to do. *Reams v. Cooley*, 171 Cal. 150, 155 (1915) (quoting from *Brady v. Mayor etc. of New York*, 16 How. Pr. 432).

The San Diego City Charter operates not as a grant of power but rather as an instrument of limitation and restriction on the exercise of power over all municipal affairs that the City is assumed to posses. Any contract made without regard to the Charter's limitations and restrictions is void and unenforceable. *Domar Electric, Ind. v. City of Los Angeles*, 9 Cal. 4th 161, 171 (1994); *Miller v. McKinnon*, 20 Cal. 2d 83, 88 (1942); *Reams v. Cooley*, 171 Cal. 150, 153-154 (1915); *Howard Jarvis Taxpayers Assn. v. City of Roseville*, 106 Cal. App. 4th 1178, 1186 (2003).

Because in adopting MP-1, the City Council incurred liabilities that exceeded revenues for that and later years, the City Council's action was *ultra vires* --[204] that is, beyond the scope or in excess of City Council's legal power or authority.[204] An *ultra vires* act is one "performed without any authority to act.... [An] *ultra vires* act of a municipality is one which is beyond powers conferred upon it by law." Black's Law Dictionary 1522 (6th ed.1990). The MP-1 contract created liabilities above same year revenues and was wholly beyond the powers of a municipality. MP-1 is therefore void. *Los Angeles Dredging Co. v. City of Long Beach*, 210 Cal. 348, 353 (1930); see also *Thomas v. City of Richmond*, 79 U.S. (12 Wall.) 349 (1870).

---

[204] Webster's Third International Dictionary.

Because those contracting with a municipality are <u>presumed to know</u> the extent of its authority with regard to constitutional municipal debt limitation, all who act contrary to those limitations must bear the risk of a shortfall in the current year's revenues. *Law Offices of Cary S. Lapidus v. City of Waco*, 114 Cal. App. 4th 1361 (2004). All parties contracting with the City are required to ensure that liability contracts are made in compliance with the Charter:

> It may sometimes seem a hardship upon a contractor that all compensation for work done, etc., should be denied him; but it should be remembered that he, no less than the officers of the corporation, when he deals in a matter expressly provided for in the charter, is bound to see to it that the charter is complied with. If he neglect this, or choose to take the hazard, he is a mere volunteer, and suffers only what he ought to have anticipated. If the statute forbids the contract which he has made, he knows it, or ought to know it, before he places his money or services at hazard. *Reams v. Cooley*, 171 Cal. 150, 157 (1915).

Those claiming benefits under MP-1 are presumed to have known that MP-1 was created in violation of Charter § 99's liability limits, and therefore they have <u>no</u> means of obtaining payment. *Weaver v. City and County of San Francisco*, 111 Cal. 319 (1986). The MP-1 claimants' ignorance of the law is no excuse: "A party engaging in business relationships with a municipality is presumed to know the law including the procedures necessary to enter into a binding contract." See *Miller v. McKinnon*, 20 Cal. 80, 83 (1942); *Seymour v. State*, 156 Cal. App. 3d 200, 205 (1984).

The framers of the California State Constitution placed the liability limits into the State Constitution to avoid floating indebtedness:

> The system previously prevailing in some of the municipalities of the State by which liabilities and indebtedness were incurred by them far in excess of their income and revenue for the year in which the same were contracted, thus creating a <u>floating indebtedness</u> which had to paid out of the income and revenue of future years, and which, in turn, necessitated the carrying forward of other indebtedness, was a fruitful source of municipal extravagance. The evil consequences of that system had been felt by the people at home and witnessed elsewhere. It was to put a stop to all of that, that the constitutional provision in question was adopted. *San Francisco Gas Co., v. Brickwedel*, 62 Cal. 641, 642 (1882).

Obviously, enforcing the Charter's liability limit would work a major change in favor of disciplining the City's fiscal practices:

> Payment not only goes hand in hand with expenditure, but wasteful expenditures, instead of being <u>concealed or mitigated by delay of payment</u> or the creation of debts, must be immediately made known to the people, through the demands of the tax-gatherer for money. This system is

wholesome in this effect upon those who control and can squander the taxes. They are made sensible that their delinquencies will be known by being immediately felt by their constituents. It is wholesome in its effect upon the people. Their self interest is provoked to prompt scrutiny into conduct of their public agents. *State v. Medbery*, 7 Ohio St. 522, 541 (1857); *Controlling Legislative Shortsightedness: The Effectiveness of Constitutional Debt Limitations*, 1991 Wis. L. Rev. 1301, 1134.

A City can violate the constitutional municipal debt limitation by incurring even a very small debt if the City's other obligations during that year have already exhausted the City's total revenues for the year. *Law Offices of Cary S. Lapidus v. City of Wasco*, 114 Cal. App. 4th 1361 (2004). In San Diego the pension board and the City Council have created a massive liability and have passed that unpaid liability on to the next generation. Those who claim MP-1 as their defense may not be heard because they are required always to comply with the liability limit provisions of the Charter, and they did not do so. MP-1 is void. Although this finding might be considered radical, it is what the law requires:

> We have neither the right nor the disposition, by judicial interpretation, to take away the wholesome restriction upon municipalities thus imposed by the Constitution. Of course, in giving effect to this radical change from the pre-existing condition of things, it will not be strange if some shall be found to suffer. But it must be remembered that all are presumed to know the law, and that whoever deals with a municipality is bound to know the extent of its powers. Those who contract with it, or furnish supplies, do so with reference to the law, and must see that limit is not exceeded. With proper care on their part and on the part of the representatives of the municipality, there is no danger of loss. *San Francisco Gas Co. v. Brickwedel*, 62 Cal. 641, 643 (1882).

## CONCLUSION

The City of San Diego has suffered irreparable injury because elected and appointed officials failed to comply with the liability limit laws of the California Constitution Article XVI § 18 and the San Diego Charter § 99. The illegal liabilities that they created in the pension plan that many of them shared in must be set aside under these and other provisions of law previously identified in the City Attorney's other Interim Reports.

By_____

Michael J. Aguirre
City Attorney



# Audit Committee
# of the
# City of San Diego

June 7, 2005

Board of the San Diego City Employees' Retirement System
401 B Street, Suite 400
Mail Station 840
San Diego, CA 92101

Members of the Board:

We write in our capacity as Audit Committee of the City of San Diego (the "City") to raise the issue of retaining a new actuary to perform the actuarial valuation of the San Diego City Employees' Retirement System (the "SDCERS") for the fiscal year ended June 30, 2003 and forward. We seek to set forth the reasons we believe retention of a new actuary should be a priority to the Board.

Our main concern stems from the belief that assumptions and professional judgment used by the actuary in the past raise substantial questions as to the soundness of current and future actuarial valuations. Additionally, with the recent surfacing of various questions surrounding the pension fees back to at least 1996, we believe it is prudent to bring a new actuary in for a fresh look at the many actuarial issues surrounding SDCERS. Outlined below are examples of the actions, or lack thereof, taken by the actuary resulting in our concern as expressed in this letter.

- The current actuary has raised a number of concerns regarding the actuarial issues for SDCERS. However, at various times it appears that he may have allowed the SDCERS Board to compromise his professional judgment. Based on his own statements, he raised concerns over Manager's Proposal I, the Corbett Settlement, modifications of assumptions of retirement age and decrease in investment return rate.

- The actuary appeared to use assumptions in calculating the Actuarially Required Contribution ("ARC") that would create the best outcome for the City. In a letter to Mike Phillips dated February 12, 1998, the actuary stated, "One reasonable hope is that assumptions could be changed to reduce or eliminate this shortfall." The shortfall referred to is the difference between the ARC and the actual contribution by the City. It would appear to be in the best interest of the Board, as fiduciaries of the pension, to retain an actuary who utilizes assumptions that reflect the reality of all of the pension contractual obligations, the expected funding and realistic returns on plan assets.

2887162.3

- In 1996, the actuary expressed concerns in the SDCERS Special Workshop regarding Manager's Proposal I ("MPI"). However, the actuary accepted its implementation. The June 11, 1996 Minutes of SDCERS Special Workshop summarize statements of the actuary as follows: "[T]here is no question that the rate that is being agreed upon is less than what he considers to be the 'ivory tower' actuarial rate over the next ten years." In an interview conducted by Vinson & Elkins, the actuary stated that "if an entity is not paying actuarial costs, downhill momentum builds, which may mean the system is at more risk." It appears that the actuary went against his own professional judgment in accepting to the implementation of MPI.

- In 2002, the actuary expressed several concerns in the SDCERS Retirement Board meetings regarding the implementation of Manager's Proposal II ("MPII"). These included the removal of the 82.3% hard floor that was established by MPI, the already decreasing funded ratio of the City; and the linking of benefit issues with funding issues. In the Vinson & Elkins interview of the actuary, the actuary was summarized as stating, "[H]e did not want to appear biased before the CERS board, but he had problems with Manager's II and expressed them." The actuary was also summarized as stating, "[H]e backed off a little because Bob Blum thought there was a practical advantage to Manager's II. Mr. Roeder explained that he acquiesced in the face of a strong legal opinion from Bob Blum..." Again, it appears that the actuary went against his own professional judgment.

The actions of the actuary as outlined above appear to have contributed to the problems facing the SDCERS today. With many major actuarial questions facing the pension, including whether the historical use of surplus may make the pension actuarially unsound, we are requesting that the Board retain a new independent actuary who has not previously been retained by SDCERS or the City. We recommend the new actuary be retained to issue independent actuarial reports for SDCERS beginning at least with the fiscal year ended June 30, 2003. If upon receipt of an independent actuarial report, there are significant discrepancies in the results including the projected pension obligations and funding requirements, further work may be required. We stand ready to elaborate on these issues should you wish to discuss them further.

Very truly yours,

Troy A. Dahlberg

cc:   San Diego City Council
      Hon. Richard Murphy
      Mr. Lamont Ewell
      Michael Aguirre, Esq.

- 2 -



| Home | Today's Paper | Sports | Careers | Homes | Autos | Entertainment | Forums | Services | Travel | Visitors G |

Advanced Search   Search Tips

KAWESCHLASER.COM

| Name | | Cell Phone |
| Email Address | | Home Phone |

All SignOnSanDiego ☐ **Go**

**POWERED BY**
**Google**


Entertainme
info,
discounts,
&
more!


San Diego Hosp
& Palliative Ca
Call toll-free
866-688-160

Local
featured Job

Searched for **'roeder.'**

Results **1 - 10** of about **62**. Search took **0.21** seconds.

Next>

Sort by date / Sort by relevance

**SignOnSanDiego.com > News > Metro > San Diego's Pension Crisis ...**
... In a letter to the pension board, the financial experts strongly question whether
actuary Rick **Roeder** acted independently of board members, the city and its ...
weblog.signonsandiego.com/news/metro/pension/20050608-667-pensionb.html - 33k - 2005-07-16

> **SignOnSanDiego.com > News > Metro > San Diego's Pension Crisis ...**
> ... The lawsuit, filed in Superior Court Tuesday, states that Rick **Roeder**, the pension
> system's actuary for the past 13 years, did not disclose that the ...
> weblog.signonsandiego.com/news/metro/pension/20050702-481-3sdretir.html - 31k - 2005-0
> [ More results from weblog.signonsandiego.com/news/metro/pension ]

**SignOnSanDiego.com > News > World – Vietnam scoring successes ...**
... "What matters is what happens from now on" in Vietnam, said UN Food and Agriculture
Organization animal health expert Peter **Roeder**, who has been advising ...
www.signonsandiego.com/news/world/20060330-1114-vietnam-beatingbirdflu.html - 33k - 2006-03-

**City retiree health care liability at $1 billion | The San Diego ...**
... Rick **Roeder**, the actuary who provided the figures in 2003, said yesterday that the
estimates he developed were "rough cuts" and nowhere near as involved as ...
www.signonsandiego.com/uniontrib/20060315/news_1n15health.html - 24k - 2006-03-15 - Cached

**The civic circus | The San Diego Union-Tribune**
... Barnett was one of them. "In the city's pension saga, Paul was one of the good guys,"
said Rick **Roeder**, whose actuarial firm advised the agency until recently. ...
www.signonsandiego.com/uniontrib/20060101/news_mz1n1cityhal.html - 33k - 2006-01-03 - Cache

**SignOnSanDiego.com > News > Metro – City retiree health care ...**
... Rick **Roeder**, the actuary who provided the figures in 2003, said yesterday that the
estimates he developed were "rough cuts" and nowhere near as involved as ...
www.signonsandiego.com/news/metro/20060315-9999-1n15health.html - 37k - 2006-03-15 - Cache

**SignOnSanDiego.com > News > Politics – The civic circus**
... Barnett was one of them. "In the city's pension saga, Paul was one of the good guys,"
said Rick **Roeder**, whose actuarial firm advised the agency until recently. ...
www.signonsandiego.com/news/politics/20060101-9999-mz1n1cityhal.html - 46k - 2006-01-01 - Ca

**[PDF] SDC076809**
... During that time, we have reviewed approximately 100 bankers boxes of documents
from sources including: SDCERS, Gabriel, **Roeder** & Smith ("GRS"), Hanson Bridgett ...
www.signonsandiego.com/news/metro/pension/images/051009leone-grissom-memo.pdf - 2005-10-

**[PDF]** SDC075670
... 2003. We have also interviewed SDCERS' actuary, Rick **Roeder**, and spoken
briefly with its fiduciary counsel, Bob Blum, Esq. We ...
www.signonsandiego.com/news/metro/pension/images/051003seltzer.pdf - 2005-10-04 - Te:
[ More results from www.signonsandiego.com/news/metro/pension ]

SignOnSanDiego.com > News > Watchdog Reports – Pension mess isn't ...
... Rick **Roeder** of Gabriel, **Roeder**, Smith & Co., the actuarial firm that advised the
San Diego system until recently, said many local government employees ...
www.signonsandiego.com/news/reports/watchdog/20050911-9999-1n11pensions.html - 43k - 2005

# Goooooooog l e ▶

Result Page    **1** 2 3 4 5 6 7   **Next**

---

| All SignOnSanDiego | ⧉ | **Go**

Powered by Google Search Appliance

**Sponsored Links**

**Student Loan Relief**
Consolidate Your Student Loan. Reduce Interest Rates By 1.25%
www.StudentLoanRelief.net

**Create Your Living Trust**
A complete, custom estate plan online for just $149/$199. Not Forms.
www.LivingTrustsontheWeb.com

**Haven't filed in a while?**
JKHarris will help you get straight with the IRS! Free Consultations
www.JKHarris.com

**Legal Offshore Tax Havens**
Free Newsletter to Explain Benefits Edited by a Former US Congressman
www.SovereignSociety.com

**$145,000 Loan for $484/mo**
Free mortgage quotes. Refinance and save $1000s - Bad Credit OK
www.LowerMyBills.com

                       **Buy a link here**

---

Contact SignOnSanDiego.com | Online Media Kit | Print Media Kit | Frequently Asked Questions
Make us your homepage | Contact the Union-Tribune | About the Union-Tribune
Site Index | Privacy Policy | Your California Privacy Rights
All Content © Copyright 2006 Union-Tribune Publishing Co. • A Copley Newspaper Site

**PBX Operator**
SAN DIEGO, CA
RANCHO BERNARD(
INN

**DATA ENTRY, imm**
CHULA VISTA, CA
LEGENDARY HOLDII

**Sales Assistant**
CARLSBAD, CA
SHELLEY SMITH

**BEVERAGE CART
ATTENDANT**
SAN DIEGO, CA
HILTON HOTEL
CORPORATION

**Account Executive**
SAN DIEGO, CA
LIVING IN STYLE
MAGAZINE

**Photographers/Pl
Sales**
San Diego, CA
FREEZE FRAME

**Fire**
SAN DIEGO, CA
STATE OF CALIFORI

**Sales and Service
Rep**
SAN DIEGO, CA
USA FEDERAL CRED
UNION

More jobs

**SignOnSanDiego.com**
THE SAN DIEGO UNION-TRIBUNE

 PRINTTHIS

San Diego's Pension Crisis

# Pension board urged to fire consultant

**By Jennifer Vigil and Ron Powell**
UNION-TRIBUNE STAFF WRITERS

**June 8, 2005**

A consultant tasked with evaluating the fitness of San Diego's troubled pension fund should be fired because of "substantial questions" about the accuracy of his financial assumptions and professional judgment, experts hired by the city said yesterday.

In a letter to the pension board, the financial experts strongly question whether actuary Rick Roeder acted independently of board members, the city and its outside attorneys as they all considered proposals -- dating to 1996 -- to underfund the retirement system.

The letter is signed by Troy Dahlberg, a member of the Audit Committee retained by the city to sort out issues related to the pension deficit, which has grown to at least $1.4 billion.

In addition to calling for Roeder's replacement, Dahlberg urges the board of the San Diego City Employees Retirement System to seek new assessments of the fund's condition in 2003, and perhaps in other years, if "there are significant discrepancies in the results."

The letter was copied to Mayor Dick Murphy, the City Council, City Manager Lamont Ewell and City Attorney Michael Aguirre.

Roeder, a partner in the San Diego firm Gabriel, Roeder, Smith & Co., has been the system's actuary for 13 years. Reached last night, he said he stands by his firm's work on the pension system.

He said at least two audits have "substantiated our results," and he called the Audit Committee's evaluation of his work "a matter of opinion."

Councilwoman Donna Frye said she agreed that Roeder should be replaced and sent a letter Monday to the retirement board urging members to do that.

"It's time for a change," Frye said yesterday.

But Frye said Roeder should not be blamed for the pension fund deficit.

"No one person or one action caused this problem," she said. "It was a series of actions that occurred over at least a 10-year time span that got us where we are today."

Dahlberg's letter also inspired concern among city officials that the pension deficit could be even higher.

Aguirre said he has received reports that the deficit has reached $1.7 billion, and that adjustments in the earlier valuations of the fund could force it up to $2 billion.

"I don't know if there's catastrophic financial facts that haven't been disclosed," he said.

Councilman Michael Zucchet agreed that the pension system deficit might be higher. "That's a reasonable observation based on the letter," Zucchet said.

Problems related to the pension crisis, caused by the city's underfunding, stock market losses and benefit increases, have prompted federal and local investigations into allegations of corruption, conflict of interest and securities fraud.

They also have left the city without two years' worth of audited financial statements, which has crippled its ability to borrow at favorable rates.

Any increase in the pension liability could further darken prospects in the city's fiscal 2006 budget, which already includes proposals to eliminate more than 300 jobs, increase fees and make cuts in community services.

The city is scheduled to make a $163 million payment to the pension system from its $863 million operating fund in the coming fiscal year.

Ewell said the effort to end Roeder's tenure with the pension board is part of the Audit Committee's attempt to demonstrate to bankers and Wall Street that the city is willing to address the pension fallout.

"In the financial world, that means making changes to ensure that we don't go through the same problem again," he said.

Pension board members have rebuffed prior requests from Dahlberg's committee and the city. They also have rejected calls from Murphy, Aguirre and U.S. Attorney Carol Lam to waive its attorney-client privilege regarding the release of documents.

Lawrence Grissom, administrator of the $3.6 billion fund, did not return calls last night.

An actuary evaluates a broad selection of variables, including financial data and demographics, for a number of different industries, including pension funds and insurance companies.

In the case of a retirement system, as Roeder told the city's Pension Reform Committee two years ago, an actuary estimates "the value of benefits owed to participants, then figures out a reasonable period of time to finance" them.

Roeder said yesterday that he warned pension board members in the summer of 2002 that they should be wary of a city proposal to extend a policy, first approved in 1996, to underfund the system. He also said he told them that their funded ratio, a measure of assets compared with liabilities, was among the lowest in the state.

"It was already in the public record, very unambiguously," Roeder said.

In his letter, Dahlberg accused Roeder of failing to address these issues and "compromising his professional judgment" by setting aside concerns he had expressed about how pension system decisions might affect its assets.

Dahlberg's conclusions were based in part on a 2004 report issued by Vinson & Elkins, a law firm retained by the city to investigate how the city came to mislead bond investors about the condition of the pension fund, a focus of federal investigators. He did not return calls seeking comment.

But Roeder disputed Dahlberg's assessment.

"Actuaries don't set assumptions in isolation," Roeder said. "They're set in accordance with what the board wishes to do. We make recommendations and often they're accepted, but certainly not always."

Joining Dahlberg on the three-member audit committee are Arthur Levitt, a former head of the Securities and Exchange Commission, and Lynn Turner, a former SEC accounting chief. Members of the committee make up to $900 an hour.

Ewell said he backs the Audit Committee members' call to remove Roeder.

"We may not like what they're saying, but we should follow their course," he said.

Jennifer Vigil: (619) 718-5069; **jennifer.vigil@uniontrib.com**

Ronald W. Powell: (619) 718-5070; **ron.powell@uniontrib.com**

**Find this article at:**
http://weblog.signonsandiego.com/news/metro/pension/20050608-667-pensionb.html

☐ Check the box to include the list of links referenced in the article.


**SignOnSanDiego.com**
THE SAN DIEGO UNION-TRIBUNE

**PRINTTHIS**

San Diego's Pension Crisis
# 3 S.D. retirees suing pension consultant

## Underfunding risks concealed, suit says

**By Jonathan Heller**
UNION-TRIBUNE STAFF WRITER

July 2, 2005

Three retired San Diego employees are suing a consultant to the city's pension system, accusing him of concealing the potential damage caused by a 2002 decision to underfund the pension plan.

The lawsuit, filed in Superior Court Tuesday, states that Rick Roeder, the pension system's actuary for the past 13 years, did not disclose that the underfunding agreement between the City Council and pension board would render the pension's trust fund financially unsound.

The pension system's deficit has since risen to at least $1.4 billion and sparked federal and local investigations into the city's financial practices.

In June, the city's Audit Committee, a panel of outside consultants hired to untangle San Diego's finances, recommended that Roeder be replaced because of what it termed "substantial questions" about his work on the fund.

The San Diego City Employees Retirement System has yet to act on that recommendation.

The lawsuit was filed by attorney Michael Conger on behalf of retirees James Gleason, David Wood and William McGuigan.

"Had (Roeder) candidly said, 'If you do this deal, it would render the system unsound,' the deal never would have been done. He never told the truth, basically," Conger said.

Conger also sued the pension system on behalf of retirees in 2003, claiming the underfunding arrangement was illegal. That suit has been settled and the city agreed to boost payments to the pension system.

Roeder did not return a telephone call for comment yesterday.

He previously said he was proud of his work evaluating the system and stressed that he had issued stern warnings about the underfunding plan in 2002 but was ignored.

In a presentation in July 2002, he said, he warned that the city needed to show "that a significantly higher amount of financial resources" would be available to fund the pension if the 2002 underfunding plan was put in place. An actuary plugs in a complex set of variables, from financial estimates to demographic information, to determine the value of benefits and how a system can fund them.

Pension Administrator Lawrence Grissom and some board members have defended Roeder, saying his work has been validated by outside evaluators and that replacing him would serve no good purpose.

Roeder offered suggestions for dealing with the city's pension crisis to members of the La Jolla Sunrise Rotary Club on Thursday.

"What I'd like people in this town to do is set aside political agendas and (follow) five common-sense approaches" to help solve the city's pension problems, he said.

He suggested that benefits for future hires be immediately reduced and that all contingent benefits -- such as the 13th monthly check sent out each year -- be eliminated until the city's funded ratio is 100 percent.

He said the city should finance its unfunded liability over a period of no longer than 15 years, instead of the 29-year financing in place for fiscal 2006. Roeder also said any future pension benefit increases should require voter approval.

Roeder noted that some of his suggestions, such as reducing benefits for future hires, were made last year by the city's Pension Reform Committee.

"Almost a year has passed," he said. "I do not know what people are waiting for if they view the city in some form of financial peril. It baffles me."

Roeder appeared before the Rotary Club on the same day that his firm's contract with the retirement system expired.

He said he did not know whether it was going to be extended.

Jonathan Heller: (619) 542-4578; **jonathan.heller@uniontrib.com**

**Find this article at:**
http://weblog.signonsandiego.com/news/metro/pension/20050702-481-3sdretir.html

☐ Check the box to include the list of links referenced in the article.



# Report on Investigation

The City of San Diego, California's

Disclosures of Obligation to Fund the

San Diego City Employees' Retirement System

and Related Disclosure Practices

1996-2004

with

Recommended Procedures and Changes to the Municipal Code

September 16, 2004

Paul S. Maco
Richard C. Sauer
Vinson & Elkins L.L.P.
Washington, D.C.

# TABLE OF CONTENTS

Introduction and Executive Summary ................................................................................................1

    I.      Introduction ........................................................................................................ 1

    II.     Executive Summary ............................................................................................ 4

Part 19

The City of San Diego ......................................................................................................10

    I.      The City of San Diego and the Related Authorities ........................................... 10

          A.       The City of San Diego ............................................................................ 10

          B.       Organization and Structure of the City ..................................................... 11

          C.       The Related Authorities .......................................................................... 12

    II.     The Issuance Process ....................................................................................... 15

Organization and Structure of the San Diego City Employees' Retirement System.....................19

    I.      History and structure ....................................................................................... 19

          A.       Participating employers ............................................................................ 19

          B.       Role of the City in SDCERS ..................................................................... 19

    II.     Applicable law ................................................................................................. 20

    III.    Board of Administration ................................................................................... 20

          A.       Administrative functions ........................................................................... 20

          B.       Investments ............................................................................................ 21

          C.       Fiduciary duties ...................................................................................... 21

    IV.    Members and benefits ...................................................................................... 22

          A.       Members ................................................................................................ 22

          B.       Benefits ................................................................................................. 23

                 1.       Service retirement ....................................................................... 23

                 2.       Disability .................................................................................... 24

                 3.       Death ......................................................................................... 25

                 4.       Retiree health ............................................................................. 25

                 5.       Other related benefits ................................................................... 26

    V.     Contributions and Funding .............................................................................. 27

          A.       Contributions ......................................................................................... 27

i

B.     Funding status ........................................................................... 28

C.     Future of contributions and funding status ............................. 29

**Part II** ...............................................................................................................30

**The Evolution of the SDCERS Funding Deficit**...........................................31

I.      The Snake in the Garden of SDCERS: the seductive concept of "Surplus Earnings"................................................................. 31

II.     The Andrews litigation ...................................................................... 34

III.    The Post-retirement healthcare benefit ............................................. 36

IV.   SDCERS changes its actuarial methodology...................................... 38

V.    The City seeks additional contribution relief from SDCERS .............. 40

VI.   Manager's Proposal 1 ("MP1") ........................................................ 41

     A.     The City proposes additional benefits in exchange for contribution relief.................................................................... 41

     B.     The opinions of SDCERS' actuary and fiduciary counsel........................ 47

     C.     The intended application of surplus earnings to the contribution shortfall created by Manager's Proposal 1................................................. 53

     D.     Modifications to the post-retirement healthcare benefit under Manager's Proposal 1 ............................................................ 57

     E.     The impact of Manager's Proposal 1 on the retirement system................ 61

     F.     The City's public disclosure concerning Manager's Proposal 1 .............. 62

VII.  Additional burdens placed on SDCERS' surplus earnings, 1998-2000 ............... 68

     A.     The Employee Contribution Rate Increase Reserve and the Supplemental COLA Reserve.................................................. 68

     B.     The Corbett Settlement ............................................................. 71

VIII. The Mayor's Blue Ribbon Committee................................................. 76

IX.   Manager's Proposal 2 ...................................................................... 79

     A.     The first approach .................................................................... 79

     B.     SDCERS' fiduciary counsel and actuary recommend against the first iteration of MP2................................................................ 84

     C.     Further iterations of the second Manager's proposal................................ 88

     D.     The final positions of SDCERS' fiduciary counsel and actuary on MP2................................................................................. 92

     E.     Disclosure failures relating to MP2 ......................................... 95

X.    The Gleason Litigation ..................................................................... 97

XI. The SDCERS Report to the Rules Committee of the City Council in February 2003 ....................................................................................... 99

XII. The analysis of SDCERS' funding by Public Financial Management ............... 105

XIII. The January 27, 2004 Voluntary Disclosure....................................................... 112

    A.    The City's disclosure comes under scrutiny ........................................... 112

    B.    The discovery of multiple errors in the footnotes to the FY 2002 financial statements.............................................................................. 114

    C.    Bond counsel insists upon additional disclosure .................................... 117

    D.    Differing views on the materiality of the footnote errors ....................... 119

    E.    The Voluntary Disclosure ..................................................................... 120

Part III ...........................................................................................................................................123

Disclosure Process and Deficiencies ...........................................................................................124

I. Financing Services......................................................................................... 124

II. The City Manager's Office .............................................................................. 128

    A.    Structure and Responsibilities of the City Manager's Office ................. 128

    B.    Working Style and Roles of Recent City Managers ............................... 129

    C.    The Director of Human Resources ......................................................... 131

    D.    The City Financial Management Director ............................................... 132

III. Auditor and Comptroller................................................................................... 132

IV. City Attorney .................................................................................................... 134

V. Independent Auditor ......................................................................................... 136

VI. City Council...................................................................................................... 137

    A.    Representations, Warranties and Certifications by the City to its investors ................................................................................................. 142

Part IV ...........................................................................................................................................145

Federal Securities Laws and the City's Disclosures....................................................................146

I. Pension Disclosure Guidance .......................................................................... 150

II. Rating Agency Criteria ..................................................................................... 152

III. Government Finance Officers Association Guidance........................................ 156

IV. Pension Disclosure for SEC Registrants........................................................... 157

Part V .............................................................................................................................................160

Evaluation .....................................................................................................................................161

Appendices ......................................................................................................................176

1. Disclosure of Pension Funding Matters: 1996-2004 ........................................177

2. Articles Index...................................................................................................238

3. An Overview of Pension Regulation ................................................................246
   I.     Defined benefit versus defined contribution plans ...........................246
   II.    Regulatory environment..................................................................... 247
          A.    Internal Revenue Code requirements......................................247
          B.    ERISA .................................................................................. 248
                1.    In general ................................................................. 248
                2.    PBGC and Title IV of ERISA.................................... 248
          C.    State and local regulation...................................................... 250
   III.   Determination of benefits for defined benefit plans ......................... 250
   IV.    Funding ............................................................................................. 251
          A.    Funding standards for private plans under the Internal Revenue
                Code and ERISA.................................................................. 251
          B.    Funding standards for governmental plans............................. 253
   V.     Role of actuaries and actuarial assumptions ..................................... 253
          A.    Actuarial considerations......................................................... 253
          B.    Standards of actuarial practice ............................................... 255
   VI.    Accounting standards........................................................................ 255

4. Glossary ...........................................................................................................256

5. Draft Ordinance ...............................................................................................261

$145,288,143.[127] This report was the only formal attempt to estimate the cost of the healthcare benefit until recent events brought renewed scrutiny to this issue. The report's recommendation that the City actuarially fund the retiree healthcare liability has, to date, not been adopted. However, the City will be required to account for and report the annual cost of this benefit beginning in FY 2008.[128]

IV.    SDCERS changes its actuarial methodology

The history of the relationship between the City of San Diego and SDCERS plays out as a series of initiatives by the City to reduce (at least in the short term) its contributions to the System, typically in response either to economic conditions that caused budgetary strain or to concessions made to the City's labor organizations. Many of these initiatives have been supported by the labor representatives on the Board. The result in each case was the postponement of difficult budgetary decisions into the future, often exacerbating the problems through the delay in confronting them.

In 1991, for example, the SDCERS Board approved a change in the method of calculating the System's annual cost. The annual cost consists of two components: (1) the actuarial present value of the pension benefits and expenses allocated to a particular year and (2) the amount necessary to amortize the portion of the actuarial accrued liability ("AAL") that exceeds System assets (i.e., "UAAL"). The annual cost, in turn, is used to determine the City's actuarially required contributions. Until this time, SDCERS had utilized the EAN method for determining the System's annual cost. The EAN method allocates the total value of a member's expected benefit liability as a level percent of payroll from entry age until retirement. If this level percent is contributed, all actuarial assumptions are met and there are no design changes, this level percent of pay contribution is designed to be sufficient to fund a member's retirement benefit and there is no UAAL. This level cost per person, when aggregated with the level cost for all members, will remain relatively constant for a fund if the average age at hire of the population remains relatively stable, design and actuarial assumptions are unchanged, and experience matches actuarial assumptions. Among the six actuarial funding methods approved by the Governmental Accounting Standards Board ("GASB"), it recommends itself as a relatively stable and conservative approach and, for this reason, is commonly used by governmental entities. Indeed, in a recent survey conducted by the SDCERS staff, 21 of 23 systems surveyed employ the EAN method.

SDCERS, however, chose to migrate from the EAN to the PUC method. The PUC method evaluates the future actuarial liability of the covered group as a whole, applying various

---

[127]    *Id.* at Appendix II. Both funding methods are described in the next section.

[128]    *See GASB Statement No. 45.*

actuarial assumptions concerning population demographics and returns on system assets. For an individual member, the PUC method allocates a cost as a percent of payroll that increases geometrically from entry age until ultimate retirement. When combined for an entire population, the annual cost remains stable only if the average attained age of the membership remains stable, something few employee populations have experienced as the baby boomers have been aging. A notable characteristic of the PUC method is that, at least in the early years after its adoption, it tends to generate a lower annual cost than the EAN method, and therefore results in lower actuarially required employer contributions. In the case of SDCERS, the change in methodology resulted in an immediate decline in AAL of approximately 2.8%.[129] Jack McGrory, San Diego's City Manager at that time, explained in an interview with Vinson & Elkins attorneys that the change in method was intended to reduce City contributions to SDCERS at a time of intense pressure on the City's General Fund. SDCERS administrators have confirmed that there was no purpose for the switch in methods other than to provide temporary contribution relief to the City.

It was anticipated by the SDCERS staff and actuary that the PUC rate would eventually increase to the point that it equaled the EAN rate, at which time the City would resume making contributions at the EAN rate. This apparently never happened.[130] Although the gap narrowed significantly in the mid-1990s, the PUC rate, as applied to the City's contributions to SDCERS, has remained more volatile than the EAN rate without ever exceeding it. As described below, however, conversion back to the EAN method remains a stated goal of the City.

In addition, as of June 30, 1991, the City reset the period for the amortization of its UAAL. The amortization period remained 30 years, but was restarted from that fiscal year-end. The result was to stretch out the period for the amortization of the UAAL, thus reducing that component of the ARC. Again, there appears to have been no purpose for this action other than to reduce the City's contributions to SDCERS.

The System's actuary acceded to actions of this type, so long as they remained within the sometimes-vague standards that govern actuarial science. This remained the case in later years as the City struggled to restrict the impact on its General Fund of escalating liabilities to the retirement system. In 1998, for example, at the suggestion of SDCERS actuary Gabriel Roeder Smith & Company, the City adopted a 40-year amortization period, for purposes of *expensing* (and consequently reporting) its UAAL, in contrast to the 30-year amortization period used for calculating its annual contributions to SDCERS. As described below, this treatment has allowed

---

[129] Letter from Lawrence B. Grissom, Retirement Administrator, SDCERS, to Ann M. Smith, Tosdal, Levine, Smith & Steiner (May 16, 1996).

[130] For many years no calculation was made of what the contribution rates would have been under the EAN method. But for the last three years, the SDCERS actuary has calculated the City's ARC under both the PUC and the EAN methods and, in each case, the PUC rate resulted in a significantly lower contribution.

39

the City to report a lower "net pension obligation" ("NPO") every year from FY 1997 forward, and was not clearly disclosed by the City until January 2004.

Although migrating to the PUC funding method and resetting the amortization period did not violate established actuarial standards, these actions eventually made a contribution to the under-funding of SDCERS. Then, as now, California law recognizes the minimization of employer contributions as a legitimate objective for pension system fiduciaries.[131] This objective, however, is clearly subordinate to their responsibility to protect the actuarial soundness of the systems they serve.[132]

V.    The City seeks additional contribution relief from SDCERS

In the mid-1990s, the City was under significant financial pressure due to a downturn in the local economy.[133] According to former City Manager Jack McGrory, the City's budget woes were compounded by its limited revenue sources – the result of San Diego's strong anti-tax bias – and by repeated raids on the City Treasury by the California Legislature. In 1995, in response to warnings from City officials, including City Auditor Edward Ryan, that the alternative would be significant lay-offs of City staff, the SDCERS Board entertained proposals to grant one-time contribution relief to the City.

The contemplated mechanism for this concession was the "Earnings Stabilization Reserve," established by transferring $10 million of FY 1994 surplus earnings to an account held outside SDCERS' assets. Under the City's proposal, this reserve would be depleted to reduce the City's contribution to SDCERS for FY 1996. As with any diversion of funds from "countable" fund assets, the Earnings Stabilization Reserve increased the System's under-funding by the amount of the diversion, and would be recovered, over time, through increased City contributions to amortize the increased UAAL.[134] The System actuary advised that granting this one-time contribution holiday was within the fiduciary discretion of the Board.[135]

In a seven to six vote, the Board agreed to this proposal, contingent upon approval of the Board's fiduciary counsel, Morrison & Foerster.[136]    Such approval, however, was not

---

[131] Cal. Const. art. XVI, § 17.

[132] *Sacramento v. Public Employees Retirement System*, 229 Cal. App. 3d 1470, 1493-94 (1991).

[133] The City was reported at that time to be facing a budget shortfall of approximately $10 million. Philip J. LaVelle, *Pension trustees OK parts of plan to ease city's ills*, San Diego Union-Tribune, June 22, 1996, at A1.

[134] Also considered was the possibility of establishing a "corridor funding" mechanism that would allow the City to pay a reduced contribution rate over a period of five years as it "ramped up" to the "actuarially required rate." This concept was further developed and implemented as an element of Manager's Proposal I, discussed immediately below.

[135] Minutes of SDCERS Board Meeting, at 5 (Mar. 24 , 1995) (remarks of Mr. Roeder).

[136] *Minutes of SDCERS Special Board Meeting, at 10 (March 24, 1995).*

40

Several years later, when it became probable that the 82.3% threshold would be crossed, the potential consequences for the City's contribution rate became a matter of controversy. The final version of Manager's Proposal 1 provides:

> The City will pay the agreed-to rates shown above for FY 96 through FY 2007.[155] In the event that the funded ratio of the System falls to a level 10% below the funded ratio calculated at the June 30, 1996 actuarial valuation which will include the impact of the benefit improvements included in this Proposal, the City-paid rate will be increased on July 1 of the year following the date of the actuarial valuation in which the shortfall in funded ratio is calculated. The increase in the City-paid rate will be the amount determined by the actuary necessary to restore a funded ratio no more than the level that is 10% below the funded ratio calculated at the June 30, 1996 actuarial valuation.

This would appear to require that the City make a lump sum payment in the amount necessary to restore the funding level to 82.3%. Nevertheless, individuals involved in negotiating this agreement insist that the intention was to "sunset" the proposal beginning the fiscal year after the year in which the trigger event occurred, resulting in a return to a contribution level set under the PUC method.[156] This was, in fact, the way in which the trigger provision was discussed before the Board.[157] It was also the understanding of fiduciary counsel to SDCERS.[158] But the following exchange between a Board member and the SDCERS actuary indicates that the potential decline in funding level resulting from the Manager's proposal was given at least passing consideration in dollar terms:

> Ms. Wilkinson stated that a 15% drop would lower the System's funding level to the high 70% range and asked what this amounts to in dollars.

> Mr. Roeder responded that the 10% drop would not occur for another 5-6 years and that this would be hard to predict. However, he stated that currently the amount at 15% would be approximately $225 million.[159]

---

[155] The reference is to the table provided above.

[156] One of the many potential flaws in MP1 derives from the "one year lag" built into the System. The SDCERS actuary calculates the System's funded ratio as of June 30 of each fiscal year. This complex calculation is then subject to evaluation and approval by the SDCERS Board before it can be adopted. Typically, this occurs many months into the next fiscal year. Because the City makes its contribution to SDCERS at the beginning of each fiscal year, the most current funding calculation available on the contribution date is always a year old. For the operation of MP1, this meant that the City would not begin to pay the amount required by the trigger provision until a year after the trigger was hit, during which time an additional decline in the System's funded status might have occurred. This, in fact, was the result that obtained after the trigger provision was engaged at June 30, 2002, as described below.

[157] See, e.g., Minutes of SDCERS Board Meeting, at 22 (June 21, 1996) (comments of Lawrence B. Grissom).

[158] Letter from Dwight Hamilton to Lawrence B. Grissom, Retirement Administrator, SDCERS, at 3 (June 21, 1996).

[159] Minutes of SDCERS Board Special Workshop, at 14 (June 11, 1996).

As it happened, Mr. Roeder's 5-6 year estimate of when the threshold would be crossed proved prescient. When that event occurred, which among the competing interpretations of the operation of the trigger provision would prevail became of critical importance.

B.    The opinions of SDCERS' actuary and fiduciary counsel

As modified, the proposal won the endorsement of the SDCERS actuary and fiduciary counsel. According to Board minutes, the System's actuary, Mr. Roeder, opined that:

> ... he would have been reluctant to recommend this plan without some sunset provisions. However, he stated that he believes that this is a sound proposal as long as the funded ratio does not drop significantly, and with the appropriate sunset provisions in place.[160]

Mr. Roeder subsequently proposed to the GASB that it consider "corridor funding" as an acceptable alternative to the six funding methods previously approved.[161] "Corridor funding" in this context meant the setting of contractually specified contribution rates to achieve, over time, actuarially calculated funding objectives, rather than pursuing those objectives by adjusting contribution levels on an annual basis.    Boundaries of the "corridor" – here the trigger mechanism – would be imposed to safeguard the System's actuarial soundness.[162]    Mr. Roeder's proposal resembled an approach under Generally Accepted Accounting Principles ("GAAP") for valuing assets held in pension funds of business corporations,[163] but was not recognized as an acceptable method to set employer contributions to a pension fund, either in the public or private sector.    Because the funding approach taken in MP1 was not among the six approved methods, GASB rules required that the City disclose, in its annual financial statements, the shortfall between the actuarially required contribution and the contribution it actually made (the NPO).[164] Winning the approval of the GASB for the "corridor funding" method would have eliminated that disclosure requirement.

Mr. Roeder obtained the written support of SDCERS administration and the City Auditor's Office for this proposal, but the GASB was apparently not persuaded.    In an interview

---

[160]    *Id.* at 15.

[161]    GASB *Statement of Standards No. 25, "Financial Reporting for Defined Benefit Pension Plans and Note Disclosures for Defined Contribution Plans,"* ¶ 44.

[162]    In a May 21, 1998 letter to the SDCERS Retirement Administrator, Mr. Roeder described corridor funding as superior to the PUC method and, in a letter dated July 14, 1998, urged the City Auditor and his deputy to join him in promoting it as an acceptable alternative to previously approved methods.

[163]    Financial Accounting Standards Board, *Statement of Financial Accounting Standards No. 106* ("Employers Accounting for Postretirement Benefits Other than Pensions") ¶ 59.

[164]    As described below, the City has made this disclosure from FY 1998 through FY 2002, the last year for which, as of the date of this Report, it has issued financial statements.

47

with Vinson & Elkins, Mr. Roeder stated that he followed up his initial letter with a second letter and, eventually, a telephone call, but received no response. Around calendar year 2001, he finally gave up hope that GASB would consider his proposal.

Fiduciary counsel for both SDCERS and the City also approved MP1. The SDCERS Board replaced its previous fiduciary counsel, Morrison & Foerster, with Dwight Hamilton of Hamilton and Faatz.[165] The explanation given to the Board for the change in counsel was that Morrison & Foerster had been slow in responding to requests for legal opinions.[166]

After examining the initial draft of MP1, Mr. Hamilton expressed serious reservations about certain of its provisions. He stated that "there were 'red flags' raised in his mind by this proposal, as it relates to the Board's duty of loyalty to the integrity of the fund and addressed those individually...."[167] In connection with the transfer of the post-retirement healthcare benefit to SDCERS, he noted that the City Charter did not appear to authorize this type of benefit, and stated: "the Board must remember that they can not breach their duty of loyalty to the beneficiaries and/or the integrity of the fund by using fund proceeds to pay for the premiums for health insurance."[168] In this he echoed previous fiduciary counsel. In response to questions from the Board, he voiced concern that the Board would be abdicating a key fiduciary responsibility in agreeing to a freeze of actuarial assumptions, as proposed by the City Manager:

> Another troublesome area to Mr. Hamilton was the specific agreement that there would be no changes in actuarial assumptions or methodology until fiscal year 2007. He reminded the Board that the pension beneficiaries and members have a vested right to an actuarially sound system and that the Board has a duty of loyalty to the integrity of the fund that cannot be contracted away. He stated that he believes the Board's rights to annually and continually review their methodology and assumptions [are] essential.[169]

Mr. Hamilton also objected to a mechanism initially contemplated to offset the shortfall with transfers from surplus earnings. The City Manager proposed that 50% of surplus earnings from each year during the operative period of MP1 would be applied to offset the difference between the ARC and the City's actual contributions under the MP1 schedule. Mr. Hamilton

---

[165] Mr. Hamilton's firm had recently become associated with the larger firm of Frandzel & Share, and his opinions were rendered on behalf of both firms.

[166] Minutes of SDCERS Board Special Meeting, at 3-4 (May 2, 1996).

[167] Minutes of SDCERS Board Workshop, at 18 (June 11, 1996).

[168] Id. at 19.

[169] Id. at 20. Fiduciary counsel for the City, Jeffrey Leavitt, Jones Day Reavis & Pogue, also raised concerns about the provision that would freeze actuarial assumptions. He viewed the ability to make changes in actuarial assumptions and methodology as fundamental to the Board's role and suggested that the Board be left an avenue to make appropriate adjustments. Letter from Jeffrey S. Leavitt to Bruce Herring, Deputy City Manager (Apr. 29, 1996).

Alternatively, if the trigger provision were read to require that the City restore System funding to the 82.3% level, the implications were even more ominous.[252] If the funded level fell only slightly below the floor, such a lump sum payment could have been less costly to the City than going to the full PUC rates. On the other hand, a more substantial drop could have mandated a massive infusion of cash from the City into SDCERS. As we now know, SDCERS' funding fell 15% below the floor level by June 30, 2003. By rough estimate, the City would have needed to pay more than $500 million in FY 2004 and 2005 to restore the funded level to 82.3%.

The concern that the trigger would be hit that year or the next increased substantially when a draft of the actuarial report for FY 2001 became available on February 12, 2002. The actuarial valuation for June 30, 2001 showed a funded ratio of 89.9%, a decline of approximately 8% over the previous year, not including the effects of the contingent element of the *Corbett* settlement. Given the continued decline in the market that had occurred after June 30, 2001, it was apparent that a significant additional deterioration in SDCERS' funded ratio should be anticipated at the next valuation.[253] In addition, SDCERS' realized earnings for fiscal year 2001 were too meager to fund any of the contingent benefits in the Waterfall. In a May 29, 2002 Board meeting, Mr. Grissom:

> ... provided the Board with a history of the System and discussed realized gains. He reported that the System has historically utilized earnings as a means to pay certain benefits within the System. However, the Board is now faced with a situation where the projected earnings for this fiscal year are far short of what they have been over the past ten years. He reported that the System's high mark was in June of 1999, when the System achieved $468 million in realized earnings. This year, Staff projects the earnings will be somewhere between $40 million and $50 million.[254]

During the spring of 2002, the City concluded labor negotiations with three of its municipal unions. In the meet and confer process, the City agreed to increase the basic multiplier for retirement benefits for general employees to 2.5% at age 55. Combined with the increase from 2.0 to 2.25% from the FY 2000 negotiations, this meant that the cost of the basic retirement

---

[252] This interpretation was adopted by System actuary Rick Roeder, fiduciary counsel Robert Blum, and Board member Ron Saathoff. Minutes of SDCERS Board Meeting, at 16-17 (June 21, 2002) (remarks of Mr. Roeder, Mr. Blum and Mr. Saathoff). At other times, however, Mr. Roeder appears to have subscribed to the competing interpretation.

[253] Another factor pointing toward additional declines in SDCERS' funded ratio was the use by Gabriel, Roeder, Smith & Co. of actuarial "smoothing" to calculate rates of return on fund assets. In essence, returns were blended over a five-year period to avoid abrupt changes in asset levels and, consequently, volatile contribution rates. Because the years that were about to fall out of this calculation had provided strong returns, the burden on the next years would be that much greater. At the time the Board was considering the second Manager's proposal, the market value of System assets trailed their actuarial value by approximately $230 million. *Id.* at 18 (remarks of Mr. Roeder).

[254] Minutes of SDCERS Special Board Meeting, at 1 (May 29, 2002).

confer process, estimated at 1.52% of payroll, would be incorporated in the City's contribution levels, which would otherwise continue to follow the schedule provided by MP1.

B.    SDCERS' fiduciary counsel and actuary recommend against the first iteration of MP2

The SDCERS Board sought advice from its fiduciary counsel and actuary, and it quickly became apparent that neither would approve the proposal without significant modification. Fiduciary counsel Constance Hiatt and Robert Blum of Hanson Bridgett, in a June 12, 2002 draft letter to SDCERS, described the new Manager's proposal as, in essence, a request that the retirement system give up something of value – the protection of the 82.3% floor – in exchange for nothing.    Unlike previous fiduciary counsel, they did not consider the contingent benefit enhancements as an adequate *quid pro quo* in determining whether the SDCERS Board had been offered an acceptable bargain on behalf of System membership.    Rather, they focused exclusively on the effect the proposal would have on the financial soundness of the System.

They began their draft opinion letter by noting that the City had been contributing to SDCERS at a level below the actuarial rate since July 1, 1997, and that the disparity between the actuarial rate and the paid rate was increasing.  For FY 2003, the City's contributions, pursuant to the first Manager's proposal would be 10.44%, a full 5.26% below the actuarial rate of 15.59%.  To date, MP1 had cost SDCERS $90 million in foregone City contributions, including interest.  Further, they noted that the anticipated funded ratio at June 30, 2002 was approximately 82.3% – the trigger level for MP1.[260]  This would represent a decline of approximately 7.6% over the current valuation.

Ms. Hiatt and Mr. Blum interpreted the trigger mechanism, in accordance with its actual wording, to require that the City make a one-time payment to restore the funded level to the specified floor.  Offering the example of a decline in the funded ratio to 80.0%, they estimated that this would require a contribution of approximately $75 million above the scheduled amount. Their letter notes that the new Manager's proposal would allow the City to escape its obligation to make such a balloon payment.    Counsel viewed this as a sign that MP1 had proven unworkable.  At the time MP1 was under consideration, the City had represented that it would address any potential balloon payment situation by increasing its payments to the System.  But, in the event, the City had failed to do so, instead citing financial hardship and requesting additional leniency from SDCERS.  In counsel's view, this signaled deterioration in San Diego's financial situation that should be of concern to the Board.

---

[260]    The actuarial valuation would not be completed for many months and would then conclude that the funded ratio at June 30, 2002 was 77.3%.  Neither this nor the 82.3% projection in counsel's letter included the additional cost of approximately 2.5% of payroll that would result from factoring in the contingent element of the *Corbett* settlement.

More generally, counsel addressed the proposal as a request by a borrower (the City) for a credit accommodation from its creditor (SDCERS), and found little to recommend it from the creditor's standpoint. "Viewing the City as a 'borrower,' as the Board did in 1996, the City is requesting more favorable terms even though its 'debt' is greater than in 1996 and the original deal objective was not reached."[261] Counsel found that the proposal would weaken the protection to the System provided by the trigger mechanism – which the letter notes was of particular significance to the System's actuary in approving MP1 – without providing any mitigating benefits.[262]

The Hanson Bridgett letter rejects the argument that additional benefits could, in and of themselves, constitute an acceptable *quid pro quo* for the additional "flexibility" in scheduled contributions requested by the City. Although "the courts have indicated that the impairment of the vested right to a soundly funded retirement system can be mitigated by providing comparable new benefits," Counsel concluded that this doctrine goes only to the employer's contractual obligations and not the Board's fiduciary duty to act in a "prudent" fashion. Raising obliquely the perverse incentive created by the benefits-for-contribution-relief aspect of MP1, Ms. Hiatt and Mr. Blum pointed out that, if this were a permissible approach:

> each time [an employer] persuaded a Board to reduce contributions, it could avoid challenges by increasing benefits. This would not pass elementary actuarial requirements. Instead, as set out in the Municipal Code, whenever benefits are increased they should be paid for in accordance with the standard actuarial practice, so normal cost is paid currently and past service costs amortized over an appropriate number of years...[263]

In considering what *would* justify the requested rate relief, counsel suggested: "the Board may wish to consider a lower 'trigger' point if there were material increases in the City's scheduled contributions, so the funding level of SDCERS is substantially strengthened on a current basis." Fiduciary counsel also urged that the Board ensure that all benefit increases (past, present and future) be reflected in the City's contribution rate. This was stated to be necessary to bring the City into compliance with Section 24.0801 of the Municipal Code, which required that

---

[261] Draft letter from Constance M. Hiatt and Robert Blum, Hanson Bridgett, to Lawrence Grissom, SDCERS, at 7 (June 12, 2002).

[262] Hanson Bridgett appears to have derived little comfort in the trigger mechanism as a safeguard against under-funding. The letter notes that the floor level is most likely to be hit during periods of economic downturn, when the City will be least able to make additional contributions. Its letter also points out that the 75% level proposed by the Manager's Office is substantially below that used by ERISA "to determine when the employer must make additional contributions to certain private sector plans." *Id.*

[263] *Id.* at 15.

it contribute an amount to SDCERS that covered the normal cost of the System, plus the amortization of past service liabilities over no more than 30 years.[264]

The letter concluded that, should the Board approve the proposal in its current form, a court might conclude that: "the decision was not a proper exercise of the Board's fiduciary responsibilities based on the facts before the Board and the actuaries [sic] opinion to the contrary." The daunting list of remedies a court could then impose included:

> ordering the Board to reconsider its decision; ordering members of the Board who were directly involved in the bargaining process to recuse themselves from any reconsidered decision; ordering the permanent removal from the Board of some or all of its members... [and] imposing personal liability on each member of the Board who voted to approve the proposed amendment...[265]

The SDCERS actuary, Mr. Roeder, was, if possible, less favorably disposed toward the initial iteration of the new Manager's proposal than was SDCERS' fiduciary counsel. His primary objection was that the weakening of the trigger provision transgressed the intended limits of "corridor funding." In materials provided to the SDCERS Board, Mr. Roeder pointed out:

- On an EAN basis, SDCERS had one of the lowest funded ratios in California;

- The gap between the actuarial rate and the City contribution rate was increasing;

- The SDCERS funded ratio was at its lowest point since the 1980s; and

- At the next evaluation, it was expected to fall further.

In a slide, colloquially entitled "Which Way Ya Goin'?," Mr. Roeder illustrated the widening gap between SDCERS' assets and liabilities under two diverging arrows labeled "enhanced benefits" and "contribution relief." Among the listed benefits were enhancements to the pension formula stemming from the 2000 and 2002 labor negotiations. Specified items of contribution relief were: the adoption of the PUC funding method; the resetting of the 30-year amortization period in 1991; the lowered contribution rates under MP1; and the phase-in of certain changes in actuarial assumptions.[266] He provided graphs to illustrate the growing

---

[264] *Id.*

[265] *Id.* at 16-17.

[266] In an interview with Vinson & Elkins, Mr. Roeder stated that the assumptions to which he referred involved the reduction in City contribution rates reflecting the fact that certain employees on whose behalf contributions were made would not become vested members of the System. The number of such employees had been overestimated in previous years, causing

disparity between the City's contributions and the PUC rate and the yet greater disparity between those contributions and the EAN rate.

Mr. Roeder had also voiced criticism of certain aspects of SDCERS' funding situation in his actuarial valuation for the fiscal year ended June 30, 2001, completed in early February 2002 and available to the public as an attachment to the SDCERS CAFR for that year. He referred in particular to the damage to the soundness of the System that could result from the misuse of the concept of surplus earnings:

> We offer comment related to disposition of Surplus Undistributed Earnings. Suppose that the System earns 0% in the current fiscal year and 16% next year. Our understanding is that a contribution to Surplus Undistributed Earnings will be made for the 16% year even though there will be no net gain from investments over the two-year period. If extra benefits are conferred in the "good" years, then the median, "after the fact" investment return to finance all other benefits should theoretically be correspondingly lower. We will revisit this issue in the experience investigation.

In all previous years after the adoption of MP1, the Gabriel Roeder Smith & Co. annual valuations had concluded that the System was, as a general matter, actuarially sound. In the 2001 valuation, however, this language included an added element of caution:

> Overall, the financial condition of the retirement system continues to be in sound condition in accordance with actuarial principles of level-cost financing. However, we want all parties to be acutely aware that the current practice of paying less than the computed rate of contribution or pickup will help foster an environment of additional declines in the funding ratios in absence of healthy investment returns.[267]

Also opposed to the amendment to MP1, as initially proposed, was San Diego attorney Michael Aguirre, who, in a letter dated June 20, 2002, threatened the Board and its members with litigation should they approve the proposal as presented. Mr. Aguirre objected to the reduction of the trigger level and expressed skepticism that the City would honor even the reduced level should it be breached. He opined that the SDCERS Board should follow the advice of its fiduciary counsel, Hanson Bridgett, and reject the proposal. "This advice is based

---

an excessive discount to the City's contribution rate. Rather than incorporate this in a single upward adjustment to the City's rates, the SDCERS Board had agreed that it would be phased in over a five-year period.

[267] 2001 Actuarial Valuation, supra note 221, at cmt. M, at 17.

on the most fundamental law of trusts," he wrote, "a trustee shall not dissipate the *res* of the trust."[268]

## C. Further iterations of the second Manager's proposal

Given the opposition of its fiduciary counsel and actuary, the Board communicated to the Manager's Office that it would not consider the proposal as it then stood. Mr. Uberuaga and his staff responded with two significant modifications. Rather than retain the MP1 schedule of .50% annual increases in City contributions, the Manager proposed to double the increase to 1% of applicable payroll. The amended proposal further provided that the agreement would sunset in FY 2009, at which time the City would pay the full PUC rate – however much progress it had or had not made toward that goal through seven years of stepped-up contributions. The City's contributions would thereafter continue to increase by .50% a year until the EAN rate was achieved, as under MP1.[269] The second iteration of the new proposal, however, retained the proposed reduction of the funding floor to 75% of the AAL.[270]

At the June 21, 2002 meeting of the SDCERS Board, its actuary acknowledged the improvements made in the revision to the new Manager's proposal, but again pointed out in detail the deterioration in the System's funded status, which was even more pronounced when measured under the EAN method. He indicated as causes of the funding shortfall changes in System demographics, substantial additional benefits and the five years of contribution relief provided by MP1. Under these circumstances, he remained unconvinced that lowering the funding trigger was an appropriate action.

> With the original Manager's Proposal, Mr. Roeder said he had similar misgiving as he has today. However, he was more comfortable with the [original] proposal because of the 82.4% [sic] floor. With that floor, it seemed to provide the necessary prudent protection to the System. However, he is concerned with the new proposal because of the coupling of benefit increases to funding, along with the significant change from the 82.3% safeguard to 75%.[271]

Mr. Roeder also objected to the involvement of the Board in the benefit-granting process, a criticism that was voiced in the Hanson Bridgett letter of June 12, 2002, and would be repeated

---

[268] Similarly, *see* Minutes of SDCERS Board Meeting, at 21 (July 11, 2002) (remarks of Mr. Aguirre).

[269] Initial ambiguity on this point was addressed by the Manager's Office in: Memorandum from Bruce Herring, Deputy City Manager, to Lawrence Grissom, Retirement Manager, SDCERS, Re: City's Proposal Regarding Contribution Rates and Reserves and Responses to Questions from SDCERS Trustees (July 1, 2002).

[270] Memorandum from Michael T. Uberuaga, City Manager, to SDCERS Board of Administration, Re: June 18, 2002 Modification to the Proposal from the City of San Diego Regarding Employee Contribution Rates, Health Insurance and Reserves (June 18, 2002). *See also* Minutes of SDCERS Board Meeting, at 16-17 (June 21, 2002) (remarks of Mr. Herring).

[271] Minutes of SDCERS Board Meeting, at 17-19 (June 21, 2002).

by several Board members. He estimated that the funded ratio at the end of the current fiscal year would be between 80% and 84%.[272] Thus, he was unable to determine at that time whether the trigger provision of MP1 would be hit at June 30, 2002.

If Mr. Roeder was not supportive of the City Manager's proposed modification to MP1, the Manager's Office was not enthusiastic about Mr. Roeder's presentation to the Board. Deputy City Manager Bruce Herring, in an individual discussion with Mr. Roeder after his presentation, criticized him for opining on policy concerns that Mr. Herring believed to be outside the actuarial sphere.[273] In an interview with Vinson & Elkins, Mr. Roeder said he felt a degree of pressure to support the proposed modifications to MP1, but also stated that this did not influence his eventual willingness to describe as "reasonable" the final iteration of MP2.

In a lengthy discourse before the Board, fiduciary counsel Robert Blum contrasted the present situation to that in 1996, when MP1 was approved. He pointed out that the substantial surpluses that supported the adoption of MP1 no longer existed. He cautioned the Board that it should consider carefully the effect on the System's financial status of the PUC funding method and the contingent component of the *Corbett* settlement.[274] In addition, like Mr. Roeder, he advised the Board to: "decouple negotiations and fiduciary decisions. One of the reasons this is such an awkward situation is that these two things have been brought together, which is unfortunate."[275] In response to a question from trustee Diann Shipione, Mr. Blum stated that it was also incumbent upon the Board to examine the creditworthiness of the City in connection with any agreement that increased the City's future payment obligations.[276]

The SDCERS Board "trailed" the new Manager's proposal pending receipt of additional information. On July 1, 2002, Deputy City Manager Bruce Herring submitted a memorandum clarifying certain aspects of the proposal, responding to questions from Mr. Vortmann and providing information on the City's financial situation.[277] The exchange with Mr. Vortmann can be described as unhelpful answers to contentious questions. For example, in reply to Mr. Vortmann's assertion that the "the City is addicted to a 'give now, pay later' approach that burdens future taxpayers," Mr. Herring wrote: "The City disagrees with this perception. The City has endeavored to maintain an adequately funded retirement system. Employee retirement

---

[272] *Id.* at 18. Mr. Roeder clarified that this "guess" assumed PUC method funding and did not reflect *Corbett* "contingent" liability. *Id.* at 19.

[273] Mr. Herring was no longer a member of the SDCERS Board at this time, having been succeeded by Ms. Lexin as the City Manager's designee. He took the lead role in presenting the second Manager's proposal to the SDCERS Board.

[274] Minutes of SDCERS Board Meeting, at 24-26 (June 21, 2002).

[275] *Id.* at 26.

[276] *Id.* at 30-31.

[277] Memorandum from Bruce Herring, *supra* note 253.

benefits are by their very nature paid in the future, when employees retire, for services performed today." The financial information consisted of reports from rating agencies and the most recent auditor's report on the City's annual financial statements.

It became apparent that the System's actuary and fiduciary counsel, and consequently a majority of the Board, would not support any change to MP1 that did not retain the 82.3% funding floor. Recognizing this reality but still eager to obtain relief from the "hard" aspect of the floor provision, Cathy Lexin and Deputy City Attorney Elmer Heap requested authority from the Mayor and Council to modify the proposal to leave undisturbed the present floor but permit the City a five-year ramp-up to full actuarial funding should that level be breached. "Given the importance of avoiding a [sic] immediate full rate implementation (versus five year phase in)," they wrote, "it is recommended that the Council authorize the staff to agree to this modification should the proposal currently before SDCERS not prevail." Ms. Lexin and Mr. Heap stated this was necessary because the Board's fiduciary counsel had written an opinion "clearly erring on the side of caution due to the fact that counsel, from his perspective, did not have time to evaluate the proposal sufficiently to render final advice."[278]

At its July 11, 2002 meeting, the Board addressed what had devolved into an offer from the City to double its yearly contribution increases to SDCERS over the MP1 levels in exchange for relief from having to make a balloon payment to SDCERS should the trigger provision of MP1 be engaged. Most Board members presumably also believed that the package of benefits agreed to in the meet-and-confer process remained contingent on the Board's approval of the new Manager's proposal (now "MP2"). In fact, the City Council, in closed session, had determined to grant the specified benefits whether or not SDCERS agreed to MP2. According to statements made by Cathy Lexin to Vinson & Elkins, the purportedly contingent nature of these benefits was now no more than a bluff. Shortly before the meeting, the City once again entered the TANS Market without disclosing concerns about the MP1 trigger, the proposed changes to MP2, or the scope of the new benefits package.

In that meeting, Mr. Roeder projected, through FY 2009, the potential effects of the new Manager's proposal on SDCERS' funded level and the City's contribution rates.[279] In general, his conclusion was, as might be expected, that the second iteration of the proposal provided greater contributions from the City than did the MP1 rates unless and until the trigger provision engaged, at which point its five-year ramp up to full PUC funding would result in lower contributions than the immediate restoration of actuarial funding. He estimated that this iteration of the proposal reduced by 75% the additional contribution shortfall that would have resulted

---

[278] Memorandum from Cathy Lexin, Human Resources Director, and Elmer Heap, Head Deputy City Attorney, to Mayor and City Council, Re: Meet and Confer: Contingent Retirement Benefits and Proposal to SDCERS (July 8, 2002).

[279] We express our appreciation to Gabriel, Roeder, Smith & Co. for providing these and other actuarial materials to Vinson & Elkins in connection with this inquiry.

from the initial version. He also noted: "the modified proposal will provide added contributions after 2009 in an effort to attain Entry Age Normal Funding levels."

Mr. Roeder also provided projections of the System's funded ratios and the City's contribution rates under earnings scenarios other than the 8% assumed rate of return. He calculated that with a 4% rate of return, the SDCERS funded ratio would decline to approximately 60% by June 30, 2009, whether or not SDCERS adopted MP2. With a 12% rate of return, the funded ratio would increase to approximately 100%. This exercise, whatever the intention at the time, illustrates that the difference in City contributions between MP1 and MP2 rates, as it affected the SDCERS funded level, would likely be far less significant than the role of market forces over the same years.

Thus, the SDCERS Board was faced with a difficult question of judgment. Depending on whether the 82.3% floor was breached and, if so, when and by how much – as well as which interpretation of MP1's trigger provision would then be applied – MP2 could result in greater or lesser payments by the City than the existing agreement. Although the SDCERS actuary declined to predict whether the funded level would fall below the 82.3% floor during the next two years,[280] the substantial decline in the System's funded ratio between FY 2000 and 2001, and the continued bear market through FY 2002, made that appear likely. Indeed, that was the very reason the City sought relief from the "hard floor" provided by MP1.[281] It was, therefore, probable that the proposed modification to the 1996 agreement would result in at least a modest reduction in City contributions over a several year period. Weighed against this, however, were the problems that would result should the City become liable to its retirement system for an enormous balloon payment as early as July 1, 2003. The layoffs and other expense reduction measures that would follow a City budgetary crisis would negatively affect many elements of SDCERS' membership.[282]

After fiduciary counsel Robert Blum indicated that he could not support reducing the trigger level to 75%, but might find acceptable a proposal that would leave the 82.3% floor in place while allowing the City a ramp-up period to achieve that level, Board member Ronald Saathoff, as anticipated by the Manager's Office, made a motion to approve MP2 contingent

---

[280] Minutes of SDCERS Board Meeting, at 19 (July 11, 2002).

[281] As Ms. Lexin stated: "her understanding is that the City is before the Board with this request because... there was a good chance we would hit the floor, and that the City would be faced with a $25 million hit to next year's budget." *Id.* at 25. *See also id.* at 26 (remarks of Mr. Blum) ("He believes there is a high probability that the 82.3% trigger will be hit in a couple of years....").

[282] It is notable that the City's municipal unions supported MP2. *Id.* at 22.

upon it being so modified.[283]   The Board passed his motion,.additionally contingent upon review and approval by the SDCERS actuary and fiduciary counsel.[284]

D.    The final positions of SDCERS' fiduciary counsel and actuary on MP2

As foreshadowed in Mr. Blum's remarks at the Board's July 11, 2002 session, Hanson Bridgett eventually opined that approving the final version of MP2, which retained the 82.3% trigger, would not cause the Board to violate its fiduciary responsibilities.  Counsel's legal analysis concluded:

> In these circumstances, it is reasonable for the Board to have decided that this Agreement is the best way to achieve long term financial integrity and soundness of SDCERS.  The Board has diligently examined the alternatives presented by the City and requested input from its outside experts.  The Board provided a full and reasoned consideration of the facts and issues before approving the Agreement.  Therefore, it is our opinion that it is reasonable for the Board to enter into the Agreement in the exercise of its fiduciary responsibilities.[285]

Moreover, actuary Rick Roeder gave his somewhat grudging approval (or at least statement of non-opposition) to the proposal in a November 5, 2002 letter to the SDCERS Board. He made several points.  First, he stated that it would be preferable for the City to begin contributing at the full PUC level as soon as possible.  He noted that under MP2 this goal would be accomplished more rapidly than under MP1 only so long as the 82.3% trigger was not hit.  He considered it "likely that the 82.3% trigger will be hit by June 30, 2003."  Therefore, he concluded:

- From a pure actuarial viewpoint, it would be best to hold the City to the existing Manager's Proposal and the 82.3% trigger... [and]

---

[283]   *Id.* at 27, 31 and 33.

[284]   Eight Board members voted to approve Mr. Saathoff's motion: Trustees Casey, Vattimo, Pierce, Saathoff, Wilkinson, Torres, Webster, and Lexin.  Mr. Rhodes and Mr. Crow voted in opposition.  Mr. Garnica abstained and Mr. Vortmann and Ms. Shipione left the meeting prior to the vote.  Ms. Shipione had previously expressed her opposition to this measure. Memorandum for Diann Shipione, Trustee, SDCERS, to SDCERS Board, Re:  Proposed Amendment to the 1997 [sic] Manager's Proposal, Issue #3, To Lower the Funding Ratio From 82.3% to 75% (June 20, 2002).

[285]   Letter from Robert Blum and Constance Hiatt, Hanson Bridgett, to Frederick W. Pierce, IV, President, SDCERS (Nov. 18, 2002).  In June 2004, SDCERS filed an action in state court against Hanson Bridgett claiming, among other things, that it committed malpractice in advising the Board that it could properly approve MP2.  *SDCERS v. Hanson, Bridsen, Marcus, Vlahus & Rudy,* Civ. No. GIC-831938 (Cal. Sup. Ct., filed June 25, 2004).  Lewis, "Officials: Pension fund agreement was a mistake.  Board sues former lawyers for malpractice, fraud," *San Diego Transcript,* Aug. 23, 2004.  *SDCERS v. Hanson, Bridgett, Marcus, Vlahos & Rudy,* Civ. No. GIC-831983 (Cal. Sup. Ct.) (filed June 25, 2004).  *As* of this writing, the summons and complaint in that matter have not been served on the defendants.

- From a pure actuarial viewpoint, we would prefer it if the Board did not provide a transition period to the City to reach the full PUC rate and then move to the full EAN rate.[286]

Nevertheless, he opined that the matter ultimately lay within the sound discretion of the Board. He concluded:

> If the Board decides that a transition period is needed, then the transition period chosen is reasonable as the City will commit to contribute an additional amount each year starting in July 2004; if the 82.3% accelerated funding trigger is hit the ramp up to full PUC rates will be accelerated; the City will contribute the full PUC rate starting in July 2006; the entire agreement will sunset on June 30, 2010; and the City and Board agree to move to the EAN rate rapidly after that date.[287]

In an interview with Vinson & Elkins, Mr. Roeder stated that his decision to provide this letter was partly a result of the willingness of Mr. Blum, whom Mr. Roeder regards as highly experienced counsel, to approve MP2. He also indicated that he viewed the retention of the 82.3% trigger – if no longer a "hard" floor – as a critical factor. In response to the question whether he felt pressure from any source to approve MP2, he stated in a June 21, 2004 e-mail to Vinson & Elkins:

> Not really pressure, but I did want to stick in a sentence in our November 2002 letter to the Board of Ret[irement] saying that MP2 [together with MP1] could result in 12 consecutive years of paying less than the actuarial rate. Bob Blum asked me not to do so and we decided not to include [it]. We had earlier said in a public meeting that they were entering a "Brave New World" in terms of meeting provisions, so we felt that this was somewhat apparent anyhow.

The City and SDCERS entered into a formal agreement on November 18, 2002, which, in essence, embodied the City Manager's proposal as modified by Mr. Saathoff's July 11, 2002 motion. This followed majority votes by the SDCERS Board and the City Council approving the agreement. Citing the "undue hardship that would be imposed on the City if the Board were to require that the City immediately increase its contributions to the full [PUC] rate," it provides a table of City contribution rates through FY 2009, after which the agreement would sunset.[288] These rates incorporated an annual increase of 1.0% of payroll, plus the actuarial cost of the enhanced benefits from the 2002 meet-and-confer process. The City and SDCERS specifically

---

[286] Letter from Rick Roeder, Gabriel, Roeder, Smith & Co., to SDCERS Board, Re: Agreement Regarding Employer Contributions Between the City and SDCERS (Nov. 5, 2002).

[287] *Id.* at 2.

[288] Agreement Regarding Employer Contributions Between the City of San Diego and the San Diego City Employees Retirement System, (Nov. 18, 2002).

# LAW OFFICE OF MICHAEL A. CONGER

Post Office Box 9374
16236 San Dieguito Road, Suite 4-14
Rancho Santa Fe, CA 92067
(858) 759-0200
(858) 759-1906
web site: www.lawconger.com
email: congermike@aol.com

Michael A. Conger

Civil Litigation
Class Actions
Employees' Rights
Business Litigation
Wrongful Death/Serious Injury

October 28, 2005

<u>Via Fax No. (619) 338-6657 and Federal Express</u>
<u>Tracking Number 851152649993</u>

<u>Confidential Pursuant to Evidence Code §§1115-1128, 1152, 1154</u>

Donald A. English, Esquire
English & Gloven
550 West C Street, Suite 1800
San Diego, CA 92101

Re:   <u>Gleason, Wood and McGuigan v. Gabriel, Roeder, Smith & Company, et al.</u>
      San Diego Superior Court Case No. GIC 849882
      Your File No. 2325.05623

Dear Mr. English:

REDACTED

# REDACTED

## A.    Actuarial Malpractice for Approval of MP II

As you are aware, one of the bases of our actuarial malpractice claim arises out of the erroneous actuarial services that Mr. Roeder provided to SDCERS in 2002 regarding MP II. These services were below the applicable standard of care because Mr. Roeder informed SDCERS that "I can live with it"[6] and that MP II was "[n]o huge deal on my end."[7] As Mr. Roeder later would candidly admit, MP II was a "train wreck."[8] Mr. Roeder also failed to comply with accepted professional standards regarding actuarial communications to SDCERS, the plan sponsor, and the plan beneficiaries, all of whom Mr. Roeder expressly understood were relying on his actuarial expertise.[9]

---

# REDACTED

he was criticized by the City's Audit Committee,[13]

REDACTED

---

REDACTED

[13]    Letter dated June 7, 2005 from Troy A. Dahlberg, which stated:

"at various times it appears that [Mr. Roeder] may have allowed the SDCERS
Board to compromise his professional judgment. . . . The actions of the actuary as
outlined above appear to have contributed to the problems facing the SDCERS
today."

REDACTED

REDACTED

First, Mr. Roeder admitted in an interview with Vinson & Elkins, previously retained by the City to conduct an illegal acts investigation, that he watered down his November 5, 2002 actuarial opinion letter.

> "I did want to stick a sentence in our November 2002 letter to the Board of Ret[irement] saying that MP2 [together with MP1] could result in 12 consecutive years of paying less than the actuarial rate. Bob Blum asked me not to do so and we decided not to include [it]."[45]

Second, Mr. Roeder concealed that he knew by at least April, 2002, that it was very likely that the MP I (82.3 percent SDCERS funded ratio) trigger would be hit as of the June 30, 2002

REDACTED

---

[45]    Vinson & Elkins, Report on Investigation, September 16, 2004, p. 93.

Donald A. English, Esquire
October 28, 2005
Page 14

REDACTED

actuarial valuation.

And Mr. Roeder has participated in more than his share of actuarial gaming.[47]

REDACTED

---

[47]     See Dahlberg letter dated June 7, 2005, p. 1 [discussing Mr. Roeder's letter to Mike Phillips dated February 12, 1998 which proposed changing actuarial assumptions "to reduce or eliminate [a funding] shortfall" in order to lower the City's employer contribution. As Mr. Dahlberg correctly stated: "[i]t would appear to be in the best interest of the Board, as fiduciaries of the pension, to retain an actuary who utilizes assumptions that reflect[s] . . . reality . . . ."

REDACTED

REDACTED

### D.     Failure to Disclose that GASB had Declined to Approve "Corridor Funding."

Mr. Roeder proposed to the Governmental Accounting Standards Board ("GASB") that it consider "corridor funding," the euphemistic term he used to describe the underfunding of MP I, as an acceptable alternative to the six funding methods previously approved.[65] The GASB declined to respond to Mr. Roeder's repeated requests to approve corridor funding, and "[a]round calendar year 2001, he finally gave up hope that GASB would consider his proposal."[66]

REDACTED

REDACTED

[65]     Vinson & Elkins, Report on Investigation, September 16, 2004, p. 47.

[66]     Vinson & Elkins, Report on Investigation, September 16, 2004, p. 48.

REDACTED

Donald A. English, Esquire
October 28, 2005
Page 28

REDACTED

Very truly yours,

Michael A. Conger

cc:    Clients
       Richard H. Benes, Esq.
       Michael A. Leone, Esq.  (Counsel for SDCERS)
       Barry J. Tucker, Esq. (Counsel for City of San Diego)
       Don McGrath, Esq. (Executive Assistant City Attorney)
       David P. Strauss, Esq. (Counsel for Abdelnour plaintiffs)
       Ann M. Smith, Esq. (Counsel for MEA)
       Anthony R. Segall, Esq. (Counsel for AFSME Local 127)
       Richard H. Castle, Jr., Esq. (Counsel for POA)
       Diane Silva-Martinez, Esq. (President of Deputy City Attorneys' Association)



# HellerEhrman LLP

David E. Kleinfeld
David.Kleinfeld@hellerehrman.com
Direct +1.858.450.8478
Main +1.858.450.8400
Fax +1.858.450.8499

December 8, 2005

42497.0001

*Via Facsimile & Hand Delivery*

## Confidential Pursuant to Evidence Code
## §§ 1115-1128, 1152, 1154

Donald A. English, Esq.
English & Gloven
550 West "C" Street, Suite 1800
San Diego, CA 92101

Re: *The City of San Diego v. Callan Associates, Inc., et al.*
    **San Diego Superior Court Case No. GIC 852419**

Dear Mr. English:

## REDACTED.

GRS was the principal actuary for the San Diego City Employees' Retirement System ("SDCERS"), from 1992 until 2005, and Rick Roeder served as the lead individual actuary. As discussed below, GRS committed professional negligence on numerous different occasions in its provision of actuarial services to SDCERS. GRS' negligence resulted in a massive shortfall in funding of SDCERS, thereby damaging the City, which will be required to make additional employer contributions now and in the future as a result of GRS' negligence. We discuss below the multiple occurrences of professional negligence committed by GRS.

Heller Ehrman LLP   4350 La Jolla Village Drive, 7th Floor   San Diego, CA  92122-1246   www.hellerehrman.com

Anchorage   Beijing   Hong Kong   Los Angeles   Madison, WI   New York   San Diego   San Francisco   Seattle
Silicon Valley   Singapore   Washington, D.C.

139

## A.    GRS' Approval of MP I

REDACTED.

Mr. Roeder nevertheless informed the Board that MP I was an actuarially "sound proposal as long as the funded ratio does not drop significantly, and with the appropriate sunset provisions in place."[3]

GRS·
put its professional stamp of approval on MP I, endorsing this fundamentally flawed funding scheme which paid out expanded benefits without requiring the necessary corresponding contributions to keep SDCERS financially stable. GRS exercised negligent professional judgment in endorsing MP I.

---

REDACTED.

---

[3] *Id.* at 15.

## B.    Corridor Funding Method

Beginning as early as 1996, GRS made the decision to adopt for SDCERS what is commonly referred to as the "corridor funding" method for determining the funding level of the City's annual employer contribution to SDCERS under MP I—in reality, the underfunding of SDCERS.

REDACTED.

GRS committed professional negligence in recommending the corridor funding method because a major flaw of that method is that if the payment amount made by the City falls below the acceptable funding floor, additional and larger contributions will be necessary, often in a short amount of time—and, as admitted by Mr. Roeder, "often at a very poor time (i.e., City of San Diego)"—to bring the system to a stable level.[6]

REDACTED,

In fact, GRS should have been aware that the GASB had never approved corridor funding, because GRS had unsuccessfully lobbied the GASB for years to approve it in this very context—for use by GRS in SDCERS.[8]

From at least 1996 until 2002, GRS unsuccessfully lobbied GASB. In 1998, for example, Mr. Roeder urged the GASB to approve the corridor funding method. Mr. Roeder touted corridor funding as a "highly attractive" funding method.[9] Four years later, Mr.

REDACTED.

---

[6] Roeder, "Demystifying."

[8] See, e.g., Roeder, "Demystifying"; Letter from Rick A. Roeder to Larry Grissom (5/21/98).

[9] Letter from Rick A. Roeder to Larry Grissom (7/14/98).

Roeder was still attempting to obtain GASB approval of the corridor funding but was likewise unsuccessful.[10]

All the while, although it should have known that corridor funding was not a GASB-approved funding method and that corridor funding understated the contribution amount the City should have made to SDCERS using an appropriate, sanctioned actuarial method, GRS utilized corridor funding for SDCERS. As Mr. Roeder himself stated, "While Corridor funding is not one of the six funding methods formally sanctioned by GASB for expensing purposes, we believe this is an excellent method for the City."[11] In support of using the corridor funding method to set the City's contribution levels, GRS also trumpeted: "In the long term, we believe corridor funding will be SUPERIOR to Projected Unit Credit [PUC] funding because higher reserves to satisfy fund commitments will ultimately be built up."[12]

REDACTED.

## C. Different Amortization Periods

In 1998, upon the recommendation of GRS, SDCERS adopted a 40-year amortization period for purposes of expensing and reporting its unfunded accrued actuarial liability ("UAAL").[13]

REDACTED.

The GASB requires that all actuarial methods and assumptions used for funding and expensing be the same, a requirement recognized by GRS; changes in such methods and assumptions must be disclosed.[14] The 40-year amortization period suggested by GRS for

---

[10] Letter from Rick A. Roeder to Karl Johnson and David Bean, of GASB (2/8/02).

[11] Letter from Rick A. Roeder to Larry Grissom (5/21/98).

[12] *Id.* (emphasis in original).

[13] *See, e.g.,* Letter from Rick A. Roeder to Mike Phillips (2/12/98).

[14] *Id.*

SDCERS to use for purposes of *expensing* and reporting its UAAL stood in marked contrast to the 30-year amortization period used for calculating the City's annual *contributions* to SDCERS.[15]

REDACTED.

        Once again acknowledging that the GASB had refused to approve the corridor funding method, Mr. Roeder explained to Mike Phillips, the City accountant in charge of the SDCERS funds:

> So, if we can say that the Corridor funding method was implemented for 1996-97 fiscal year (a somewhat arguable point since the System had traditionally used a one-year lag in contribution implementation), then we could compare the actual contributions made against the acceptable method which produces the *least contribution*. We believe that this method would be Projected Unit Credit with *40-year amortization* on a level-percent-of-payroll basis.[17]

Nor did GRS advise the City to disclose the disparity in amortization periods, despite the assertion by Mr. Roeder, the actuarial professional responsible for SDCERS, that "We are familiar with GASB expensing."[18]

REDACTED

---

[15] V&E Report, at 39.

REDACTED

[17] Letter from Rick A. Roeder to Mike Phillips (2/12/98) (emphasis added). Mr. Roeder further stated: "Under this basis, the normal cost would be unchanged from above but the unfunded liability amortization would be lowered to $4,857,243 from $6,164,770. This would reduce the ARC [actuarially required contribution] to $34,036,492 and the resulting shortfall to $5,975,989."

[18] *Id.*

D.   Actuarial "Smoothing" Method

REDACTED

Furthermore, on February 12, 2002, GRS had informed the Board that the funded ratio of SDCERS for FY 2001 was 89.9%, a severe decline from 97.3% in FY 2000.[20]

REDACTED

A principal and aggravating factor for these further declines in SDCERS' funded ratio was GRS' use of an actuarial "smoothing" method to calculate rates of return on fund assets. Under GRS' actuarial smoothing method, GRS blended returns over a five-year period. This had the effect of understating the full amount of loss in difficult years—for example, to avoid sharp declines in asset levels and resulting volatile contribution rates.[23]

REDACTED

---

[20] SDCERS Annual Actuarial Valuation for June 30, 2001, Comment A (at 14). Despite this decline, GRS nevertheless concluded that SDCERS "continues to be in sound condition in accordance with actuarial principles of level-cost financing." *Id.* at Comment M (at 17). The issue of GRS' actuarial valuations of SDCERS is discussed below.

REDACTED

[23] V&E Report, at 81, n.253.

REDACTED

REDACTED

GRS should have been aware of the detrimental impact of actuarial smoothing; nevertheless GRS continuously recommended that SDCERS use the five-year actuarial smoothing method. On April 9, 2003—three months *after* GRS had disclosed the SDCERS funded ratio fell below the MP I trigger—Mr. Roeder told Board members that, "We believe [the] method provides reasonable results and have not strongly pushed for any change. . . . We believe five years makes sense."[26] Yet, as the gravity of the shortfalls began to come to light, Mr. Roeder himself acknowledged his negligence: "The existing approach of smoothing assets has never thrilled us. We inherited this. Our view 'OK, not worth losing sleep over but *not best practice.*'"[27]

Instead of exercising proper professional judgment and advising the Board to adopt actuarially sound practices, GRS continued to advocate use of this smoothing method despite its many, readily apparent, deleterious effects on SDCERS.

E.     **GRS' Approval of MP II**

REDACTED

GRS had negligently endorsed MP I and, instead of rectifying the situation, which had created a funding crisis for SDCERS, it gave its blessing to MP II. On November 5, 2002, GRS gave its written approval to the Board for adoption of MP II, stating that the Board's exercise

REDACTED

[26] Letter from Rick A. Roeder to Larry Grissom and Paul Barnett (4/9/03).

[27] E-mail from Rick Roeder to Paul Barnett (6/4/03) (emphasis added).

145

of judgment in choosing a "transition period" to allow the City to reach the required contribution rates was "reasonable."[28]

REDACTED

One week before the letter was issued, Mr. Roeder expressed some misgivings to Mr. Blum about his actuarial conclusion:

> Bob, I took a look at the version marked 9/16 – Item j: 'then the transition period is reasonable[.]' hmmmmm, thinking about this, I do not want to have anybody think that we advocate a method, which, in total, would have over a decade of subsidized rates. An easy point to overlook in a written treatise: we already think they have been 'in transition' since the original Mgr's proposal in 1996.[31]

Mr. Blum responded to Mr. Roeder: "[Y]ou had signed off on this exact language before. [S]o lots of people would be very unhappy if you are unwilling to sign off on it now."[32] Mr.

---

[28] Letter from Rick A. Roeder to SDCERS Board (11/5/02).

REDACTED

[31] E-mail from Rick Roeder to Robert Blum (10/29/02).

[32] E-mail from Robert Blum to Rick Roeder (10/29/02).

Roeder buckled, without hesitation, in his reply: "I can live with the language – *just not optimum*. No huge deal at my end."[33]

REDACTED

F.    Actuarial Valuations of SDCERS

Throughout the time period discussed above, GRS issued a clean bill of health each year to SDCERS—despite clear indications to the contrary: the precipitous declines in SDCERS' funded ratio caused by adoption of MP I and MP II, both endorsed by GRS; as well as GRS' use of the corridor funding method, 40-year amortization period for calculating unfunded liabilities, and actuarial smoothing method.

REDACTED

Such repeated diagnoses by GRS that SDCERS remained in "sound condition" or "adequate condition," given the grave discrepancies between what SDCERS was paying out

---

[33] E-mail from Rick Roeder to Robert Blum (10/30/02) (emphasis added).

REDACTED

in benefits and receiving in contributions, were contrary to sound actuarial practice. The profound lack of professional judgment demonstrated by GRS, for all the reasons detailed above, enabled and facilitated the massive funding deficit facing the City and SDCERS.

REDACTED

# HellerEhrman LLP

Very truly yours,

David E. Kleinfeld

DC 263920 v2
(42497.0001)

1 | MICHAEL J. AGUIRRE, City Attorney
DON McGRATH, Executive Assistant City Attorney (CA Bar No. 44139)
2 | ANDRA M. DONOVAN  (CA Bar No. 177792)
EMILY B. RAGLAND, Deputy City Attorney, (CA Bar No. 239401)
3 |    Office of the City Attorney
      1200 Third Avenue, Suite 1100
4 |    San Diego, California 92101-4100
      Telephone:  (619) 533-5800
5 |    Facsimile:  (619) 236-6018

6 | DAN L. STANFORD, Esq.
STANFORD AND ASSOCIATES
7 |    402 West Broadway, Suite 2900
      San Diego, CA  92101
8 |    Telephone:  (619) 696-6160
      Fascimile:  (619) 531-0853
9 |
BRYAN C. VESS, Esq.
10 |    402 West Broadway, 29th Floor
      San Diego, CA  92101
11 |    Telephone:  (619) 795-4300
      Fascimile:  (619) 795-4301
12 | Attorneys for Plaintiff CITY OF SAN DIEGO

13 |                    **SUPERIOR COURT OF CALIFORNIA**

14 |                       **COUNTY OF SAN DIEGO**

15 | THE CITY OF SAN DIEGO,                    )   Case No. GIC852419
                                              )
16 |          Plaintiff,                       )   **RESPONSE OF CITY OF SAN DIEGO**
                                              )   **TO GABRIEL, ROEDER, SMITH**
17 |    v.                                     )   **MOTION TO SEVER**
                                              )
18 | CALLAN ASSOCIATES, INC., GABRIEL,         )
ROEDER SMITH & COMPANY, et al.,               )
19 |                                           )   I/C Judge:    Hon. Kevin A. Enright
            Defendants.                        )   Dept.:        69
20 |                                           )   Action filed: August 19, 2005
                                              )   Trial:        Not set
21 |                                           )
                                              )
22 |

23 |         The City of San Diego ("the City") hereby agrees that its claim against GABRIEL,

24 | ROEDER, SMITH ("GRS") should be severed from its case against CALLAN ASSOCIATES,

25 | INC. ("CALLAN") for purposes of trial only, but opposes severance of the case in its entirety on

26 | the grounds that it would result in a significant amount of duplicative discovery.

27 |         As set forth in the First Amended Complaint, the City's claims against both GRS and

28 | Callan arise from work each performed in connection with the San Diego City Employees

                                              1
**RESPONSE OF CITY OF SAN DIEGO TO GABRIEL, ROEDER, SMITH MOTION TO SEVER**

RECEIVED

MAR 2 1 2006

BY:

1  Retirement System ("SDCERS"). GRS served for some time as the SDCERS actuary. Callan

2  has and still does serve as its investment consultant. The work of the two defendants is

3  interconnected and interdependent, since the System's actuary must rely upon its investment

4  consultant's valuation of SDCERS' assets when calculating the annual required contribution of

5  the City to the System. SDCERS' actuary must also rely upon the investment consultant's

6  valuation of assets in calculating the system's overall worth for purposes of SDCERS' financial

7  report. The information contained in that financial report is, then, incorporated by the City when

8  the City prepares its own financial report. Thus, the accuracy and completeness of the

9  information provided by one dictates to some extent the accuracy and completeness of the

10  information provided by the other. (Declaration of Andra M. Donovan at ¶ 2.)

11      In light of the interdependence of the work performed by the two defendants, there is a

12  significant amount of necessary discovery which is relevant to the case against each. This

13  includes, but is not limited to depositions of key witnesses on issues of reporting and valuation,

14  depositions and written discovery regarding communication between the two defendants or

15  between one or both of the defendants and City and/or SDCERS. The City, therefore, does not

16  agree that economy is served by severance of the two claims for all purposes. (Declaration of

17  Andra M. Donovan at ¶ 3.)

18      Insofar as the discovery from this case will likely overlap considerably with the discovery

19  to be conduced in the related case of *Gleason v. Gabriel, Roeder, Smith & Company, Inc.* (San

20  Diego Superior Court Case No. GIC 849882), the City hereby suggests and agrees that this

21  related case should be transferred to this department for coordination with this case.

22  (Declaration of Andra M. Donovan at ¶ 4.)

23

24  Dated: March 20, 2006             MICHAEL J. AGUIRRE, City Attorney

25

26                            By

27                               Andra M. Donovan
                                    Deputy City Attorney
                                Attorneys for Defendants/Cross-Complainants

28

151

1  MICHAEL J. AGUIRRE, City Attorney
   DON MCGRATH, Executive Assistant City Attorney (CA Bar No. 44139)
2  ANDRA M. DONOVAN (CA Bar No. 177792)
   EMILY B. RAGLAND, Deputy City Attorney, (CA Bar No. 239401)
3       Office of the City Attorney
        1200 Third Avenue, Suite 1100
4       San Diego, California 92101-4100
        Telephone: (619) 533-5800
5       Facsimile: (619) 236-6018

6  DAN L. STANFORD, Esq.
   STANFORD AND ASSOCIATES
7       402 West Broadway, Suite 2900
        San Diego, CA 92101
8       Telephone: (619) 696-6160
        Facsimile: (619) 531-0853
9
   BRYAN C. VESS, Esq.
10      402 West Broadway, 29th Floor
        San Diego, CA 92101
11      Telephone: (619) 795-4300
        Facsimile: (619) 795-4301
12 Attorneys for Plaintiff CITY OF SAN DIEGO

13                    **SUPERIOR COURT OF CALIFORNIA**

14                       **COUNTY OF SAN DIEGO**

15 THE CITY OF SAN DIEGO,                 )  Case No. GIC852419
                                          )
16              Plaintiff,                 )  **DECLARATION OF ANDRA M.**
                                          )  **DONOVAN IN SUPPORT OF**
17       v.                                )  **RESPONSE OF CITY OF SAN DIEGO**
                                          )  **TO GABRIEL, ROEDER, SMITH**
18 CALLAN ASSOCIATES, INC., GABRIEL       )  **MOTION TO SEVER**
   ROEDER SMITH & COMPANY, et al.,        )
19                                          )
              Defendants.                  )
20                                          )  I/C Judge:    Hon. Kevin A. Enright
                                          )  Dept.:        69
21                                          )  Action filed: August 19, 2005
                                          )  Trial:        Not set
22

23       I, ANDRA M. DONOVAN, Deputy City Attorney, declare and say as follows:

24       1.      I am an attorney duly authorized to practice law and in good standing with the

25 California State Bar, and am responsible for handling of this matter. Except where indicated to

26 be based on information and belief, the facts set forth herein are based on my own personal

27 knowledge. If called upon to testify, I could and would competently do so as set forth herein.

28

                                          1
   **DECLARATION OF ANDRA M. DONOVAN IN SUPPORT OF RESPONSE OF CITY OF SAN DIEGO**
                **TO GABRIEL, ROEDER, SMITH MOTION TO SEVER**

2. As set forth in the First Amended Complaint, the City's claims against both GRS and Callan arise from work each performed in connection with the San Diego City Employees Retirement System ("SDCERS"). GRS served for some time as the SDCERS actuary. Callan has and still does serve as its investment consultant. I am, therefore, informed and believe that the work of the two defendants is interconnected and interdependent, since the System's actuary must rely upon its investment consultant's valuation of SDCERS' assets when calculating the annual required contribution of the City to the System. I am further informed and believe that SDCERS' actuary must also rely upon the investment consultant's valuation of assets in calculating the system's overall worth for purposes of SDCERS' financial report, and that the information contained in that financial report is, then, incorporated by the City when the City prepares its own financial report. Thus, I am informed and believe that the accuracy and completeness of the information provided by one dictates to some extent the accuracy and completeness of the information provided by the other.

3. In light of the interdependence of the work performed by the two defendants, the City anticipates there is a significant amount of necessary discovery which is relevant to the case against each. This includes, but is not limited to depositions of key witnesses on issues of reporting and valuation, depositions and written discovery regarding communication between the two defendants or between one or both of the defendants and City and/or SDCERS. The City, therefore, does not agree that economy is served by severance of the two claims for all purposes.

4. Since the discovery from this case will likely overlap considerably with the discovery to be conduced in the related case of *Gleason v. Gabriel, Roeder, Smith & Company, Inc.* (San Diego Superior Court Case No. GIC 849882), the City suggests and agrees that this related case should be transferred to this department for coordination with this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: March 20, 2006

Andra M. Donovan, Deputy City Attorney

2

DECLARATION OF ANDRA M. DONOVAN IN SUPPORT OF RESPONSE OF CITY OF SAN DIEGO TO GABRIEL, ROEDER, SMITH MOTION TO SEVER

1 | MICHAEL J. AGUIRRE, City Attorney
2 | DON MCGRATH, II, Exec. Assistant City Attorney
California State Bar No. 44139
3 |     Office of the City Attorney, Civil Division
    1200 Third Avenue, Suite 1100
4 | San Diego, California 92101
    (619) 533-5800; Fax (619) 533-5856
5 | Attorneys for Plaintiff

6 | ## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

7 |

| DECLARATION OF | Case No. GIC852419 |
| SERVICE BY MAIL AND FAX | *The City of San Diego v. Callan Associates, Inc., et al.* |
| | *And related Actions* |

I, the undersigned declare that I am, and was at the time of service of the papers herein referred to, over the age of eighteen years and not a party to the action; and I am employed in the County of San Diego, California, in which county the within-mentioned mailing occurred. My business address is 1200 Third Avenue, Suite 1100, San Diego, California, 92101.

On **Tuesday, March 21, 2006**, I caused to be served the following document described as:

1. Response of City of San Diego to Gabriel, Roeder, Smith Motion to Sever
2. Declaration of Andra M. Donovan in Support of Response of City of San Diego to Gabriel, Roeder, Smith Motion to Sever

in this action by placing the true copies thereof enclosed in a sealed envelope addressed as follows:

### SEE ATTACHED SERVICE LIST

[ X ]   **(BY MAIL)**   I served the individual named by placing the documents in a sealed envelope. I then placed it for collection and mailing with the United States Postal Service this same day, at my address shown above, following ordinary business practices.

[ X ]   **(BY FAX)**   At ___, I transmitted the above-described document by facsimile machine to the above-listed fax number. The transmission originated from facsimile phone number (619) 236-7215 and was reported as complete and without error. The facsimile machine properly issued a transmission report, a copy of which is attached hereto. [CCP section 1013(c); CRC Rule 2008].

[ ]   **(BY PERSONAL SERVICE)**   I served the individual named by personally delivering the copies to the offices of the addressee.
Time of delivery: _____     a.m./p.m.   Person served: _____ .

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **Tuesday, March 21, 2006**, at San Diego, California.

Jean E. Peters

## PROOF OF SERVICE BY MAIL AND FAX
### CCP §§ 1013(A); 2015.5

154

| | | |
|---|---|---|
| 1 | Paul A. Renne, Esq. | Attorneys for Defendant Callen Associates, Inc. |
| 2 | Charles M. Schaible, Esq. | |
| | COOLEY GODWARD LLP | |
| 3 | 101 California Street, 5th Floor | |
| | San Francisco, CA 94111-5800 | |
| 4 | (415) 693-2000 / (415) 693-2222 (fax) | |
| 5 | Donald A. English, Esq. | Attorneys for Defendant Gabriel, Roeder, Smith & Company |
| | Christy I. Yee, Esq. | |
| 6 | Melissa S. Provencher, Esq. | |
| | ENGLISH & GLOVEN | |
| 7 | 550 West "C" Street, Suite 1800 | |
| | San Diego, CA 92101 | |
| 8 | (619) 338-6610 / (619) 338-6657 (fax) | |
| 9 | Dan L. Stanford, Esq. | Co-counsel for Plaintiff The City of San Diego |
| | STANFORD AND ASSOCIATES | |
| 10 | 402 West Broadway, Suite 2900 | |
| | San Diego, CA 92101 | |
| 11 | (619) 696-6160 / (619) 531-0853 (fax) | |
| 12 | Bryan C. Vess, Esq. | Co-counsel for Plaintiff The City of San Diego |
| | 402 West Broadway, 29th Floor | |
| 13 | San Diego, CA 92101 | |
| | (619) 795-4300 / (619) 795-4301 (fax) | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

**PROOF OF SERVICE BY MAIL AND FAX**
**CCP §§ 1013(A); 2015.5**

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

CENTRAL DIVISION

HONORABLE KEVIN A. ENRIGHT            DEPARTMENT 72

*CITY OF SAN DIEGO, ET AL.,*      )
                                   )
                                   )

    PLAINTIFF,                )
                                   )
                                   ) GIC852419
               VS.              )
                                   ) MOTION HEARING
                                   )   3-27-06
                                   )

*CALLAN ASSOCIATES, ET AL.,*      )
                                   )

    DEFENDANTS.             )
                                   )
_____)

*REPORTER'S TRANSCRIPT OF PROCEEDINGS*

MARCH 27, 2006

**REPORTED BY:**

*DONNA L. FOSTER, RPR, CSR NO. 7698*
*SAN DIEGO SUPERIOR COURT*
*HALL OF JUSTICE, DEPARTMENT 72*
*330 WEST BROADWAY*
*SAN DIEGO, CALIFORNIA 92101*



1
2

### *INDEX OF PROCEEDINGS*

3
4

COMMENCEMET OF PROCEEDINGS. . .PAGE 3

5

---oOo---

6
7

### *APPEARANCES OF COUNSEL*

8
9

FOR PLAINTIFF:

10
MR. DON MCGRATH
MR. DAN STANFORD

11
12

FOR DEFENDANT:

13
MR. DONALD ENGLISH
MR. CHARLES SCHAIBLE (VIA TELEPHONE)

14
15

---oOo---

16
17
18
19
20
21
22
23
24
25
26
27
28

1  *CITY OF SAN DIEGO VS CALLAN; MOTION; DEPT. 72; 3-27-06*

2  *P R O C E E D I N G S*

3  ---oOo---

6  THE COURT:  CITY OF SAN DIEGO VERSUS CALLAN.

7  GOOD MORNING.

8  MR. DAN STANFORD:  GOOD MORNING, YOUR HONOR.  I

9  AM DAN STANFORD.  I REPRESENT THE CITY OF SAN DIEGO IN

10  THE CALLAN PORTION OF THE CASE.

11  MR. DON MCGRATH:  DON MCGRATH, EXECUTIVE

12  ASSISTANT CITY ATTORNEY, ON THE ROEDER PORTION FOR THE

13  CITY.

14  MR. DONALD ENGLISH:  GOOD MORNING, YOUR HONOR.

15  DONALD ENGLISH ON BEHALF OF GABRIEL, ROEDER, SMITH &

16  COMPANY.  AND WE HAVE A GENTLEMAN BY TELEPHONE AS WELL.

17  THE CLERK:  YOU ARE ON SPEAKER-PHONE IN THE

18  COURTROOM.

19  MR. CHARLES SCHAIBLE:  GOOD MORNING, YOUR

20  HONOR.  IT'S CHARLES SCHIABLE ON BEHALF OF CALLAN.

21  THE COURT:  OKAY.  AND IF YOU COULD KEEP YOUR

22  VOICE UP, WE ARE ON THE RECORD.  DID YOU HEAR COUNSEL'S

23  APPEARANCE ON THE RECORD?

24  MR. CHARLES SCHAIBLE:  I DID NOT, YOUR HONOR.

25  I JUST WAS TRANSFERRED TO THIS NUMBER.

26  THE COURT:  OKAY.  MR. STANFORD, MR. MCGRATH,

27  AND MR. ENGLISH HAVE ALREADY STATED THEIR APPEARANCES.

28  AND HAS EVERYBODY SEEN THE TENTATIVE?

1      MR. DON MCGRATH:  YES, YOUR HONOR.

2      MR. DONALD ENGLISH:  YES, YOUR HONOR.

3      THE COURT:  OKAY.  NOW WHAT I DID IS THIS WAS

4  INITIALLY AN UNOPPOSED MOTION, THEN I GOT A LATE

5  OPPOSITION.  A LATE OPPOSITION, LATE REPLY.  I HAVE

6  CONSIDERED EVERYTHING.  SO I WANTED EVERYONE TO BE AWARE

7  OF THAT.

8      MR. DON MCGRATH:  COULD I SPEAK JUST BRIEFLY,

9  YOUR HONOR?

10      THE COURT:  SURE.

11      MR. DON MCGRATH:  WE REALLY DON'T DISAGREE,

12  IT'S JUST A MATTER OF WHERE WE STAY.  WE -- THE CITY

13  JUST HAS LIMITED RESOURCES.  WE PUT BOTH OF THESE CASES

14  IN ONE PLEADING INITIALLY.  IF WE COULD STAY HERE WITH

15  BOTH THE ROEDER'S, AND JUST COORDINATE THE DISCOVERY, NO

16  PROBLEM WITH SEVERING THE TRIAL.  BUT WE ARE GOING TO

17  HAVE DUPLICATE DEPOSITIONS.  AND WE ARE ALL MATURE.  I

18  THINK WE CAN HANDLE IT, AND, YOU KNOW, CROSS-OVER ON THE

19  DEPOS AND SO FORTH.  IF WE GO TO ANOTHER COURT, THEN WE

20  ARE GOING TO GET LOST FROM THE -- WHAT DISCOVERY HE'S

21  DOING IN CALLAN.

22      MR. DAN STANFORD:  AND I WOULD ECHO THOSE

23  SENTIMENTS, YOUR HONOR.

24      THE COURT:  OKAY.  AND THAT REFERS TO WHICH

25  CASE, MR. STANFORD?

26      MR. DAN STANFORD:  CALLAN PORTION OF THE CASE.

27      THE COURT:  OKAY.  AND I SEE MR. CONGER IS HERE

28  IN THE AUDIENCE.  AND I KNOW YOU ARE NOT APPEARING, MR.

1   CONGER, BUT I AM INTERESTED IN THE STATUS OF THE CASE

2   BEFORE JUDGE QUINN NOW.

3            MR. DONALD ENGLISH:  I CAN ADDRESS THAT, YOUR

4   HONOR.

5            THE COURT:  OKAY.

6            MR. DONALD ENGLISH:  BECAUSE I AM IN THAT CASE.

7            THE COURT:  ALL RIGHT.

8            MR. DONALD ENGLISH:  WE APPEARED BEFORE JUDGE

9   QUINN LAST FRIDAY FOR A CONTINUED CASE MANAGEMENT

10  CONFERENCE COORDINATED FOR THE SAME DATE THAT WE ARE

11  HAVING A CONTINUED CASE MANAGEMENT CONFERENCE IN THIS

12  COURTROOM.  AND SHE GRACIOUSLY ACKNOWLEDGED YOUR ILLNESS

13  AND HAS CONTINUED THE CASE MANAGEMENT CONFERENCE TO

14  TODAY FOLLOWING WHAT YOU DO.  AND SO SHE HAS TENTATIVELY

15  SET US FOR 11 O'CLOCK, BUT SINCE YOUR CLOCK DOESN'T MOVE

16  I DON'T KNOW IF WE WILL EVER GET TO IT.

17           MR. DAN STANFORD:  IT'S PAST 11.

18           THE COURT:   WE ARE SUSPENDED IN TIME.

19           MR. DONALD ENGLISH:  WE ARE, INDEED.

20           MR. DAN STANFORD:  TIME STANDS STILL.

21           MR. DONALD ENGLISH:  BUT WE ARE TO REPORT TO

22  HER DEPARTMENT AFTER YOU MAKE WHATEVER DECISIONS YOU

23  MAKE ON THE MOTION TO SEVER, SO WE THEN HAVE SOME BASIS

24  TO TELL HER WHETHER OR NOT CASES WILL BE TRANSFERRED OR

25  NOT TRANSFERRED.

26           THE COURT:  OKAY.  THE -- WHAT IS YOUR THOUGHT,

27  IN LIGHT OF WHAT MR. MCGRATH SAID?

28           MR. DONALD ENGLISH:  UM, WITH ALL DUE RESPECT

1     TO MR. MCGRATH, HE'S WRONG. AND THAT IS TAKEN --

2           MR. DON MCGRATH: I AM OLD.

3           MR. DONALD ENGLISH: IN REALITY, THE DISCOVERY

4     DOESN'T HAVE A NEED TO HAVE A STAY IN THE CALLAN

5     LITIGATION. WHAT IS APPROPRIATE IS TO COORDINATE IT

6     WITH THE OTHER GABRIEL, ROEDER, SMITH CASE. THERE

7     CURRENTLY IS PENDING, IF THE COURT RECALLS, A MOTION TO

8     COMPEL INTERROGATORIES, FOR EXAMPLE, THAT CALLAN

9     ASSOCIATES HAD BROUGHT BEFORE THIS COURT, SOME 500

10     INTERROGATORIES. NONE OF THOSE ADDRESS MY CLIENT. THEY

11     HAVE PREVIOUSLY WORKED ON TRYING TO GET DISCOVERY

12     SCHEDULES AND DEPOSITION SCHEDULES, NEVER ONCE CALLING

13     OUR OFFICE TO COORDINATE THOSE, NEVER ONCE DOING ANY OF

14     THOSE. EVEN THOUGH ONE OF THE WITNESSES MAY, IN FACT,

15     HAVE A ROLE IN OUR CASE, THEY ARE JUST NOT ON THE SAME

16     FACTS. AND I GO BACK TO OUR ARGUMENTS THAT WE PUT IN

17     THE MOVING PAPERS, WHICH IS THE COMPLAINT WAS STRUCTURED

18     SO AS TO BE STAND-ALONE ALLEGATIONS. THERE ARE NO

19     OVERLAPPING PARAGRAPHS EVEN ALLEGED. WHEN THE PLAINTIFF

20     BROUGHT THE COMPLAINT, THE CITY OF SAN DIEGO, IN EVERY

21     CAUSE OF ACTION ALLEGED AGAINST MY CLIENT, THERE ARE NO

22     CALLAN ASSOCIATES CLAIMS INCORPORATED BY REFERENCE. NOT

23     ONE PARAGRAPH. NOT ONE COMMON PARAGRAPH PLEADING WAS

24     PLED. AND I DON'T SEE THESE TWO CASES BEING ANYTHING

25     OTHER THAN DISJOINTED. AND IF WE WERE STANDING BEFORE

26     YOU TO SAY THERE ARE TWO SEPARATE CASES, LET'S

27     CONSOLIDATE THEM, YOU WOULD SAY THERE IS NO WAY I AM

28     GOING TO REQUIRE GABRIEL, ROEDER & SMITH TO SIT IN ON

1  TRIAL ON THE OTHER CASE AND VICE VERSA.

2          AS TO DISCOVERY, THERE IS NO WAY THAT YOU WOULD

3  IMPART ON OUR CLIENT A DUTY TO HAVE TO GO TO SAN

4  FRANSISCO FOR DEPOSITIONS OF MR.  -- OF CALLAN

5  ASSOCIATES WHICH -- BECAUSE THEY ARE LOCATED THERE.  WE

6  WILL NOT HAVE A NEED TO GO TO THOSE, BUT WE CAN'T NOT GO

7  TO THEM JUST IN CASE.  THERE WAS A DECLARATION FILED BY

8  THE ASSOCIATE CITY COUNCIL, NOT MR. MCGRATH, BUT HIS

9  ASSISTANT, MISS DONOVAN, THAT SAID THAT THERE MAY, IN

10  FACT, BE AN OVERLAP IN THOSE DEPOSITIONS, WHICH IS NOT

11  TRUE.  HER DECLARATION WAS ON INFORMATION, BELIEF.  IT

12  IS NOT TRUE, AND I DON'T BELIEVE THAT THERE SHOULD BE

13  ANYTHING OTHER THAN COMPLETE SEPARATES, AN ASSIGNMENT OF

14  SEPARATE CASE NUMBER, SO FILINGS GO IN THE FILE.  THEY

15  ARE COMPLETELY SEPARATE.  SERVICE IS COMPLETELY

16  SEPARATE.  THEN MR. CONGER AND I CAN ADDRESS WITH JUDGE

17  QUINN WHICH COURT SHOULD HAVE THESE CASES, ALONG WITH

18  THEIR INPUT, MR. MCGRATH'S INPUT, SO WE CAN COORDINATE

19  DISCOVERY AND DECIDE WHETHER OR NOT WE CAN CONSOLIDATE

20  FOR ANY OTHER PURPOSES.  I JUST DON'T SEE THERE IS ANY

21  OTHER LAY OF THE LAND HERE.

22          THE COURT:  WHEN YOU SAY COORDINATE FOR

23  DISCOVERY, YOU ARE REFERRING TO WHAT DISCOVERY?

24          MR. DON MCGRATH:  THE DEPOSITIONS.

25          MR. DONALD ENGLISH:  WELL, FOR WHAT I AM

26  REFERRING TO IS --

27          THE COURT:   WITHIN THIS CASE, AS IT NOW

28  STANDS, OR BETWEEN THE TWO CASES?

1        MR. DONALD ENGLISH: NO, NO. BETWEEN THE TWO

2 CASES INVOLVING MY CLIENT, NOT WHAT MR. STANFORD

3 SUGGESTED OR MR. MCGRATH SUGGESTED THAT WE COORDINATE IN

4 THIS CASE. WE DON'T NEED -- WE DON'T NEED THAT. AND WE

5 DON'T WANT THAT. AND THAT WAS THE REASON WE ARE

6 BRINGING THE MOTION TO SEVER IN PART. WHEN I SAW THE

7 500 INTERROGATORIES, FOR EXAMPLE, AND ALL THE MEET AND

8 CONFERRING AFTER THE FACT REGARDING THE DEPOSITIONS THAT

9 WE WEREN'T EVEN INCLUDED ON, WE WOULD HAVE SPENT

10 HUNDREDS OF HOURS TRYING TO FIGURE OUT WHETHER OR NOT

11 ANY OF THAT WAS RELEVANT TO OUR CASE.

12        MR. DON MCGRATH: I --

13        MR. DAN STANFORD: WELL, YOUR HONOR, OTHER THAN

14 A DOORSTOP, I DON'T THINK THE INTERROGATORIES AFFECTED

15 HIM OR HIS OFFICE AT ALL. AND THE REASON WE HAVEN'T

16 COORDINATED WITH HIS OFFICE ON DEPOSITIONS IS BECAUSE

17 NONE OF THEM HAVE BEEN SCHEDULED YET. BUT I THINK EVERY

18 DEPOSITION THAT IS INTENDED TO BE TAKEN IN THIS CASE, AT

19 LEAST FROM THE CITY'S STANDPOINT, ALL OF THOSE CITY

20 WITNESSES THAT YOU HAVE HEARD SO MUCH ABOUT, UM, I THINK

21 EVERY ONE OF THOSE IS GOING TO BE A WITNESS IN HIS CASE.

22 SO ALL OF THOSE PEOPLE, INCLUDING DIANE SHIPPIONE AND

23 OTHERS, ARE GOING TO BE DEPOSED TWICE.

24        MR. DONALD ENGLISH: BUT NOT ON --

25        MR. DAN STANFORD: THEY ARE GOING TO BE DEPOSED

26 IN THIS CASE AND DEPOSED IN THE OTHER CASES, SEPARATELY.

27        MR. DONALD ENGLISH: WITH ALL DUE RESPECT TO

28 MR. STANFORD'S SUGGESTION THEY MAY, IN FACT, BE

1  WITNESSES IN BOTH CASES, BUT THAT DOESN'T MEAN THAT THE

2  FACTS OVERLAPPING THAT WOULD REQUIRE ME TO SIT THERE FOR

3  TWO OR THREE DAYS LISTENING TO INVESTMENT ADVISER FACT

4  PATTERNS THAT THE CITY IS SUING -- THE CITY HAS SUED

5  OTHER ADVISERS IN OTHER LAWSUITS.  THEY CAN TAKE THE

6  CALLAN CASE AND GO MERGE THAT TOGETHER WITH THOSE OTHER

7  LAWSUITS, UM, THE ONES INVOLVING THE OUTSIDE ADVISERS OF

8  MR. STANFORD IS CURRENTLY REPRESENTING THE CITY ON.

9  THERE IS MUCH MORE EFFICIENCY THERE THAN IN THIS CASE.

10  WE HAVE A MALPRACTICE CASE AGAINST MY CLIENT, ON

11  ACTUARIAL SERVICES.  BY LAW, CALLAN ASSOCIATES COULD NOT

12  HAVE PROVIDED THOSE SERVICES.  THEY ARE NOT LICENSED TO

13  DO SO, THEY AREN'T QUALIFIED TO DO SO, THEY COULD NOT

14  HAVE PROVIDED THOSE ACTUARIAL SERVICES.  ON THE FLIP

15  SIDE, MY CLIENT COULD NOT HAVE BEEN AN INVESTMENT

16  ADVISER DOING THE SERVICES FOR WHICH THEY ARE SUING

17  CALLAN FOR.  NOT LICENSED INVESTMENT ADVISER, NOT

18  LICENSED WITH THE PROPER GOVERNMENTAL AUTHORITIES TO DO

19  THAT.  THEY ARE COMPLETELY DIFFERENT.

20          AND AS I SUGGESTED IN MY SUPPLEMENTAL

21  DECLARATION, WHEN I HAVE REVIEWED THE RECORD, OF THE SAN

22  DIEGO, UM, UM, CITY EMPLOYEES RETIREMENT SYSTEMS RECORD

23  OF WHEN MY CLIENT MADE PRESENTATIONS, THEY MADE

24  PRESENTATIONS, THE TWO DEFENDANTS MADE PRESENTATIONS TO

25  DIFFERENT COMMITTEES OVER THE TIME PERIODS IN WHICH THEY

26  WERE, UM, PROVIDING SERVICES TO S.D.C.E.R.S.  SO I DON'T

27  SEE THERE IS A REASON.  AND I THINK JUDICIAL NOTICE OF

28  THE COMPLAINT, WITH THE PARAGRAPHS COMPLETELY SEPARATE.

1 THERE ISN'T ONE MEETING THAT'S BEEN ALLEGED TOGETHER.

2 THERE ISN'T ONE JOINT WORK-PRODUCT THAT'S BEEN ALLEGED.

3 THERE ISN'T ONE REVIEW. THERE IS ABSOLUTELY ZERO, ZERO

4 IN THE COMPLAINT.

5 　　　　MR. DAN STANFORD:　WELL --

6 　　　　MR. DONALD ENGLISH:　AND I JUST SEE THE

7 EFFICIENCY FOR MR. CONGER'S LAWSUIT AND THE CITY'S

8 LAWSUIT AGAINST MY CLIENT TO WORK ON COORDINATION IN

9 THAT LAWSUIT, OTHERWISE WE WILL HAVE NO EFFICIENCY

10 WHATSOEVER. AND TO INVITE MR. CONGER NOW TO GO ATTEND

11 THE CALLAN ASSOCIATES DEPOSITIONS THAT THEY TAKE, I MEAN

12 HE CAN COME AS A SPECTATOR. HE DOES IT A LOT IN OTHER

13 CASES THAT HE'S NOT COUNSEL ON, BUT WE SHOULDN'T HAVE TO

14 GO TO THOSE.

15 　　　　MR. DON MCGRATH:　YOUR HONOR, IF I MAY, UM, I

16 THINK THE COURT CAN TAKE JUDICIAL NOTICE OF THE CITY'S

17 PLIGHT. AND IF IT WERE -- AND AS YOU KNOW, WE WOULD BE

18 IN A BANKRUPTCY COURT RIGHT NOW. BUT IF WE COULD SAVE

19 THE COURT IN A DEPOSITION, COURT REPORTER FEE, IT WOULD

20 BE WORTH IT. WE DON'T WANT TO TRY THE CASES TOGETHER.

21 WE ABIDE BY YOUR RULING ON THAT. WE JUST WANT TO STAY

22 WITH ONE JUDGE, YOU, AND COORDINATE. IT'S NOT THAT

23 HARD. WE ARE NOT CHILDREN. THESE ARE MATURE LAWYERS

24 HERE. SOME OF US ARE MORE MATURE.

25 　　　　MR. DAN STANFORD:　SOME OF US ARE MORE MATURE

26 WHEN WE LEFT THAN WHEN WE CAME IN, YOUR HONOR.

27 　　　　THE COURT:　WELL, I GUESS FROM THE CITY'S POINT

28 OF VIEW, THE -- AND THE REASON FOR THE TENTATIVE IN

LARGE PART IS ISN'T IT CORRECT FROM ROEDER'S POINT OF VIEW THAT THE OVERLAP BETWEEN ACTUARIAL AND INVESTMENT SERVICES IS MAYBE NOT NIL, BUT APPROACHING IT. IN OTHER WORDS, DIFFERENT THEORIES. YES, I CAN SEE POSSIBLY A NEED FOR COORDINATION. BUT INSTEAD OF ME IN THE ABSTRACT RULING, WHICH I AM ALMOST DOING NOW ON A DISCOVERY ISSUE, ALLOW COUNSEL TO MEET AND CONFER RELATIVE TO THAT, COME TO ME OR JUDGE QUINN, WHOEVER THE JUDGE IS, OR BOTH OF US, AND COORDINATE ISSUES OF DISCOVERY. BUT I GUESS I AM WONDERING WHEN IT REALLY COMES DOWN TO IT, ON THIS MOTION, AS IT'S WRITTEN, TO SEVER IT COMPLETELY, ISN'T THERE VERY LITTLE IN COMMON? I RECOGNIZE THERE IS OVERLAPPING WITNESSES. I AM -- AND I AM HEARING THAT. AND I AM HEARING THE SAVING MONEY QUESTION. BUT I GUESS I -- I GUESS I WONDER ON THE MERITS OF THIS MOTION BEFORE ME, ISN'T IT WELL TAKEN?

MR. DON MCGRATH: I THINK IT'S LIKE HE SAID, HE'S WRONG. IT'S CLOSE. BUT THERE IS ENOUGH TO KEEP EVERYTHING HERE. THE ROEDER CASE IS ALL HERE, SEPARATE. JUST LET US WORK ON THE DISCOVERY AND COORDINATE IT. IT WOULDN'T BE THAT HARD. BUT IF WE GET OVER TO JUDGE QUINN, IF ALL ROEDER GOES TO QUINN, THEN WE ARE GOING TO GET -- WE ARE GOING TO HAVE PROBLEMS -- WE ARE GOING TO HAVE PROBLEMS. WE ARE GOING TO BE DUPLICATING ON DEPOS. IT SEEMS TO ME IF WE ARE IN ONE PLACE, ON BOTH CALLAN AND ROEDER, IT LENDS ITSELF TO SAVE A BUCK. AND A BUCK IS A BUCK RIGHT NOW FOR US. MY PREDICTION IS SOME DAY WE WILL PROBABLY BE IN BANKRUPTCY. BUT THEN AGAIN, I AM

1  NOT ALLOWED TO SAY THAT, SO --

2  MR. DONALD ENGLISH:  YOU MAY BE SUSPENDED

3  AGAIN.  YOU BETTER BE CAREFUL.

4  MR. DON MCGRATH:  YES.  ONE MORE TIME.

5  THE COURT:  WELL --

6  MR. DAN STANFORD:  HE'S NOT ALLOWED TO SAY IT

7  SO HE SAYS IT TWICE.

8  MR. DONALD ENGLISH:  YEAH.  ON THE RECORD.

9  MAY I MAKE ONE OTHER COMMENT?

10  THE COURT:    YES.

11  MR. DONALD ENGLISH:  WE REQUESTED THE COURT

12  TAKE JUDICIAL NOTICE.  AT THE TIME WE DID IT, WE THOUGHT

13  IT WAS MORE LIMITED.  BUT I WOULD SUGGEST THE COURT TAKE

14  JUDICIAL NOTICE OF THE MYRIAD OF LAWSUITS THE CITY OF

15  SAN DIEGO HAS FILED.  THEY HAVE NOT COMPLIED WITH

16  MR. MCGRATH'S THOUGHT PROCESS HERE THIS MORNING OF

17  HAVING ONE LAWSUIT, THE MOTHER OF ALL LAWSUITS WHICH YOU

18  WILL ONLY DO DISCOVERY ONCE AND HAVE IT APPLY TO ALL

19  PENSION LAWSUITS.  THEY HAVE LAWSUITS PENDING IN FRONT

20  OF BARTON, DENTON.

21  MR. DON MCGRATH:  I RESPECTFULLY DISAGREE, THAT

22  HE DOES NOT KNOW THERE WHAT HE'S TALKING ABOUT.  I HAVE

23  TALKED WITH PRESIDING 100 TIMES AND SAID PUT THEM ALL IN

24  ONE BIG ARENA AND LET'S GET AFTER IT.  THE JUDGES DON'T

25  WANT TO LET THESE CASES GO FOR THE MOST PART.  THEY ARE

26  INTERESTING.  FEDERAL CASE, WE GOT ANOTHER CASE,

27  ABSOLUTELY THE SAME.  BUT IF I HAD MY WAY, WE WOULD BE

28  IN ONE COURT.  WE HAVE GOT A LOT OF THEM WITH BARTON

1  NOW.

2  MR. DONALD ENGLISH: AND I ACCEPT HIS THOUGHT

3  ON THAT. AND I DON'T DISAGREE THAT HE THINKS THAT, BUT

4  THE REALITY IS, IS THAT, FOR EXAMPLE, MR. STANFORD

5  REPRESENTS THE CITY SUING LAW FIRMS AND OUTSIDE

6  AUDITORS, REGARDING CERTAIN FINANCIAL STATEMENTS THAT

7  HAVE A WHOLE LOT TO DO WITH THINGS THAT MAY OVERLAP IN

8  THE CALLAN ASSOCIATES CASE, AND THIS CASE. THEY SHOULD

9  BE COORDINATING DISCOVERY IN THAT CASE. IT'S THROUGH

10  ONE OFFICE, MR. STANFORD'S OWN OFFICE. HE'S

11  REPRESENTING THE PLAINTIFF IN BOTH OF THOSE CASES. SO I

12  WOULD SUGGEST IT RUNS HOLLOW, IT SOUNDS HOLLOW THAT

13  MR. MCGRATH THINKS THE EFFICIENCY IS -- IS IN THIS CASE,

14  WITH GABRIEL, ROEDER, SMITH & COMPANY. IT'S NOT. THE

15  EFFICIENCY WOULD BE IN THE OTHER CASES THAT MR. STANFORD

16  IS HANDLING RELATING TO 'SIMILAR ISSUES, THE FINANCIAL

17  ISSUES, THE FINANCIAL STATEMENTS AND THOSE SORTS OF

18  THINGS. I SUGGEST IN A PERFECT WORLD THESE TWO CASES

19  WOULD HAVE BEEN FILED SEPARATELY UP FRONT AND WOULD

20  NEVER HAVE BEEN CONSOLIDATED. EVER. NOW WHETHER THEY

21  SHOULD BE COORDINATED FOR A DEPOSITION, THAT CAN BE LEFT

22  TO THE PARTIES TO DISCUSS LATER, AFTER THE SEVERANCE

23  OCCURS. AND I WOULD SUGGEST IN A PERFECT WORLD, THE TWO

24  CASES THAT HAVE ADDRESSED THE IDENTICAL FACT PATTERN

25  AGAINST MY CLIENT FOR THE IDENTICAL ACTS, WITH THE

26  IDENTICAL WORK-PRODUCT, BE ALLOWED TO BE IN ONE FORUM,

27  ONE COURTROOM. NOW WHETHER THEY ARE COORDINATED OR

28  CONSOLIDATED WILL BE LEFT TO THE JUDGE THAT HAS BOTH

1    THOSE CASES, AFTER WE HEAR FROM ALL COUNSEL INCLUDING

2    MR. CONGER.  AND I DON'T KNOW YET ON THAT, BUT AT LEAST

3    WE WILL HAVE THE EFFICIENCY OF HAVING ONE.  WE WILL NOT

4    HAVE THE INCONSISTENT RULINGS, BECAUSE WE DO PLAN TO

5    BRING SUBSTANTIVE MOTIONS CHALLENGING THOSE ALLEGATIONS.

6    WE DO PLAN TO BRING THEM, IF WE HAVE TO, IN BOTH

7    COURTROOMS.  WE WILL LIKELY HAVE TO ASK ONE TO BE STAYED

8    WHILE THE OTHER IS ATTENDED TO, AND THAT SEEMS TO ME TO

9    BE SO INEFFICIENT THAT WE CHOSE TO BRING THE MOTION AT

10   THIS JUNCTURE, AND THAT IS WHY WE DID.  SO THAT IS WHERE

11   WE ARE.

12        THE COURT:  I THINK -- AND I DON'T THINK THERE

13   IS ANY ILLUSION TO IT THAT THE REAL REASON FOR THIS

14   MOTION IS TO GET ROEDER IN ONE COURTROOM.  AND IF THAT

15   IS TRUE, DEALING WITH THE PRACTICALITY, WHY ISN'T THAT A

16   FAIR REQUEST BY ROEDER?  NOW I RECOGNIZE I DON'T KNOW

17   ANYTHING ABOUT THE ROEDER CASE BEFORE JUDGE QUINN, OTHER

18   THAN I KNOW IT EXISTS.  BUT I DON'T KNOW ANYTHING ABOUT

19   THE SIMILARITIES OR LACK THEREOF OF THE ALLEGATIONS.

20   BUT WHAT IT SOUNDS LIKE, FROM WHAT I AM HEARING FROM

21   MR. ENGLISH, PRETTY CLOSE.  AND IF THAT IS REALLY WHAT

22   IS DRIVING THE TRAIN HERE, I WOULD LIKE THE CITY'S

23   THOUGHT ON WHETHER THAT IS A VIABLE REQUEST ON THEIR

24   PART OR WHETHER THAT IS INAPPROPRIATE.

25        MR. DON MCGRATH:  NO.  THEY SHOULD BE IN THE

26   SAME COURT.  WE ARE JUST SAYING HERE.  AND BECAUSE OF

27   THAT OTHER CASE, THERE IS THIS -- JUST THAT LITTLE BIT

28   OF EVIDENCE THAT, YOU KNOW, THAT COULD MAKE HAVING

1  CALLAN AND THE ROEDER'S TOGETHER MAKES MORE SENSE IN

2  FRONT OF YOU.  IT MAKES NO SENSE TO HAVE THE ROEDER'S

3  OVER THERE WITH JUDGE QUINN AND NO CALLAN, BECAUSE WE

4  ARE GONNA -- WE ARE GOING TO HAVE SOME PROBLEMS.  SO

5  JUDGE QUINN ALREADY HAS PLENTY OF CITY CASES.  SHE'S A

6  VERY, VERY, VERY BUSY WOMAN.  WE HAVE GOT ALL THE ROCKY

7  DE LA FUENTE STUFF OVER THERE.  I AM SAYING STAY WHERE

8  WE ARE, WITH YOU.  WE ARE ALL MATURE.  WE CAN WORK IT

9  OUT.  BUT YOU ARE GOING TO SEE ONCE IN A WHILE A DEPO

10 THAT IS SIMILAR.  AND YOU, THE ONE JUDGE, YOU KNOW, WILL

11 SEE, OH, IT'S CALLAN, ROEDER, CALLAN, HERE IT IS AT MY

12 ROOM.  AND THAT IS MY POINT.

13         MR. DONALD ENGLISH:  I STILL DON'T AGREE.  AND

14 I CAN SHOW THE JUDGE --

15         THE COURT:   WELL, I GUESS -- AND I DON'T WANT

16 TO PUT ANYONE IN AN AWKWARD POSITION, BUT WHAT I AM

17 HEARING IS -- WELL MAYBE IT IS AN AWKWARD POSITION.  SO

18 MAYBE I SHOULDN'T ASK IT.  BUT I GUESS I DON'T -- I AM

19 NOT REALLY HEARING THAT THERE IS A DISAGREEMENT BETWEEN

20 ANY OF THE PARTIES HERE, IT'S JUST WHERE ONE OR BOTH OF

21 THESE CASES ARE GOING TO BE.

22         MR. DONALD ENGLISH:  THERE IS A DISAGREEMENT.

23         THE COURT:  OKAY.

24         MR. DONALD ENGLISH:  MAYBE MORE SUBTLE, AND I

25 WILL BE A LITTLE MORE EXPLICIT.  FIRST I WANTED TO POINT

26 OUT ONE POINT.  WE DID LODGE WITH THE COURT -- AND I

27 KNOW THE COURT HAS A LOT OF OTHER THINGS IN INITIALLY

28 THINKING THIS MOTION WAS UNOPPOSED MAY NOT HAVE LOOKED

1  AS MUCH AT OUR PAPERS.  WE DID LODGE BOTH THE COMPLAINTS
2  AND BOTH OF THE ACTIONS AGAINST GABRIEL ROEDER SMITH
3  COMPANY.  AND YOU WILL SEE THAT THEY HAVE THE SAME
4  PROFESSIONAL NEGLIGENCE CAUSE OF ACTION, SAME FRAUD OR
5  CONCEALMENT CAUSE OF ACTION, AND THE CITY DID ADD AN
6  AMENDED -- AN AMENDMENT FOR 17200 CLAIM FOR UNFAIR
7  BUSINESS PRACTICE, WHICH AT SOME POINT WILL GO AWAY
8  HOPEFULLY BY STIPULATED DISMISSAL, BECAUSE OUR CLIENT
9  DOESN'T OFFER ANY SERVICES ANYMORE TO THE S.D.C.E.R.S.
10 BOARD.  DECLINED TO RESPOND TO AN RP LAST YEAR AFTER
11 EVERYBODY STARTED SAYING DIFFERENT THINGS ABOUT THEM.
12 BUT THE POINT IS, WE DID REQUEST AND WE DID IDENTIFY THE
13 ADDITIONAL NOTICE WHY THOSE OVERLAP.  SO WE ALL KNOW.
14 AND I THINK MR. MCGRATH AGREES THAT THOSE CASES SHOULD
15 BE IN THE SAME COURT.  WHAT I DISAGREE ON IS TO HAVE
16 SOMEONE STAND UP WITH NO EVIDENCE BEING PRESENTED TO
17 THIS -- TO YOUR HONOR AND SAY THAT THIS DISCOVERY IS SO
18 CLOSE THAT EVERYONE WILL BENEFIT AND SAVE MONEY BY
19 HAVING THAT, EVEN ONE COURT REPORTER WOULD BE
20 BENEFICIAL, WHEN, IN FACT, IF YOU DO AN EXAMINATION OF
21 THE EXISTING CASES, THE CITY HAS BROUGHT TO EVEN
22 MR. STANFORD'S OFFICE IT'S BELIED BY WHAT THEY HAVE
23 DONE.  AND IF I CAN LODGE WITH THE COURT THE CASE THAT
24 MR. STANFORD REPRESENTS THE CITY ON.  THE DISCOVERY IN
25 THAT CASE WOULD MORE CLOSELY OVERLAP WITH CALLAN, AND I
26 DON'T WANT TO GO ATTEND THOSE DEPOSITIONS EITHER.  AND
27 YET, FOLLOWING MR. MCGRATH'S LOGIC, I SHOULD GO ATTEND
28 THEM SO HE SAVES ONE COURT REPORTER FEE, BUT INSTEAD OF

1  ONE COURT REPORTER FEE WE ARE GOING TO HAVE FOUR DAYS OF

2  A WITNESS INSTEAD OF ONE DAY IN EACH CASE.  I AM NOT

3  SURE THERE IS GOING TO BE ANY SAVINGS.  THERE IS

4  CERTAINLY NO EVIDENCE BEFORE THE COURT IN RESPONSE TO

5  THE OPPOSITION TO THE MOTION THAT SAYS HERE IT'S THE

6  WITNESS, HERE ARE THE 14 OF THEM THAT WE CURRENTLY THINK

7  HAVE TO BE TAKEN, THESE 14, 12 OF THEM HAPPEN TO OVERLAP

8  THE GABRIEL ROEDER SMITH ISSUES.  I KNOW OF NONE WITH

9  THE EXCEPTION OF DIANE SHIPIONE, WHICH MR. STANFORD

10  MENTIONED, AND DIANE SHIPIONE WILL PRESENT TESTIMONY IN

11  BOTH CASES BUT IT SHOULD NOT BE OVERLAPPING.  WHEN

12  CALLAN ASSOCIATES MADE THEIR PRESENTATIONS TO THE

13  INVESTMENT COMMITTEE OF WHICH MISS SHIPIONE WAS A PARTY,

14  MY CLIENT WASN'T PRESENT.  MY CLIENT HAS NEVER MADE A

15  PRESENTATION TO THE INVESTMENT COMMITTEE OF S.D.C.E.R.S.

16  IN THE 13 YEARS THAT HE WAS THE OUTSIDE ACTUARY, HAS

17  NEVER.  HE, THOUGH, MADE HIS PRESENTATIONS TO THE

18  BUSINESS AND PROCEDURES COMMITTEE OF WHICH MISS SHIPIONE

19  WAS NOT A MEMBER.  NOW YES, MISS SHIPIONE HAPPENED TO BE

20  ALSO A BOARD MEMBER AND ULTIMATELY DID VOTE ON CERTAIN

21  ISSUES IN 2002.  AND THERE WILL BE A SLIGHT OVERLAP IN

22  THAT ISSUE -- IN THAT AREA.  BUT I DON'T THINK I NEED TO

23  SIT THERE FOR A DAY OR TWO DAYS OR THREE DAYS TO HEAR

24  ALL OF THE CALLAN QUESTIONS OF MISS SHIPIONE AS TO WHAT

25  HAPPENED IN THE INVESTMENT COMMITTEE.  BUT I WON'T KNOW

26  WHEN THEY ARE GOING TO HAPPEN.  AND THE REASON, AS

27  MR. MCGRATH SAID, TO SAVE ONE DEPOSITION EXPENSE, IS

28  HOLLOW, BECAUSE THE COURT REPORTER'S WILL CHARGE BY THE

1   PAGE AND BY THE DAY.  AND WE WON'T SAVE ANY TIME, WE

2   WILL STILL HAVE TWO BILLS THAT ARE NOW INTO ONE BILL.

3   AND BECAUSE THEY HAVEN'T PRESENTED ANY EVIDENCE, I

4   RESPECTFULLY SUBMIT ON THE EVIDENCE BEFORE YOU THIS

5   SEVERANCE IS APPROPRIATE.

6           THE COURT:  OTHER THOUGHTS?

7           MR. DON MCGRATH:  WELL, IT'S A JUDGMENT CALL.

8   I WATCHED SHIPIONE TESTIFY IN JUDGE LINK'S COURT IN THE

9   PRELIMINARY HEARING, AND I VISITED WITH HER HUNDREDS OF

10  TIMES, AND HER STORY IS THE SAME FOR BOTH OF THESE

11  CASES.  THE FIRST THREE DAYS OF HER DEPOSITION, THE LAST

12  HOUR AS TO CALLAN COULD BE A LITTLE DIFFERENT, BUT IT'S

13  GOING TO BE THE SAME STORY IN BOTH CASES.  AND SHE'S

14  PROBABLY THE MAIN REASON, BUT THERE IS OTHER PEOPLE

15  THAT -- THE BASIC STORE OF MPI AND MPII HAS TO BE TOLD

16  IN BOTH CASES, AND TO ME IS JUST DUPLICATIVE TO GET AWAY

17  FROM THEM.

18          THE COURT:   OKAY.  ANY OTHER THOUGHTS?  ALL

19  RIGHT.  I APPRECIATE IT.  HERE IS MY THOUGHT ON IT, I

20  THINK IT IS A CLOSE CALL.  AND THE REASON FOR MY INQUIRY

21  IN THE PAPER -- TAKE YOUR TIME ON IT THIS MORNING -- IS

22  BECAUSE I WANTED TO KIND OF FERRET OUT AS BEST I CAN SO

23  I UNDERSTAND WHAT IS REALLY DRIVING THE TRAIN HERE.  AND

24  I THINK THIS, ON THE LEGAL ISSUE OF WHETHER THE MOTION

25  TO SEVER SHOULD BE GRANTED, I THINK, BASED ON WHAT IS

26  BEFORE ME NOW, WHICH -- AND AGAIN I HAVE INCLUDED THE

27  THE LATE FILING.  I CONSIDERED THAT, I CONSIDERED YOUR

28  ARGUMENTS, BOTH WELL-STATED ON BOTH SIDES, BUT I THINK

THAT THE MOTION TO SEVER SHOULD BE GRANTED.  I WOULD SAY
THIS:  IF YOU CAN INFORM JUDGE QUINN -- AND MR. ENGLISH,
IF YOU CAN DO THIS -- THAT I STAND READY, WILLING AND
ABLE TO HELP IN ANY WAY I CAN, BECAUSE I THINK, IN PART,
IT'S WHERE THE RESPECTIVE PARTIES WANT TO BE.  AND I
JUST WANT JUDGE QUINN TO BE AWARE.  I WON'T WALK DOWN
THE HALL AND TALK TO HER, BUT IF YOU COULD RELAY THAT TO
ME, I AM READY, WILLING AND ABLE TO HELP IN ANY WAY THAT
I CAN.  THE SECOND THING IS, WHEREVER THIS CASE IS,
FORTUNATELY THERE IS EXCELLENT COUNSEL ON ALL SIDES OF
THIS CASE.  YOU ARE GOING TO NEED TO HAVE AN ORDER MADE
BY THE JUDGE TO MEET AND CONFER VERY CLOSELY RELATIVE TO
THESE INDIVIDUAL DEPOSITIONS, SO THAT THERE IS NO
DUPLICATION.  I UNDERSTAND, MR. ENGLISH.  AND IT'S A
SIGNIFICANT ASPECT OF THE COURT'S RULING, WHY YOU DON'T
WANT TO ATTEND A LENGTHY PORTION OF THE DEPOSITION THAT
IS GOING TO BE TAKEN IN ANY EVENT IN A -- IN THE ROEDER
CASE, OR ROEDER CASES, AND YOU DON'T WANT TO LISTEN TO
IT RELATIVE TO CALLAN.  I UNDERSTAND THAT WHEN YOU HAVE
THE SAME DEPOSITION.  BUT THERE OUGHT TO BE A WAY,
PARTICULARLY WITH EXCELLENT COUNSEL, THAT EVERYONE CAN
BE ACCOMMODATED, RELATIVE TO THE DUPLICATION, OR LACK
THEREOF.  AND I THINK IT'S PROBABLY GOT TO BE ON AN
INDIVIDUAL DEPONENT BASIS, BUT YOU CAN HAVE SOME GENERAL
PARAMETERS.  SO TO SUM UP, I THINK THE TENTATIVE SHOULD
STAND.  AND THEREFORE, IT WILL STAND.  BUT AS I SAY,
MR. ENGLISH, IF YOU CAN RELAY TO JUDGE QUINN HERE
SHORTLY WHEN YOU SEE HER THAT I STAND READY, WILLING AND

1  ABLE TO ACCEPT ANY AND ALL ASPECTS OF THE CASE.

2  MR. DON MCGRATH:  YOU ARE NOT MAKING A RULING

3  THAT THIS PART GOES OVER TO HER COURT OR EITHER WAY?

4  THE COURT:   NO.  IT'S NOT AN APPROPRIATE

5  RULING FOR THE COURT TO MAKE.  BUT I JUST WANT TO HAVE

6  EVERYONE UNDERSTAND, I AM READY TO STEP IN AS SHE SEES

7  FIT OR AS COUNSEL SEES FIT.  OKAY.

8  MR. DONALD ENGLISH:  MAY I INQUIRE QUICKLY?

9  THE COURT:  YES.

10  MR. DONALD ENGLISH:  AS TO THE SEVERANCE, IT'S

11  COMPLETE SEVERANCE?

12  THE COURT:  YES.

13  MR. DONALD ENGLISH:  AND --

14  THE COURT:   IN OTHER WORDS, THE WAY THE

15  TENTATIVE READS --

16  MR. DONALD ENGLISH:  CORRECT.  WILL THERE BE A

17  NEW CASE NUMBER ASSIGNED SO WE CAN THEN FILE IN ONE CASE

18  AND NOT THE OTHER?

19  THE COURT:  WHEN WE NORMALLY WOULD SEVER, WE

20  WOULD KEEP -- WELL, CORRECT ME IF I AM WRONG, I THINK WE

21  WOULD NORMALLY KEEP THE SAME CASE NUMBER AND SHOW THE

22  SEVERANCE.

23  MR. DONALD ENGLISH:  SO JUST ON THE CAPTION

24  ITSELF SAY SEVERED FROM -- OR INDEPENDENT.  SO WHEN WE

25  FILE A PAPER, FOR EXAMPLE --

26  THE COURT:   NO.  I UNDERSTAND YOUR CONCERN.

27  LET ME -- IF YOU CAN HOLD FOR JUST A MOMENT, PLEASE.

28  GET ROBIN ON THE PHONE.  UNLESS COUNSEL HAVE AN

1    AGREEMENT ON IT.

2            MR. DON MCGRATH:  I DON'T CARE.

3            THE COURT:  IT'S JUST AN ADMINISTRATIVE ISSUE

4    IS WHAT YOU ARE CONCERNED ABOUT?

5            MR. DON MCGRATH:  RIGHT.

6            MR. DONALD ENGLISH:  JUDGE QUINN DID ASK THAT

7    QUESTION LAST FRIDAY, AND I SAID I WOULD ASK YOU.

8            THE COURT:  OKAY.

9            MR. DONALD ENGLISH:  IF YOU UPHELD YOUR

10    TENTATIVE, I WOULD ASK YOU.

11            MR. DON MCGRATH:  I DON'T SEE TYING YOU UP,

12    JUDGE.  YOU CAN LET US KNOW, JUST THE CAPTION.

13            MR. DONALD ENGLISH:  RIGHT.  MARY ANN COULD LET

14    US KNOW.

15            THE COURT:  ROBIN THIS IS ON CITY OF SAN DIEGO

16    VERSUS CALLAN.  THE TENTATIVE IS THE FINAL.  SO IT'S

17    SEVERED.  AND THE QUESTION IS RELATIVE TO THE SEVERED

18    PART OF THE CASE, SHOULD THERE BE A NEW CASE NUMBER

19    ASSIGNED?

20            THE CLERK:  NO.  TRIAL DATE WILL BE SET AFTER

21    AT THE END, AT THE END --

22            THE COURT:   WE ARE NOT TO THE TRIAL DATE YET.

23    THEY WANT, FROM AN ADMINISTRATIVE ASPECT.  WE NORMALLY

24    WOULDN'T DO THAT LIKE ASSIGNING AN A OR B --

25            MR. DAN STANFORD:  HOW ABOUT BRACKETS SEVERED,

26    SHOULD WE DO THAT?  SO WHEN HE SENDS A NOTICE HE DOESN'T

27    HAVE TO GO, THAT IS WHAT --

28            THE COURT:   YOU CAN DO THAT.  WHY DON'T YOU

1    JUST DO THAT.  AS TO THE SEVERED PORTION, JUST PUT

2    BRACKETS SEVERED.

3           MR. DONALD ENGLISH:  OKAY.  WE WILL ASSUME THE

4    GABRIEL ROEDER SMITH IS THE SEPARATE PORTION AND THAT

5    CALLAN IS THE MAIN PORTION, IS THAT OKAY?

6           THE COURT:    THAT'S FINE.  SINCE YOU BROUGHT

7    IT.

8           MR. DONALD ENGLISH:  THEY ARE THE SECOND NAMED

9    DEFENDANT ANYWAY.  MY CLIENT IS THE SECOND NAMED

10   DEFENDANT.

11          MR. DON MCGRATH:  I HOPE YOU FEEL BETTER,

12   JUDGE.

13          THE COURT:  THANK YOU.  I AM BACK.  IT'S ALSO

14   ONE OF THOSE BAD DAYS.

15          MR. DONALD ENGLISH:  NOW WILL WE ALSO BE DOING

16   THE CASE MANAGEMENT CONFERENCE NOW?  YOU STILL HAVE BOTH

17   CASES.

18          THE COURT:  WHY DON'T YOU DO THIS:  I WILL BE

19   HERE THIS MORNING.  IF YOU WANT TO -- ARE YOU GOING TO

20   SEE JUDGE QUINN AT 11?

21          MR. DONALD ENGLISH:  YES.  SHE SAID TO COME BY

22   WHEN WE WERE FINISHED, SINCE IT'S NOW 11:25, WE WILL

23   ACTUALLY SEE HER.

24          THE COURT:    WHY DON'T YOU -- WHY DON'T WE DO

25   THIS --

26          MR. DON MCGRATH:  WHY DON'T WE JUST CONTINUE

27   THAT.

28          THE COURT:  WHY DON'T WE CONTINUE IT.  THEN IF

1    YOU WANT TO COME SEE ME EX PARTE, IN LIGHT WHAT HAPPENS

2    AT 11 O'CLOCK IN FRONT OF JUDGE QUINN, YOU CAN.  BUT

3    LET'S JUST PUT IT OVER FOR COUPLE WEEKS.  SO THAT YOU

4    CAN SORT OUT TODAY'S EVENT AND WHAT MAY HAPPEN IN JUDGE

5    QUINN.  UNLESS THERE IS SOMETHING ELSE, MR. ENGLISH.

6          MR. DONALD ENGLISH:  YEAH.  I AM NOT SURE WHAT

7    JUDGE QUINN HAD IN MIND.  SHE WAS VERY CAUTIOUS ABOUT

8    DOING THINGS.  AND I THINK SHE EXPECTED SOME TYPE OF,

9    UM, SUGGESTION OF WHAT MR. MCGRATH WAS ALLUDING TO,

10   WHICH IS ULTIMATELY THE TWO GABRIEL ROEDER SMITH CASES

11   SHOULD BE IN THE SAME COURT --

12         THE COURT:   OKAY.

13         MR. DONALD ENGLISH:  AND WE HAVE NOT HAD

14   DISCUSSIONS, BUT WE ALL HAVE PUBLICLY STATED EITHER

15   COURT IS FINE.

16         MR. DON MCGRATH:  WE JUST WENT THROUGH THIS.

17   WE ARE WASTING HIS TIME.  WE WILL GO SEE HER AND WE'LL

18   COME BACK IN A COUPLE WEEKS AND SEE WHERE WE ARE.  HE'S

19   NOT GOING TO MAKE A DECISION ON THAT.

20         THE COURT:  UNLESS THERE IS SOMETHING ELSE THAT

21   IS PRESSING.

22         MR. DONALD ENGLISH:  I THINK WE ARE GOING TO

23   END UP COMING BACK IN ABOUT FIVE MINUTES, BUT WE WILL DO

24   THAT.

25         THE COURT:  OKAY.  I WILL BE HERE.

26         MR. DON MCGRATH:  HOW DO YOU KNOW THAT?

27         MR. DONALD ENGLISH:  I DON'T KNOW THAT.

28         MR. DON MCGRATH:  YOU DO KNOW.

1          THE COURT:    ALL RIGHT.   OKAY.   THANK YOU.

2          MR. DON MCGRATH:   I HOPE WE DIDN'T MAKE YOU

3     SICKER.

4          MR. DONALD ENGLISH:   DO YOU WANT US TO PREPARE

5     A -- AN ORDER?

6          THE COURT:    NO.   WE CAN GO BY THE MINUTE

7     ORDER.   THAT IS FINE.

8          MR. DONALD ENGLISH:   WE STILL HAVE PHONE ON THE

9     PHONE FOR THE CMC FOR THE OTHER PORTION OF THE CASE.

10          (DISCUSSION OFF THE RECORD HELD).

11          (RECESS TAKEN AT THIS TIME).

STATE OF CALIFORNIA          )
                             )  SS
COUNTY OF SAN DIEGO          )

I, DONNA FOSTER, RPR, C.S.R. # 7698, A CERTIFIED
SHORTHAND REPORTER IN AND FOR THE COUNTY OF SAN DIEGO,
STATE OF CALIFORNIA, DO HEREBY DECLARE:

THAT SAID PROCEEDINGS WERE TAKEN BEFORE ME AT THE
TIME AND PLACE SET FORTH AND WAS TAKEN DOWN BY ME IN
SHORTHAND AND THEREAFTER REDUCED TO COMPUTERIZED
TRANSCRIPTION, UNDER MY DIRECTION; AND I HEREBY DECLARE
THAT TO THE BEST OF MY KNOWLEDGE THE FOREGOING
TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPTION OF MY
SHORTHAND NOTES SO TAKEN.

DATED THIS 8TH DAY OF MAY, 2006.



_____
DONNA L. FOSTER,
RPR, CSR



1  Donald A. English, Esq.   (State Bar No. 115569)
   Christy I. Yee, Esq.     (State Bar No. 166238)

2  ENGLISH & GLOVEN
   A Professional Corporation

3  550 West "C" Street, Suite 1800
   San Diego, California 92101

4  Telephone: (619) 338-6610
   Facsimile: (619) 338-6657

5

6  Attorneys for Defendant
   Gabriel, Roeder, Smith & Company

7

8          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9               **FOR THE COUNTY OF SAN DIEGO**

| | |
|---|---|
| 10  THE CITY OF SAN DIEGO, | Case No. GIC 852419 |
| 11 | **NOTICE OF RULING ON DEFENDANT** |
|         Plaintiff, | **GABRIEL, ROEDER, SMITH &** |
| 12 | **COMPANY'S MOTION FOR SEVERANCE** |
| | **AND SEPARATE TRIAL OF PLAINTIFF'S** |
| 13  v. | **FIRST AMENDED COMPLAINT FOR** |
| | **DAMAGES AND INJUNCTIVE RELIEF** |
| 14 | **AGAINST CALLAN ASSOCIATES, INC.** |
| 15  CALLAN ASSOCIATES, INC., GABRIEL, ROEDER, SMITH & COMPANY, and DOES | |
| 16  1 through 100, inclusive, | Date: March 27, 2006 |
| | Time: 10:30 a.m. |
| 17 | Judge: Kevin A. Enright |
| | Dept: 72 |
| 18        Defendants. | |
| | Complaint Filed:   August 15, 2005 |
| 19 | Trial Date:       Not Set |

20     TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

21     NOTICE IS HEREBY GIVEN THAT on March 27, 2006 in Department 72 of the above-entitled

22  Court, the Honorable Kevin A. Enright granted Gabriel, Roeder, Smith & Company's motion for

23  severance and separate trial of plaintiff's first amended complaint for damages and injunctive relief

24  against Callan Associates, Inc. Attached hereto as Exhibit "A" is a copy of the Court's final ruling. As

25  such, the cases and causes of action against each defendant are severed for all purposes and shall be

26  treated as separate matters.

27  ///

28  ///

1     PLEASE TAKE FURTHER NOTICE THAT the case number for the action entitled <u>The City of</u>

2  <u>San Diego v. Gabriel, Roeder, Smith & Company</u> will now be listed as "GIC 852419 (SEVERED)."

3

4  Dated: March _28_, 2006                    ENGLISH & GLOVEN
                                               A Professional Corporation
5

6                                             By: _Donald A English._

7                                                  Donald A. English
                                                   Christy I. Yee
                                               Attorneys for Defendant
8                                              Gabriel, Roeder, Smith & Company

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Return to Request Ruling

The following is a TENTATIVE ruling for 3/24/2006,
Department 72, the Honorable Kevin A. Enright presiding.

## Case Number GIC852419

Defendant Gabriel, Roeder, Smith & Company's Motion for Severance and Separate Trial of Defendant Callan Associates' alleged Professional Negligence and Unfair Competition is granted pursuant to CCP 1048(A) and (b) on the ground it promotes the statutory goals of efficiency, convenience, and judicial economy.

## Oral Argument Policy

This ruling is a tentative ruling pursuant to California Rule of Court 324. Unless modified or vacated by oral argument, the tentative ruling will become the final order of the Court. [See California Rule of Court 324] Parties appearing for oral argument must appear on the date and at the time noticed for the hearing. Failure to appear will be deemed waiver of oral argument. Unless otherwise ordered, no further order is to be prepared after the hearing. The prevailing party is to prepare and serve notice of this ruling pursuant to CCP Section 1019.5.

*This ruling file posted to web server: 3/23/2006 3:28:54 PM*
*This ruling file retrieved by browser: 3/27/2006 4:05:47 PM*

Donald A. English, Esq.     (State Bar No. 115569)
Christy I. Yee, Esq.        (State Bar No. 166238)
ENGLISH & GLOVEN
A Professional Corporation
550 West "C" Street, Suite 1800
San Diego, California 92101
Telephone:  (619) 338-6610
Facsimile:  (619) 338-6657

Attorneys for Defendant
Gabriel, Roeder, Smith & Company

1
2
3
4
5
6
7

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| THE CITY OF SAN DIEGO, | Case No. GIC 852419 |
| Plaintiff, | **PROOF OF SERVICE BY MAIL** |
| v. | |
| CALLAN ASSOCIATES, INC., GABRIEL, ROEDER, SMITH & COMPANY; and DOES 1 through 100, inclusive, | Judge: Kevin A. Enright<br>Dept:  72 |
| Defendants. | Complaint Filed: August 15, 2005 |

I, Antoniette Jennings, declare that:  I am over the age of 18 years and not a party to the case; I am employed in the County of San Diego, California, where the mailing occurs; and my business address is 550 West "C" Street, Suite 1800, San Diego, California 92101.

On March 28, 2006, I served the following document(s):

> **Notice of Ruling on Defendant Gabriel, Roeder, Smith & Company's Motion for Severance and Separate Trial of Plaintiff's First Amended Complaint for Damages and Injunctive Relief Against Callan Associates, Inc.**

by placing a true copy of each document in a separate envelope addressed to each addressee, respectively, as follows:

1    Michael J. Aguirre, Esq.           Attorneys for Plaintiff
2    Donald McGrath, II, Esq.        City of San Diego
     Office of the City Attorney
3    1200 Third Avenue, Suite 110
     San Diego, CA 92101-4100
4    Telephone:    619-533-5800
     Facsimile:     619-533-5856

5    Bryan C. Vess, Esq.             Attorney for Plaintiff
     402 West Broadway, 29th Floor    City of San Diego
6    San Diego, CA 92101
     Telephone:    619-795-4300
7    Facsimile:     619-795-4301

8    Dan L. Stanford, Esq.          Attorneys for Plaintiff
     Wendy E. Davisson, Esq.      City of San Diego
9    Stanford and Associates
     402 West Broadway, 29th Floor
10   San Diego, CA 92101
     Telephone:    619-696-6160
11   Facsimile:     619-531-0853

12   Paul A. Renne, Esq.           Attorneys for Defendant
     Charles M. Schaible, Esq.     Callan Associates, Inc.
13   Cooley Godward LLP
     101 California Street, 5th Floor
14   San Francisco, CA 94111-5800
     Telephone:    415-693-2000
15   Facsimile:     415-693-2222

16       I then sealed each envelope and, with postage thereon fully prepaid, placed each for deposit in the

17 United States Postal Service, this same day, at my business address shown above, following ordinary

18 business practices. I am readily familiar with the business practices for collecting and processing of

19 correspondence and pleadings for mailing with the United States Postal Service; and that the

20 correspondence and pleadings shall be deposited with the United States Postal Service this same day in

21 the ordinary course of business.

22       I declare under penalty of perjury under the laws of the State of California that the foregoing is

23 true and correct.

24

25 Dated: March 28, 2006                         _Antoniette Jennings_

26

27

28

DONALD A. ENGLISH
MARK M. GLOVEN
CHRISTY I. YEE
JEFFREY E. FLYNN
MELISSA S. PROVENCHER
EMILY L. GRANT

# ENGLISH & GLOVEN

**A PROFESSIONAL CORPORATION**

ATTORNEYS AT LAW

550 WEST "C" STREET, SUITE 1800

SAN DIEGO, CALIFORNIA 92101

TELEPHONE: (619) 338-6610

FACSIMILE: (619) 338-6657

E-MAIL: firm@englishpc.com

April 6, 2006

<u>Via Facsimile & U.S. Mail</u>

Michael J. Aguirre, Esq.
Donald A. McGrath, II, Esq.
Office of the City Attorney
1200 Third Avenue, Suite 1100
San Diego, CA 92101-4100

Re:  <u>Gabriel, Roeder, Smith & Company adv. The City of San Diego</u>
San Diego Superior Court Case No. GIC 852419
Our File No. 2325.05624

Gentlemen:

Please be advised that the <u>City of San Diego v. Gabriel, Roeder, Smith & Company</u>, San Diego Superior Court Case No. GIC 852419 - "SEVERED" has been removed to federal court. Enclosed is a conformed copy of the notice of removal without exhibits. The notice of removal with the exhibits will be sent by mail.

Very truly yours,

Donald A. English
ENGLISH & GLOVEN
A Professional Corporation

DAE:arj
Enclosures

cc:  Gabriel, Roeder, Smith & Company

Donald A. English, Esq.      (State Bar No. 115569)
Christy I. Yee, Esq.      (State Bar No. 166238)
ENGLISH & GLOVEN
A Professional Corporation
550 West "C" Street, Suite 1800
San Diego, California 92101
Telephone: (619) 338-6610
Facsimile: (619) 338-6657

Attorneys for Defendant
Gabriel, Roeder, Smith & Company

FILED

APR 0 5 2006

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

THE CITY OF SAN DIEGO,                )   Case No. 06 CV 0792 WQH FJR
                                      )
              Plaintiff,              )   **NOTICE OF REMOVAL OF CIVIL**
                                      )   **ACTION TO UNITED STATES DISTRICT**
       v.                             )   **COURT UNDER 28 U.S.C. § 1441(b)**
                                      )   **(DIVERSITY)**
GABRIEL, ROEDER, SMITH & COMPANY, )
a Michigan corporation; and DOES 1 through )
100, inclusive,                       )
                                      )
              Defendants.             )
                                      )

TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN

DISTRICT OF CALIFORNIA:

PLEASE TAKE NOTICE that defendant Gabriel, Roeder, Smith & Company ("GRS") hereby

removes to this Court the state court action described below.

1.      On August 15, 2005, an action was commenced in the Superior Court of California,

County of San Diego, entitled The City of San Diego, Plaintiff v. Callan Associates, Inc. and Gabriel,

Roeder, Smith & Company, Defendants, Case No. GIC852419.

///

///

///

///

///

188

2. On August 19, 2005, service of the summons and complaint was made on GRS. GRS is a corporation incorporated under the laws of the State of Michigan, with its principal place of business in the State of Michigan. At the time of service on GRS, the action also included as an additional defendant, Callan Associates, Inc., a corporation incorporated under the laws of the State of California, with its principal place of business in the State of California. Plaintiff is the City of San Diego. Attached as Exhibit "A" is a copy of all pleadings served on GRS.

3. On March 27, 2006, the Superior Court ordered the case against GRS and Callan Associates, Inc. severed for all purposes. On March 28, 2006, GRS served and filed a Notice of Ruling incorporating the March 27, 2006 order severing the cases for all purposes. Attached as Exhibit "B" and incorporated by reference is a copy of the Notice of Ruling and the court order severing the actions. As of March 27, 2006, complete diversity of citizenship arose in the action against GRS.

4. The above-described action is a civil action of which this Court has original jurisdiction under the provisions of Title 28, Section 1332 of the United States Code, and is one that may be removed to this Court by GRS, pursuant to Title 28, Section 1441 of the United States Code, in that it is a civil action wherein the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

5. Plaintiff The City of San Diego, at the time the action was commenced, and at the time of the order granting severance, was and still is a citizen of the State of California. Defendant GRS, at the time this action was commenced, was and still is a corporation incorporated under the laws of the State of Michigan, with its principal place of business in the State of Michigan, and was not and is not incorporated under the laws of the State of California, wherein this action was brought. Defendant GRS is the only defendant in this severed case following the order severing this action from the other defendant.

6. Defendant GRS files this notice of removal within 30 days of complete diversity of citizenship under Title 28, Section 1446 of the United States Code. Attached as Exhibit "C" are copies of other pleadings and papers served and filed regarding GRS in this action.

///

///

2

1    7.    Accordingly, defendant GRS prays that this action now be removed from the Superior

2    Court of California, County of San Diego, to the United States District Court, Southern District of

3    California. Please note that only the severed case against GRS (GIC849051 - "SEVERED") is being

4    removed.

5

6    Dated: April _5_, 2006                    ENGLISH & GLOVEN
                                               A Professional Corporation
7

8                                              By: _Donald A English_
                                                   Donald A. English
9                                                  Christy I. Yee
                                               Attorneys for Defendant
10                                             Gabriel, Roeder, Smith & Company

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                  3

MICHAEL A. CONGER, ESQUIRE  (State Bar #147882)
LAW OFFICES OF MICHAEL A. CONGER
16236 San Dieguito Road, Suite 4-14
Mailing:  P.O. Box 9374
Rancho Santa Fe, California 92067
Telephone: (858) 759-0200
Facsimile:  (858) 759-1906

Attorneys for Plaintiffs JAMES F. GLEASON, and
DAVID W. WOOD, individually, and
on behalf of all others similarly situated

NOTE: Jury Trial Demand on Last page.

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| JAMES F. GLEASON and DAVID W. WOOD, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAN DIEGO CITY EMPLOYEES' RETIREMENT SYSTEM and CITY OF SAN DIEGO, FREDERICK PIERCE, IV, JOHN TORRES, JOHN CASEY, DAVID CROW, MARY VATTIMO, RON SAATHOFF, TERRI WEBSTER, SHARON WILKINSON, DICK VORTMANN, RAY GARNICA, and DOES 1-100,<br><br>Defendants. | CASE NO: GIC 803779<br><br>CLASS ACTION COMPLAINT FOR DECLARATORY RELIEF [C.C.P. §1060] AND BREACH OF FIDUCIARY DUTY |

## THIS IS A CLASS ACTION LAWSUIT.

1.     This is a class action lawsuit brought by the plaintiffs, James F. Gleason and

David W. Wood.  The plaintiffs bring this suit on their own behalf and for all those other

similarly situated.  The definition of the class is set forth in paragraph 35 of this complaint.

/ / /

/ / /

1

Class Action Complaint for Declaratory Relief [C.C.P. §1060] and Breach of Fiduciary Duty

## GENERAL ALLEGATIONS

2.     This class action is brought pursuant to section 382 of the California Code of Civil Procedure. The monetary damages sought by the plaintiffs exceed the minimum jurisdictional limits of the Superior Court. The monetary damages sought on behalf of each and every member of the class and as aggregate class damages exceed those jurisdictional limits as well.

3.     Venue is proper in San Diego because defendant San Diego City Employees' Retirement System ("CERS") is an entity doing business in San Diego County. Moreover, all acts relevant to this case occurred in San Diego County, California.

4.     The plaintiffs in this action are former employees of the City of San Diego who have acquired vested contractual rights to receive benefits from CERS.

5.     CERS is an entity established in 1927 by the City of San Diego, in accordance with California Constitution article XVI, section 17, San Diego City Charter articles IX and X, sections 141 to 148.1, and San Diego Municipal Code sections 24.0100, *et seq*. CERS provides retirement, health insurance, disability and death benefits to its members.

6.     The City of San Diego ("the City") is a charter city pursuant to California Constitution article XI, section 5.

7.     Frederick Pierce, IV is an individual member of the CERS board of administration.

8.     John Torres is an individual member of the CERS board of administration.

9.     John Casey is an individual member of the CERS board of administration.

10.    David Crow is an individual member of the CERS board of administration.

11.    Mary Vattimo is an individual member of the CERS board of administration.

12.    Ron Saathoff is an individual member of the CERS board of administration.

13.    Terri Webster is an individual member of the CERS board of administration.

14.    Sharon Wilkinson is an individual member of the CERS board of administration.

Class Action Complaint for Declaratory Relief [C.C.P. §1060] and Breach of Fiduciary Duty

15. Dick Vortmann is an individual member of the CERS board of administration.

16. Ray Garnica is an individual member of the CERS board of administration. Defendants Pierce, Torres, Casey, Crow, Vattimo, Saathoff, Webster, Wilkinson, Vortmann and Garnica will be collectively referred to as the "individual defendants."

17. The true names or capacities, whether individual, corporate, associate, or otherwise, of defendants DOES 1 to 100, inclusive, are unknown to plaintiffs, who therefore sue said defendants by such fictitious names.

18. Plaintiffs are informed and believe and thereon allege that each of the defendants designated herein as a DOE is responsible in some manner for the events and happenings herein referred to, and caused injury and damages proximately thereby to plaintiffs as herein alleged. Plaintiffs will seek leave of court to amend this complaint to set forth the true names and capacities of such named defendants when their identities become known to them.

19. Plaintiffs are informed and believe and thereon allege that each defendant named in this action, including DOE defendants, at all relevant times, was the agent, ostensible agent, servant, employee, representative, assistant, joint venturer, and/or co-conspirator of each of the other defendants, and was at all times acting within the course and scope of his, her, or its authority as agent, ostensible agent, servant, employee, representative, joint venturer, and/or co-conspirator, and with the same authorization, consent, permission or ratification of each of the other defendants.

20. CERS administers trust funds which are used to pay the various retirement, health insurance, disability and death benefits to which its members are entitled.

21. Plaintiffs were employees of the City of San Diego and are members of CERS, who have paid into, earned, and acquired vested contractual rights to various CERS' benefits.

22. "The assets of a public pension or retirement system are trust funds and [are] held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system."

Class Action Complaint for Declaratory Relief [C.C.P. §1060] and Breach of Fiduciary Duty

1 | (Cal. Const., art. XVI, § 17, subd. (a).)

2 |      23.    As the California Supreme Court explained in *Hittle v. Santa Barbara County*

3 | *Employees Retirement Assn.*, 39 Cal.3d 374 (1985), the members of such a retirement board are

4 | voluntary trustees, within the meaning of Civil Code sections 2216 and 2222, and are charged

5 | with a fiduciary relationship to the beneficiaries of the trust.

6 |      24.    "A retirement board's duty to its participants and their beneficiaries shall take

7 | precedence over any other duty." (Cal. Const., art. XVI, § 17, subd. (b).)

8 |      25.    According to City Charter article IX, section 143:

9-14 | "The retirement system . . . shall be conducted [as] a contributory plan, the City contributing jointly with the employees affected thereunder. Employees shall contribute according to the actuarial tables adopted by the Board of Administration . . . . The City shall contribute annually an amount substantially equal to that required of employees for normal retirement allowances, as certified by the actuary, but shall not be required to contribute in excess of that amount, except in the case of financial liabilities accruing under any new retirement plan or revised retirement plan because of the past service of the employees."

15 |      26.    From at least October 25, 1962 until November 18, 2002, San Diego Municipal

16 | Code section 24.0801 provided in part:

17 | **"City's Contribution**

18-20 | Commencing July 1, 1954 the City shall contribute to the Retirement Fund in respect to members a percentage of earnable compensation as determined by the System's Actuary pursuant to the annual actuarial evaluation required by Section 24.0901. . . ."

21 |      27.    On November 18, 2002, the City Council amended San Diego Municipal Code

22 | section 24.0801 to provide:

23 | **"City's Contribution:**

24-27 | The City will contribute to the Retirement Fund, on behalf of Members employed by the City, the amounts agreed to in the governing Memorandum of Understanding between the City and the Board. The Actuary separately determines the City's contributions for General Members, Safety Members and Elected Officers. All deficiencies that occur due to the adoption of any

28 |

4

1   Retirement Ordinances must be amortized over a period of thirty
    years or less. The portion of the contribution that the City
2   designates for the 401(h) Fund or the Health Trust, to be used for
    retiree health benefits under Division 12, is not a deficiency within
3   the meaning of this section."

4   28.   San Diego Municipal Code section 24.1111 provides:

5         **"City Contributions**

6         The City shall contribute to the Retirement Fund a percentage of
          compensation earnable as determined by the System's Actuary
7         pursuant to the annual actuarial evaluation. The required City
          contributions shall be determined separately by the Actuary for
8         General Members and for Safety Members.

9         All deficiencies which may accrue must be amortized over a
          period of thirty years or less."

10

11  29.   The funding method adopted by CERS and the individual defendants is not one of

12  the six approved funding methods permitted under the rules set forth by the Governmental

13  Accounting Standards Board.

14  30.   Beginning with its fiscal year from July 1, 1996 to June 30, 1997, and in each and

15  every fiscal year since, the City has failed and refused to contribute the amount to CERS as

16  required by City Charter article IX, section 143. The City's cumulative contribution shortfall

17  currently exceeds $50 million, without interest.

18  31.   Beginning with its fiscal year July 1, 1996 to June 30, 1997, and in each and

19  every fiscal year since, the City has failed and refused to contribute the amount to CERS

20  required by San Diego Municipal Code section 24.0801.

21  32.   Beginning with its fiscal year July 1, 1996 to June 30, 1997, and in each and

22  every fiscal year since, the City has failed and refused to contribute the amount to CERS

23  required by San Diego Municipal Code section 24.1111.

24  33.   In approximately February 2002, a "Blue Ribbon Committee on City of San

25  Diego Finances," convened by City Mayor Dick Murphy, concluded that "[t]he City is not

26  paying out of its current year's budget the full cost being incurred by its current workforce for

27

28  _____5_____

1 their future pension and retiree health benefits. As a result, a portion of the cost of today's City

2 workforce will be paid by future year's taxpayers."

3     34. As the result of the City's violations of the City Charter and San Diego Municipal

4 Code sections 24.0801 and 24.1111, and the mismanagement and breaches of fiduciary duties of

5 CERS and the individual defendants, CERS' actuary confirmed that as of June 30, 2002, the

6 retirement fund is now less than 68% funded, with an unfunded accrued liability of $720 million.

7     35. CERS' actuary has projected that by 2009, CERS will be only 52% funded, and

8 the City will owe approximately $2.8 billion to CERS, with an annual City budget expense of

9 more than $250 million (more than 5 times the actuarially required contribution for the fiscal

10 year ending June 30, 2001).

11 **CLASS ACTION ALLEGATIONS**

12     36. This action is brought under California Code of Civil Procedure section 382.

13     37. The plaintiff class consists of all those persons who are no longer employed by

14 the City and are entitled to receive benefits from CERS.

15     38. This action is properly brought and maintained as a class action because:

16     (a)   the questions and issues of law and fact raised are of common and general

17     interest affecting the class;

18     (b)   the plaintiff class is estimated to contain in excess of 5,000 individuals

19     and it is impractical to bring all members of the class individually before

20     the court;

21     (c)   the questions of law or fact common to the class are substantially similar

22     and predominate over those questions that affect individual members.

23     These common questions include:

24     (i)   whether the City has violated the City Charter by failing to fund its

25     retirement plan as required by Article IX, section 143 of the City

26     Charter;

27

28

6

| | | |
|---|---|---|
| (ii) | | whether the City has violated San Diego Municipal Code section 24.0801; |
| (iii) | | whether the City has violated San Diego Municipal Code section 24.1111; |
| (iv) | | whether the CERS board and any of the individual defendants have breached their fiduciary duties by allowing the City to underfund CERS; |
| (v) | | whether the underfunding of CERS has rendered the trust fund actuarially unsound; |
| (vi) | | whether the underfunding of CERS has unconstitutionally impaired plaintiffs' vested contractual rights; |
| (vii) | | what are the appropriate remedies for violations of the City Charter, of the San Diego Municipal Code, of breaches of fiduciary and constitutional duties and of impairment of contract rights; |
| (viii) | | whether the plaintiff class is entitled to money damages; |
| (ix) | | whether the plaintiff class is entitled to prejudgment interest; and |
| (x) | | whether the plaintiff class is entitled to attorney's fees. |

(d)   the claims of the representative plaintiffs are typical of those of the class;

(e)   the representative plaintiffs will fairly and adequately protect the interests of the class, have no interests which conflict with the class, and have retained attorneys experienced in the prosecution of class and multi-plaintiff litigation to represent the class herein;

(f)   the prosecution of separate actions by individual members of the class will create a risk of:

(i)   inconsistent or varying adjudications with respect to individual

members of the class which would establish incompatible
standards of conduct for defendants; or

(ii)    adjudications with respect to some individual members which
would, as a practical matter, be dispositive of the interests of the
other members not parties to the adjudications; or

(iii)    adjudications which would substantially impair or impede the
ability of individual members to protect their interests;

(g)    a plaintiff class action is superior to other available methods for
the fair and efficient adjudication of the claims presented in this
complaint, and will prevent the undue financial, administrative and
procedural burdens on the parties and on this Court which
individual litigants and litigations would impose.

39.    Proof of a common or single practice by the defendants will establish the right of each of the members of the plaintiff class to recover on the causes of actions herein alleged.

40.    All of the plaintiffs were subject to a systematic course and pattern of practice and were thereby treated by the defendants in a similar manner, as is specifically alleged elsewhere in this complaint.

41.    The plaintiff class is entitled in common to a specific fund with respect to the monies paid by or on the behalf of the plaintiff class to the defendants for services in connection with the legal representation of plaintiff class. The plaintiff class is entitled in common to damages for which the defendants are liable. This action is brought for the benefit of the entire class and will result in the creation of a common fund. The representative plaintiffs will expend efforts and expense to prevail in this action from which other plaintiffs will derive benefits. This action will result in the conferral of substantial benefits, of both a pecuniary and a non-pecuniary nature.

42.    Defendant CERS and the individual defendants owed and owe plaintiffs and all

Class Action Complaint for Declaratory Relief [C.C.P. §1060] and Breach of Fiduciary Duty

1  CERS participants a fiduciary duty to adequately disclose the City's violations and the

2  actuarially unsound underfunding of CERS as described in this complaint.  These breaches and

3  the applicable facts and circumstances have been concealed from the plaintiffs by CERS and the

4  individual defendants.  Because those duties, including the duty of disclosure, have been

5  breached, any applicable statute of limitations has been tolled.

6  <u>**FIRST CAUSE OF ACTION - DECLARATORY RELIEF**</u>

7  **(Against All Defendants and DOES 1-25)**

8      43.    Plaintiffs incorporate by reference and reallege paragraph 1 through 42 as though

9  fully set forth herein.

10     44.    An actual and justiciable controversy has arisen, and now exists, between

11  plaintiffs, on the one hand, and the defendants, on the other hand, as to:

12          (a)    whether the City has violated the City Charter by failing to fund its

13                 retirement plan as required by article IX, section 143 of the City Charter;

14          (b)    whether the City has violated San Diego Municipal Code section 24.0801

15                 by failing to fund its retirement plan as required; and

16          (c)    whether the City has violated San Diego Municipal Code section 24.1111

17                 by failing to fund its retirement plan as required.

18     45.    Plaintiffs contend that:

19          (a)    the City has violated the City Charter by failing to fund its retirement plan

20                 as required by article IX, section 143 of the City Charter;

21          (b)    the City has violated San Diego Municipal Code section 24.0801 by

22                 failing to fund its retirement plan as required; and

23          (c)    the City has violated San Diego Municipal Code section 24.1111 by

24                 failing to fund its retirement plan as required.

25     46.    Pursuant to California Code of Civil Procedure section 1060, plaintiffs desire

26  judicial determinations that:

27

28                                          9

(a)   the City has violated the City Charter by failing to fund its retirement plan as required by article IX, section 143 of the City Charter;

(b)   the City has violated San Diego Municipal Code section 24.0801 by failing to fund its retirement plan as required; and

(c)   the City has violated San Diego Municipal Code section 24.1111 by failing to fund its retirement plan as required.

47.   Such judicial determinations are necessary and appropriate at this time so that the parties can ascertain their respective rights and duties in order to avoid the potential for a multiplicity of costly judicial challenges by individual members of CERS.

48.   There are no administrative remedies available to plaintiffs to compel the relief sought herein. Therefore, plaintiffs, and each of them, have exhausted all available administrative remedies.

49.   Plaintiffs, and each of them and the members they represent, have no plain, speedy or adequate remedy at law.

50.   The prosecution of this action, if successful, will result in the enforcement of an important right affecting the public interest in that benefits, in the form of substantial additional sums being available to ensure vested CERS benefits are conferred, and to save future taxpayers from an enormous debt created by past violations. The necessity and financial burden of private enforcement of the rights involved in this action are such as to make an award of attorney's fees appropriate and attorney's fees should not, in the interest of justice, be imposed on plaintiffs. As a result, plaintiffs are entitled to an award of attorney's fees under section 1021.5 of the California Code of Civil Procedure.

## SECOND CAUSE OF ACTION - DECLARATORY RELIEF

### (Against All Defendants and DOES 26-50)

51.   Plaintiffs incorporate by reference and reallege paragraph 1 through 50 as though fully set forth herein.

Class Action Complaint for Declaratory Relief [C.C.P. §1060] and Breach of Fiduciary Duty

52. An actual and justiciable controversy has arisen, and now exists, between plaintiffs, on the one hand, and the defendants, on the other hand, as to:

    (a) whether the CERS board and any of the individual defendants have breached their fiduciary duties by allowing the City to underfund CERS;

    (b) whether the underfunding of CERS has rendered the trust fund actuarially unsound; and

    (c) whether the underfunding of CERS has unconstitutionally impaired plaintiffs' vested contractual rights.

53. Plaintiffs contend that:

    (a) the CERS board of administration and each of the individual defendants have breached their fiduciary duties by allowing the City to underfund CERS;

    (b) underfunding of the CERS' trust fund has rendered the trust fund actuarially unsound; and

    (c) the underfunding of CERS' trust fund has unconstitutionally impaired plaintiffs' vested contractual rights.

54. Pursuant to California Code of Civil Procedure section 1060, plaintiffs desire judicial determinations that:

    (a) the CERS board of administration and each of the individual defendants have breached their fiduciary duties by allowing the City to underfund CERS;

    (b) underfunding of the CERS' trust fund has rendered the trust fund actuarially unsound; and

    (c) the underfunding of CERS' trust fund has unconstitutionally impaired plaintiffs' vested contractual rights.

55. Such judicial determinations are necessary and appropriate at this time so that the

1  parties can ascertain their respective rights and duties in order to avoid the potential for a

2  multiplicity of costly judicial challenges by individual members of CERS.

3      56.    There are no administrative remedies available to plaintiffs to compel the relief

4  sought herein.  Therefore, plaintiffs, and each of them, have exhausted all available

5  administrative remedies.

6      57.    Plaintiffs, and each of them and the members they represent, have no plain,

7  speedy or adequate remedy at law.

8      58.    The prosecution of this action, if successful, will result in the enforcement of an

9  important right affecting the public interest in that benefits, in the form of substantial additional

10  sums being available to ensure vested CERS benefits are conferred, and to save future taxpayers

11  from an enormous debt created by past violations.  The necessity and financial burden of private

12  enforcement of the rights involved in this action are such as to make an award of attorney's fees

13  appropriate and attorney's fees should not, in the interest of justice, be imposed on plaintiffs.  As

14  a result, plaintiffs are entitled to an award of attorney's fees under section 1021.5 of the

15  California Code of Civil Procedure.

16              **THIRD CAUSE OF ACTION - DECLARATORY RELIEF**

17                  **(Against All Defendants and DOES 51-75)**

18      59.    Plaintiffs incorporate by reference and reallege paragraphs 1 through 58 as though

19  fully set forth herein.

20      60.    An actual and justiciable controversy has arisen, and now exists, between

21  plaintiffs, on the one hand, and the defendants, on the other hand, as to what are the appropriate

22  remedies for violations of the City Charter, of the San Diego Municipal Code, of breaches of

23  fiduciary and constitutional duties and of impairment of contractual rights.

24      61.    Plaintiffs contend that they are entitled to appropriate remedies for violations of

25  the City Charter, of the San Diego Municipal Code, of breaches of fiduciary and constitutional

26  duties and of impairment of contract rights.

27

28                                    12

1    62.    Pursuant to California Code of Civil Procedure section 1060, in addition to a

2    declaration of their rights, plaintiffs request the following other relief: (a) restitution by the City

3    of all amounts owed to the CERS' trust fund as a result of the City's past violations of law; (b)

4    an injunction prohibiting the City from unlawful underfunding of the CERS' trust fund in the

5    future; (c) money damages to the plaintiff class for retirement benefits which could have and

6    would have been paid but for the defendants' unlawful conduct; (d) money damages against the

7    individual defendants for any harm suffered by the CERS' trust fund as a result of their breaches

8    of fiduciary duty; and (e) removal of the individual defendants from their offices as trustees of

9    the CERS board of administration.

10    63.    Such judicial determinations are necessary and appropriate at this time so that the

11    parties can ascertain their respective rights and duties in order to avoid the potential for a

12    multiplicity of costly judicial challenges by individual members of CERS.

13    64.    There are no administrative remedies available to plaintiffs to compel the relief

14    sought herein. Therefore, plaintiffs, and each of them, have exhausted all available

15    administrative remedies.

16    65.    Plaintiffs, and each of them and the members they represent, have no plain,

17    speedy or adequate remedy at law.

18    66.    The prosecution of this action, if successful, will result in the enforcement of an

19    important right affecting the public interest in that benefits, in the form of substantial additional

20    sums being available to ensure vested CERS benefits are conferred, and to save future taxpayers

21    from an enormous debt created by past violations. The necessity and financial burden of private

22    enforcement of the rights involved in this action are such as to make an award of attorney's fees

23    appropriate and attorney's fees should not, in the interest of justice, be imposed on plaintiffs. As

24    a result, plaintiffs are entitled to an award of attorney's fees under section 1021.5 of the

25    California Code of Civil Procedure.

26    / / /

27

28

Class Action Complaint for Declaratory Relief [C.C.P. §1060] and Breach of Fiduciary Duty

## FOURTH OF ACTION - BREACH OF FIDUCIARY DUTY

### (Against CERS, the Individual Defendants, and DOES 76-100 Only)

67.     Plaintiffs incorporate by reference and reallege paragraph 1 through 66 as though fully set forth herein.

68.     On or about November 15, 2002, the individual defendants cast votes as members of the CERS board of administration allowing the City to intentionally underfund CERS in violation of (a) article I, section 10 of the United States Constitution, (b) article XIV, section 17, and article I, section 10 of the California Constitution, and (c) article IX, section 143 of the City Charter.

69.     As more particularly alleged above in paragraph 22, "[t]he assets of a public pension or retirement system are trust funds and [are] held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system." (Cal. Const., art. XVI, § 17, subd. (a).)

70.     As more particularly alleged above in paragraph 23, the members of CERS board are voluntary trustees, within the meaning of Civil Code sections 2216 and 2222, and are charged with a fiduciary relationship to the beneficiaries of the trust.

71.     As more particularly alleged above in paragraph 24, "[a] retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty." (Cal. Const., art. XVI, § 17, subd. (b).)

72.     The primary fiduciary duty of CERS and the individual defendants, is to administer CERS is such a way as to ensure compliance with the both legal and actuarially sound funding requirements.

73.     CERS and each of the individual defendants breached their fiduciary duty to the individuals represented by plaintiffs, and each of them, as set forth above, by failing to administer the System for the exclusive and primary purpose of providing benefits to members

Class Action Complaint for Declaratory Relief [C.C.P. §1060] and Breach of Fiduciary Duty

1  of the System and their beneficiaries.

2  **WHEREFORE, Plaintiffs pray that:**

3      1.      Following a duly noticed hearing, this Court render a judicial determination on

4  plaintiffs' First Cause of Action that:

5              (a)      the City has violated the City Charter by failing to fund its retirement plan

6                       as required by article IX, section 143 of the City Charter;

7              (b)      the City has violated San Diego Municipal Code section 24.0801 by

8                       failing to fund its retirement plan as required; and

9              (c)      the City has violated San Diego Municipal Code section 24.1111 by

10                      failing to fund its retirement plan as required.

11     2       Following a duly noticed hearing, this Court render a judicial determination on

12 plaintiffs' Second of Action that:

13             (a)      the CERS board and each of the individual defendants have breached their

14                      fiduciary duties by allowing the City to underfund CERS;

15             (b)      underfunding of the CERS' trust fund has rendered the trust fund

16                      actuarially unsound; and

17             (c)      the underfunding of CERS' trust fund has unconstitutionally impaired

18                      plaintiffs' vested contractual rights.

19     3.      Following a duly noticed hearing, this Court grant the following additional relief

20 on plaintiffs' Third Cause of Action:

21             (a)      restitution by the City of all amounts owed to the CERS' trust fund as a

22                      result of the City's past violations of law;

23             (b)      an injunction prohibiting the City from unlawful underfunding of the

24                      CERS' trust fund in the future;

25             (c)      money damages to the plaintiff class for retirement benefits which could

26                      have and would have been paid but for the defendants' unlawful conduct;

27

28

Class Action Complaint for Declaratory Relief [C.C.P. §1060] and Breach of Fiduciary Duty

(d) money damages against the individual defendants for any harm suffered by the CERS' trust fund as a result of their breaches of fiduciary duty; and

(e) removal of the individual defendants from their offices as trustees of the CERS board of administration.

4. Following a duly noticed hearing on plaintiffs' Fourth Cause of Action:

(a) each individual defendant be ordered to redress their breach of trust by payment of money pursuant to California Probate Code section 16420, subdivision (a)(3); and

(b) each individual defendant be removed from the CERS board pursuant to California Probate Code section 16420, subdivision (a)(5).

5. This Court award plaintiffs their costs of suit herein.

6. This Court award plaintiffs their attorney reasonable attorney's fees in accordance with section 1021.5 of the California Code of Civil Procedure, and

7. This Court award such other and further relief as it deems necessary and proper.

Dated: January 16, 2003      **LAW OFFICES OF MICHAEL A .CONGER**

By: _____
Michael A. Conger
Attorney for Plaintiffs

Jury trial demanded

Class Action Complaint for Declaratory Relief [C.C.P. §1060] and Breach of Fiduciary Duty

1  Donald A. English, Esq.  (State Bar No. 115569)
   Christy I. Yee, Esq.  (State Bar No. 166238)
2  ENGLISH & GLOVEN
   A Professional Corporation
3  550 West "C" Street, Suite 1800
   San Diego, California 92101
4  Telephone: (619) 338-6610
   Facsimile: (619) 338-6657
5
   Attorneys for Defendant
6  Gabriel, Roeder, Smith & Company

7

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10
   THE CITY OF SAN DIEGO,                 )  Case No. 06CV 0792   WQH FJR
11                                        )
              Plaintiff,                  )  NOTICE OF REMOVAL OF CIVIL
12                                        )  ACTION TO UNITED STATES DISTRICT
       v.                                 )  COURT UNDER 28 U.S.C. § 1441(b)
13                                        )  (DIVERSITY)
   GABRIEL, ROEDER, SMITH & COMPANY, )
14 a Michigan corporation; and DOES 1 through )
   100, inclusive,                        )
15                                        )
              Defendants.                 )
16 _____

17      TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN

18 DISTRICT OF CALIFORNIA:

19      PLEASE TAKE NOTICE that defendant Gabriel, Roeder, Smith & Company ("GRS") hereby

20 removes to this Court the state court action described below.

21      1.      On August 15, 2005, an action was commenced in the Superior Court of California,

22 County of San Diego, entitled The City of San Diego, Plaintiff v. Callan Associates, Inc. and Gabriel,

23 Roeder, Smith & Company, Defendants, Case No. GIC852419.

24 ///

25 ///

26 ///

27 ///

28 ///

2. On August 19, 2005, service of the summons and complaint was made on GRS. GRS is a corporation incorporated under the laws of the State of Michigan, with its principal place of business in the State of Michigan. At the time of service on GRS, the action also included as an additional defendant, Callan Associates, Inc., a corporation incorporated under the laws of the State of California, with its principal place of business in the State of California. Plaintiff is the City of San Diego. Attached as Exhibit "A" is a copy of all pleadings served on GRS.

3. On March 27, 2006, the Superior Court ordered the case against GRS and Callan Associates, Inc. severed for all purposes. On March 28, 2006, GRS served and filed a Notice of Ruling incorporating the March 27, 2006 order severing the cases for all purposes. Attached as Exhibit "B" and incorporated by reference is a copy of the Notice of Ruling and the court order severing the actions. As of March 27, 2006, complete diversity of citizenship arose in the action against GRS.

4. The above-described action is a civil action of which this Court has original jurisdiction under the provisions of Title 28, Section 1332 of the United States Code, and is one that may be removed to this Court by GRS, pursuant to Title 28, Section 1441 of the United States Code, in that it is a civil action wherein the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

5. Plaintiff The City of San Diego, at the time the action was commenced, and at the time of the order granting severance, was and still is a citizen of the State of California. Defendant GRS, at the time this action was commenced, was and still is a corporation incorporated under the laws of the State of Michigan, with its principal place of business in the State of Michigan, and was not and is not incorporated under the laws of the State of California, wherein this action was brought. Defendant GRS is the only defendant in this severed case following the order severing this action from the other defendant.

6. Defendant GRS files this notice of removal within 30 days of complete diversity of citizenship under Title 28, Section 1446 of the United States Code. Attached as Exhibit "C" are copies of other pleadings and papers served and filed regarding GRS in this action.

///

///

2

7.    Accordingly, defendant GRS prays that this action now be removed from the Superior Court of California, County of San Diego, to the United States District Court, Southern District of California. Please note that only the severed case against GRS (GIC849051 - "SEVERED") is being removed.

Dated: April 5, 2006

ENGLISH & GLOVEN
A Professional Corporation

By: _Donald A English_
       Donald A. English
       Christy I. Yee
Attorneys for Defendant
Gabriel, Roeder, Smith & Company

3